# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

### NO. _____

---

### YOKAMON LANEAL HEARN,

**Petitioner,**

**v.**

### RICK THALER
#### Director, Texas Department of Criminal Justice Institutional Division,

**Respondent.**

---

---

# PETITION FOR A WRIT
# OF HABEAS CORPUS
### (Capital Case)

---

**NAOMI TERR**                          **RICHARD BURR**
**1927 Blodgett Street**                **PO Box 525**
**Houston, Texas 77004**                **Leggett, Texas 77350**
**(713) 222-7788**                      **(713) 628-3391**
**(713) 222-0260 (fax)**                **(713) 893-2500 (fax)**
NaomiTerr@aol.com                       dick.burrandwelch@gmail.com


**Counsel for Yokamon Laneal Hearn**

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Offense and Legal History of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ground for Habeas Corpus Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      Mr. Hearn Was Deprived of His Right to Effective Assistance of Counsel as
      Guaranteed by the Sixth and Fourteenth Amendments to the United States
      Constitution Due to Trial Counsel's Failure to Develop and Present Mitigating
      Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.      The Jury's Picture of Mr. Hearn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              1.      The State's Penalty-Phase Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              2.      The Penalty-Phase Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                     a.      Testimony About Yokamon's Mother . . . . . . . . . . . . . . . . . . . . . 13

                     b.      Testimony About Yokamon's Father . . . . . . . . . . . . . . . . . . . . . . 14

                     c.      Testimony About Yokamon's Maternal Grandfather . . . . . . . . . 14

                     d.      Testimony About Yokamon's Living Arrangements . . . . . . . . . . 15

                     e.      Testimony About Yokamon's Functioning in School . . . . . . . . . 16

                     f.      Testimony About Yokamon's Relationships With Peers . . . . . . 16

      B.      Trial Counsel's Inadequate Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              1.      Trial counsel's investigation into mitigating
                     evidence in the instant case was woefully
                     inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              2.      The defense's punishment-phase closing argument
                     reflects counsel's utter failure to develop and
                     present meaningful mitigating evidence . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.      The prevailing standard of care at the time of Yokamon's trial
        mandated that the defense conduct a thorough social history  . . . . . . . . 24

C.     A Truer Picture  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1.     Yokamon's parents were severely impaired and they
       failed to meet Yokamon's needs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       a.      Yokamon's mother was severely impaired  . . . . . . . . . . . . . . . 30

               i.      Long-term and severe substance abuse history  . . . . . . . 30

               ii.     Serious psychiatric history . . . . . . . . . . . . . . . . . . . . . . . 33

               iii.    Physical and sexual victimization  . . . . . . . . . . . . . . . . . 34

               iv.     Long history of complicated migraines  . . . . . . . . . . . . . 35

               v.      Inability to maintain stable employment  . . . . . . . . . . . . 35

       b.      Yokamon suffered neglect at the hands of his mother . . . . . . . . 36

       c.      Yokamon's father was also severely impaired . . . . . . . . . . . . . . 38

               i.      Extensive and serious criminal history  . . . . . . . . . . . . . 39

               ii.     Cognitive deficits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

               iii.    Substance abuse/violence history . . . . . . . . . . . . . . . . . . 40

       d.      Yokamon's father was unable to
               meet Yokamon's basic needs  even
               during limited visitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

2.     Yokamon's relatives were reluctant to care for Yokamon and  had
       difficulty meeting his basic needs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

3.     Yokamon had a mental health history that included
       suicidal ideations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

4.     Yokamon suffered brain damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

a. Yokamon was exposed to risk factors associated with brain dysfunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

 i. In-*utero* exposure to alcohol and serious complications at birth . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

 ii. Possible exposure to lead . . . . . . . . . . . . . . . . . . . . . . . 47

b. Neuropsychological testing confirms that Yokamon had brain damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

c. Yokamon exhibited life-long impairments in day-to-day functioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

 i. Substandard school performance . . . . . . . . . . . . . . . . . . 51

 ii. Impairments in receptive language skills . . . . . . . . . . . . 55

 iii. Inadequate social skills . . . . . . . . . . . . . . . . . . . . . . . . . 55

 iv. Dismal work history . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

D. There Is a Reasonable Likelihood That Effective Investigation of Mr. Hearn's Life Would Have Made a Difference in Mr. Hearn's Sentence . . . . . . . 57

Procedure:  Why the Court Should Treat This Petition as a First Petition Rather Than a Successive Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

I. *Martinez* Has Provided a Basis for Arguing "Cause" to Overcome the Procedural Default and for Arguing that This Petition Should Not Be Treated as "Second or Successive" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

 A. Mr. Hearn Can Now Show Cause for the Procedural Default . . . . . . . . . . . . . . . 65

 B. Mr. Hearn Can Now Show that This Petition Should Not Be Treated as "Second or Successive" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

 C. Response to Arguments that Respondent Is Likely to Make . . . . . . . . . . . . . . . 75

II. The Holding of *Martinez* Applies to Texas, Because State Habeas Proceedings Provide the First Occasion to Raise a Claim of Ineffective Assistance at Trial for All Ineffectiveness Claims Based, As Mr. Hearn's Claim Is, on Evidence Outside the Trial Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

iv

A. The Circumstances in Which the *Martinez* Rule Applies . . . . . . . . . . . . . . . . . . 79

B. *Martinez* Applies to Texas Because, Pursuant to Texas Law as Determined by the State's Highest Criminal Court, *Relief* on an Extra-Record Ineffective Assistance of Counsel Claim Is Only Available in Post-Conviction Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

C. The Unpublished and Non-Precedential Decisions of the Fifth Circuit Are Neither Dispositive Nor Grounded in an Accurate Understanding of Texas Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

III. Mr. Hearn Was Provided Ineffective Assistance by the Attorneys Appointed to Represent Him in His First State Habeas Proceeding Due to Their Failure to Investigate and Present the Ineffective Assistance of His Trial Attorneys . . . . . . . . . . 96

A. The Capital Habeas Statute, as Well as the Contemporaneous Standard of Care, Mandates That Capital Habeas Corpus Counsel Conduct a Thorough Extra-Record Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

1. Texas's capital habeas corpus statute *requires* that appointed counsel conduct an extra-record investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

2. The contemporaneous standard of care in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

B. How State Habeas Counsel Spent Their Time: They Conducted No Meaningful Investigation of Facts Outside the Record . . . . . . . . . . . . . . . . . . . 103

C. Ms. Hemphill and Mr. Swanda Provided Ineffective Assistance to Mr. Hearn in His State Habeas Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

IV. Representing Mr. Hearn in His First Federal Habeas Proceeding, Ms. Hemphill Repeated Her Ineffective Performance as State Habeas Counsel by Failing to Conduct Any Investigation of Ineffective Assistance by Mr. Hearn's Trial Attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Conclusion and Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

v

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner YOKAMON LANEAL HEARN, by undersigned counsel, respectfully requests

that the Court entertain this Petition for Writ of Habeas Corpus and grant a stay of his execution.

Mr. Hearn is confined at the Polunsky Unit of the Texas Department of Criminal Justice under

No. 999292, is under sentence of death, and is scheduled to be executed July 18, 2012.  Exhibit

1, Order Setting Execution Date.

### Introduction

When Governor Perry was running for the presidential nomination in 2011, he was asked

a question about Anthony Graves, a person who was wrongfully convicted and sentenced to

death in a capital murder case in 1994.  Graves was exonerated and freed from prison in 2010,

due to the prosecutor's dismissal of charges after his conviction had been set aside by the federal

courts.  The prosecutor's re-investigation of his case after he was sent back for a new trial

determined that Graves was innocent.  Asked whether he was troubled that an innocent man

could have spent sixteen years on death row in Texas, Governor Perry responded that

> the case showed that the state's criminal justice system is working. "I think we
> have a justice system that is working, and he's a good example of — you continue
> to find errors that were made and clear them up," Perry said, according to a report
> in the Lubbock Avalanche-Journal. "That's the good news for us, is that we are a
> place that continues to allow that to occur. So I think our system works well; it
> goes through many layers of observation and appeal, et cetera."

http://deathpenaltynews.blogspot.com/2011/08/rick-perrys-death-penalty-stance-may-be.html (8-

16-11).

Yokamon Hearn was tried for capital murder and sentenced to death in 1998.  Unlike

Anthony Graves, the criminal justice system has not worked for Mr. Hearn.  His trial lawyers

failed to undertake the most important investigation there is for the sentencing phase of his case,

the investigation into his life.  That investigation would have revealed a wealth of compelling mitigating evidence, including evidence that both of Yokamon's parents were severely impaired throughout his life; that starting as an infant, he was the victim of extreme neglect at the hands of his parents; that relatives who were portrayed at trial as unflinchingly committed and capable of caring for Yokamon were not so; that he experienced mental health problems, including suicidal ideations, as a young child and that his emotional problems stemmed from his parents' lack of parenting skills;  that he was exposed from the time he was conceived to risk factors commonly associated with brain damage; that he exhibited severe impairments in day-to-day functioning consistent with brain dysfunction; and that Yokamon, in fact, suffered from brain damage.

        Without investigating and finding this evidence, Mr. Hearn's trial lawyers were able to present only a superficial outline of mitigating evidence at his trial.  The story they presented was that Mr. Hearn's mother began to neglect him when she became addicted to crack, his father was in prison and thus not there for him, and in the wake of this his grandparents and other relatives pitched in to take care of him, and the death of his grandfather was particularly hard because he was the only father figure Yokamon knew.  The real story—of a mother who drank during her pregnancy with Yokamon and caused damage to his developing brain, who nevertheless loved him and tried to take care of him but always ended up neglecting and abandoning him during her lifelong struggle with addiction and mental illness, of a father who struggled during his own life because of mental retardation and uncontrolled episodes of violence which led to his never being involved in Yokamon's life, of relatives who could not commit to him and give him the love and guidance he so desperately needed, of his own growing depression and feelings of worthlessness and suicidal behaviors as he moved into adolescence, and of the daily additional insults to his

2

brain that growing up in lead-contaminated housing inflicted—would have gone below the surface of the little evidence Mr. Hearn's lawyers did present and helped the jury understand that Mr. Hearn's capital murder and other crimes he committed over the course of a week when he was nineteen years old were significantly the result of forces beyond his control. The jury would have been able to see that these crimes were the lashing out of a child whose deep anger was sometimes directed at himself through suicidal behaviors, sometimes—with terribly tragic consequences—at others.

When the criminal justice system fails in this way, there are ways for it, as Governor Perry explained, to "continue to find errors that were made and clear them up." Thus, when a criminal defense lawyer fails to provide effective assistance to his or her client at trial, the failings of the lawyer are supposed to be investigated and examined in state habeas corpus proceedings. Federal habeas corpus proceedings thereafter, in which the federal courts review the reasonableness of the state courts' decisions on issues like ineffective assistance of trial counsel, serve as an additional safeguard against errors at trial. The capacity of state and federal habeas corpus proceedings to "find errors and clear them up," however, depends on the lawyers who represent the convicted person in those proceedings. If *the habeas corpus lawyers* fail to provide effective assistance, by failing to investigate and raise substantial claims that trial counsel provided ineffective assistance, the capacity of the justice system to find these errors and clear them up breaks down.

This is precisely what has happened in Mr. Hearn's case. His trial lawyers provided ineffective assistance in failing to investigate the readily available and powerful mitigation evidence in Yokamon's life. Then, at the juncture in legal proceedings when his next lawyers,

those who represented him in state and federal habeas corpus proceedings, should have investigated and raised the claim that his trial lawyers provided ineffective assistance, these lawyers failed to do any investigation or raise any claim about trial counsel's ineffective assistance.  His habeas corpus lawyers thus provided ineffective assistance of their own in habeas corpus proceedings.

Until March 20, 2012, there was no legal remedy for ineffective assistance of state habeas corpus lawyers.  If habeas lawyers failed to provide effective assistance in habeas proceedings by their failure to investigate and raise claims that trial counsel provided ineffective assistance, the client lost any chance of having those claims considered by the courts.  No court would hear the claims because they had not been raised at the first opportunity (that is, in state habeas corpus proceedings).  On March 20, 2012, however, the United States Supreme Court provided a partial remedy for this.  The Court recognized for the first time in *Martinez v. Ryan*,___ U.S. ___, 132 S.Ct. 1309 (2012), that if a state habeas corpus lawyer provides ineffective assistance in failing to investigate and raise a claim that trial counsel provided ineffective assistance, the federal courts in federal habeas corpus proceedings may now be permitted to hear the claim that trial counsel was ineffective.  Previously when presented with this question, the Supreme Court said that the failure of the state habeas lawyer to raise the claim of trial counsel's ineffectiveness was an absolute barrier to the federal courts considering the claim. What changed is that the Supreme Court recognized that the unfairness of this result is no longer acceptable.  The Court explained:

> To present a claim of ineffective assistance at trial in accordance with the State's [habeas corpus] procedures, then, a prisoner likely needs an effective attorney.
>
> The same would be true if the State did not appoint an attorney to assist the prisoner in the [state habeas corpus] proceeding. The prisoner, unlearned in the law, may not comply with the State's procedural rules or may misapprehend the

4

substantive details of federal constitutional law. [Citation omitted.]  While
confined to prison, the prisoner is in no position to develop the evidentiary basis
for a claim of ineffective assistance, which often turns on evidence outside the
trial record.

A prisoner's inability to present a claim of trial error is of particular concern when
the claim is one of ineffective assistance of [trial] counsel.  The right to the
effective assistance of counsel at trial is a bedrock principle in our justice system.
It is deemed as an "obvious truth" the idea that "any person haled into court, who
is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is
provided for him." *Gideon v. Wainwright,* 372 U.S. 335, 344 (1963). Indeed, the
right to counsel is the foundation for our adversary system.

*Martinez v. Ryan*, 132 S.Ct. at 1317.

*Martinez* may make it seem that Mr. Hearn now has a judicial remedy for the ineffective

assistance of his trial lawyers.  Thus far, however, the courts in the Fifth Circuit have been

hesitant to extend the remedy to habeas petitioners in Mr. Hearn's shoes.  Thus far, the federal

courts have only allowed the consideration of claims of ineffective assistance of trial counsel

which were not previously raised in state habeas corpus proceedings in cases that were still

pending in the federal courts in the first federal habeas corpus proceeding at the time the

Supreme Court decided *Martinez*.  Mr. Hearn's first federal habeas corpus proceeding *ended*

*November 17, 2003*, when the Supreme Court refused to hear his appeal in his first federal

habeas corpus proceeding.

For these reasons, there is a prospect that the system of justice that is now available to

Mr. Hearn will *not* "continue to find errors that were made and clear them up."  To be sure, every

case gets to a point where the courts will no longer review errors.  The courts deem this fair,

because the prisoner has had adequate opportunities to raise all errors in prior legal proceedings.

Even if the prisoner has not raised the errors before, s/he has had the opportunity to do so.  What

is so important about the Supreme Court's *Martinez* decision is the Court's recognition that some

people—those whose state habeas lawyers have failed, because of their own ineffective assistance, to raise legitimate claims that trial counsel provided ineffective assistance—*have not had an adequate opportunity* to raise a critical kind of error, trial counsel's ineffectiveness, before.

This is why this Court must act to stop Mr. Hearn's execution.  This Court must be the safety net for Mr. Hearn and must be true to what the Governor says the justice system in Texas does and should do:  "continue to find errors that were made and clear them up."  Accordingly, we ask that the Court grant Mr. Hearn's request for a stay of execution to provide (1) sufficient time for a full consideration of why this petition must be treated as if it were Mr. Hearn's first federal habeas petition, and then, (2) plenary consideration of the claim that Mr. Hearn's trial counsel provided ineffective assistance in relation to the penalty phase of his trial.

## Statement of the Offense and Legal History of the Case

Mr. Hearn was indicted for the capital murder of Joseph Franklin Meziere that occurred on March 25, 1998.  Mr. Hearn was tried, convicted and sentenced to death in the 282nd Judicial District Court of Dallas County, Texas, in December,1998.   The murder took place during the course of a robbery and kidnapping.  Mr. Hearn and his codefendants, Delvin Diles, Dwight Burley, and Teresa Shavon Shirley, were looking for someone to rob the night of March 25, 1998.  They happened upon Mr. Meziere at a car wash.  At gunpoint, Hearn and Diles took Mr. Meziere and his car, followed by Burley and Shirley in their car, to a remote area of Dallas County.  Hearn and Diles together shot Mr. Meziere in the head approximately ten times, with the evidence showing that Hearn likely fired first and fired six shots.  Hearn and Diles then took Meziere's car and later left it in a parking lot, where it was discovered and reported to the police.

6

The Texas Court of Criminal Appeals affirmed Mr. Hearn's conviction and sentence in an unpublished decision, *Hearn v. State*, No. 73,371 (Tex. Crim. App. Oct. 3, 2001) (per curiam), and review was denied by the Supreme Court. *Hearn v. Texas*, 535 U.S. 991 (2002).

Mr. Hearn filed a state habeas corpus application while his direct appeal was pending. No issues based on evidence outside the trial record were raised; the issues were standard, "boilerplate" legal issues raised in numerous capital cases. None was the kind of issue that met the requirements for issues that could be considered in a state habeas application. On November 14, 2001, the Court of Criminal Appeals denied his habeas application. *Ex parte Hearn*, WR-50,116-01. Mr. Hearn then filed a federal habeas corpus petition in the United States District Court for the Northern District of Texas, presenting a combination of issues raised in the state habeas application and the direct appeal. None required or called for hearing evidence outside the trial record. The district court denied the habeas petition. *Hearn v. Cockrell*, No. 3:01-CV-2551-D (N.D. Tex. July 11, 2002). Thereafter, the United States Court of Appeals for the Fifth Circuit denied Hearn's appeal in an unpublished opinion, *Hearn v. Dretke*, No. 02-10913, 73 Fed.Appx. 79, 2003 WL 21756441 (5th Cir. Jun. 23, 2003), and the Supreme Court denied review. *Hearn v. Dretke*, 540 U.S. 1022 (2003).

Represented by different habeas corpus counsel and facing an execution date in early March, 2004, Mr. Hearn attempted (without success) to first raise an *Atkins* claim[1] in the state courts and then, after securing a stay of execution from the United States Court of Appeals for the Fifth Circuit, filed a request to authorize the filing of a "successive" (that is, second or subsequent) federal habeas petition raising an *Atkins* claim. Mr. Hearn was allowed to proceed

_____

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002).

by the Fifth Circuit and then filed his successive petition raising an *Atkins* claim in the federal

district court.[2]   The federal district court determined that Mr. Hearn appeared to establish that he

had mental retardation even though, with respect to the first prong of mental retardation, his IQ

scores ranged from 74 to 93.   Counsel for Mr. Hearn argued—and supported with expert

opinion—that the significantly subaverage intellectual functioning component of mental

retardation can be satisfied, even in the face of full-scale IQ scores well above 70, with a

showing of brain impairment when the impairment has contributed to significant limitations in

adaptive functioning.   Defense mental health experts found that Mr. Hearn had brain damage,

which caused IQ testing for him to be unreliable, and that because of this, IQ scores could not be

used to assess whether Mr. Hearn met the subaverage-intellectual-functioning component (first

prong) of mental retardation.   The experts found that the effects of Mr. Hearn's brain damage

thus satisfied the first prong of mental retardation.

The federal district court accepted these facts as setting forth a *prima facie* case of mental

retardation under *Atkins*.  *Hearn v. Quarterman*, 2008 WL 679030 *4 (N.D.Tex. March 13,

2008).  Because the evidence of Mr. Hearn's mental retardation had all been developed in

connection with proceedings in the federal court, however, the federal district court thereafter

stayed Mr. Hearn's federal proceedings and ordered him to return to the state courts to give them

an opportunity to review the claim.  *Hearn v. Quarterman*, 2008 WL 3362041 *7 (N.D.Tex.

August 12, 2008).

---

[2]Following the stay of execution by the Fifth Circuit, undersigned counsel were appointed as new counsel to represent Mr. Hearn and were provided funds for investigative and expert assistance by the federal courts to investigate Mr. Hearn's potential *Atkins* claim.

8

Mr. Hearn filed a subsequent state habeas application setting forth his *Atkins* claim in the state trial court in October, 2008.  The application was forwarded to the Court of Criminal Appeals (CCA) for its determination whether the claim had *prima facie* merit and met the procedural requirements for a subsequent habeas application.  On April 28, 2010, the CCA ruled that Mr. Hearn's claim was without merit because the subaverage intellectual functioning component of mental retardation can only be satisfied by a full-scale IQ score of 75 or below:

> In making his *Atkins* claim, applicant asks this Court to significantly alter the current definition of mental retardation.  Applicant correctly notes that the assessment of "about 70 or below" is flexible; "[s]ometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded." *[Ex parte] Briseno,* 135 S.W.3d [1,] at 7 n. 24 [(Tex.Crim.App. 2004)](citing AAMR at 23).  Applicant, however, misconstrues this language to mean that clinical judgment can completely replace full-scale IQ scores in measuring intellectual functioning.

*Ex parte Hearn*, 310 S.W.3d 424, 430 (Tex.Crim.App. 2010) (footnote omitted).  The court then held that "applicants may not use clinical assessment as a replacement for full-scale IQ scores in measuring intellectual functioning."  *Id*. at 431.   Mr. Hearn sought review of the CCA's decision in this Court, but the Supreme Court denied review.  *Hearn v. Texas*, ___ U.S. ___, 131 S.Ct. 507 (November 1, 2010).

In the wake of the CCA's ruling, Mr. Hearn returned to the federal district court, where both he and Thaler briefed the effect of the decision on the federal habeas proceeding.  On March 3, 2011, the district court held as follows:

> Concluding that the decision of the CCA is not an unreasonable application of *Atkins,* and that its denial of his claim was not contrary to or an unreasonable application of clearly established federal law, the court denies the petition on the merits and dismisses this action with prejudice.

9

*Hearn v. Thaler*, 2011 WL 825744, *4 (N.D.Tex. 2011).  On January 30, 2012, the United States

Court of Appeals for the Fifth Circuit upheld the federal district court's ruling on the subsequent

appeal, *Hearn v. Thaler*, 669 F.3d 265 (5th Cir. 2012), and on March 20, 2012, denied rehearing.

On June 18, 2012, counsel for Mr. Hearn filed a petition for writ of certiorari in the

United States Supreme Court seeking review of the federal courts' decisions, and also asked the

Court to stay Mr. Hearn's execution.  The Court has not yet acted on Mr. Hearn's petition or

request for a stay.

<u>**Ground for Habeas Corpus Relief**</u>

**Mr. Hearn Was Deprived of His Right to Effective Assistance of Counsel as Guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution Due to Trial Counsel's Failure to Develop and Present Mitigating Evidence**

Yokamon's jury learned about violence, more violence, a history of burglaries, and, in

sharp contrast, exceedingly superficial and inaccurate mitigation during his sentencing

proceedings.  Yokamon's lawyers were the reason the jury learned almost nothing about his life.

They failed to conduct a minimally adequate investigation into Yokamon's life history when, had

they done so,  they would have uncovered a wealth of compelling mitigating evidence, including

evidence that Yokamon's parents were severely impaired throughout his life; that starting at a

young age, he was the victim of neglect at the hands of his parents; that relatives who were

portrayed at trial as unflinchingly committed and capable of caring for Yokamon were not so;

that he had a history of mental health problems, including suicidal ideations, as a young child and

that his emotional problems stemmed from his parents' inability to parent him;  that he was

exposed to risk factors commonly associated with brain damage; that Yokamon, in fact, suffered

from brain damage; and  that he exhibited severe impairments in day-to-day functioning

consistent with brain dysfunction.  The failure of Yokamon's lawyers to investigate his life

constituted grossly deficient performance.  Absent those failures, there is a strong likelihood that

one or more jurors would have concluded that Yokamon did not deserve the death penalty.

Because the facts establish both incompetence of counsel and prejudice to Mr. Hearn as a result

of their incompetence, Applicant's death sentence violates the Sixth and Fourteenth Amendment

right to counsel.  *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362

(2000); *Strickland v. Washington*, 466 U.S. 668 (1994).

> **A.  The Jury's Picture of Mr. Hearn**
>
> **1.  The State's Penalty-Phase Evidence**

The state's penalty phase evidence presented Mr. Hearn not only as a murderer, but also

as a thief, a burglar, and a man guilty of several different violent crimes.  In addition to evidence

suggesting that he broke into several homes, stole items, and then gave them to a friend named

Aaron Runnels to pawn, the State presented witnesses who testified that Mr. Hearn had

previously committed arson, sexual assault, and attempted murder.

Arthur Canfield testified that when Mr. Hearn had lived in a neighboring house, he broke

into his house and stole a shotgun.  RR 43 at 10-13.[3]  Mr. Canfield said that when the shotgun

was returned to him, both the barrel and stock had been sawed off.  *Id.* at 17. The implication that

Mr. Hearn had broken into Mr. Canfield's house on another occasion was also presented to the

jury. *Id.* at 10.  Mr. Hearn apologized after the incident.  *Id.* at 18.  Glenn Mills later testified

that an assortment of guns, including a Tec-9, was stolen from his apartment.  *Id*. at 16-17.

---

[3]"RR" refers to the Reporter's Record, or transcript, of the trial.  It is followed by the volume number of the
trial transcript and the pages within that volume that the testimony appeared.

Josh Dunn testified that, when he was a kid, Mr. Hearn assaulted him.  *Id.* at 32.  Mr. Dunn said that one day after school, he discovered Mr. Hearn riding his (Mr. Dunn's) bike around without permission, apparently having undone the lock to the bike.  *Id.* at 30.  Mr. Dunn demanded his bike back, at which point Mr. Hearn rode over to Mr. Dunn and punched him in the side of the head.  *Id.* at 32.  Mr. Hearn then walked off without saying anything.  *Id.*

Jeannie Rogers testified that she came home one day to find two boys she did not know in her backyard, pushing a bike.  *Id.* at 38.  She did not see either one well enough to recognize a face, and they jumped the fence and ran when they saw her arrive home.  *Id.* at 40.  Officer Mantis Davis then testified that he was the police officer dispatched in response to Ms. Rogers's complaint.  *Id.* at 49.  He arrested Mr. Hearn as one of the two boys who had trespassed into Ms. Rogers's backyard.  *Id.* at 50.

Julie Denise Myers testified that Mr. Hearn raped her one night in 1996.  *Id.* at 65-66.  She said that they were both sleeping on the floor in Aaron Runnels's bedroom, and after Mr. Runnels left early in the morning for work, Ms. Myers woke up to discover Mr. Hearn on top of her.  *Id.* at 72-76.  She testified that Mr. Hearn unbuttoned and pulled down her pants, and then raped her for two to three minutes.  *Id.* at 77, 80-81.  She further testified that she chose not to call for help and chose not to report the rape to the police because she was afraid of retribution from Mr. Hearn.  *Id.* at 81, 85.

Javar Jones testified that, after Mr. Jones had taken a coat belonging to Delvin Diles, Mr. Hearn brandished a gun while demanding that it be returned.  *Id.* at 103.  Then Dorothy Reedy testified that Mr. Hearn and another, unknown man robbed her of her purse at gunpoint.  *Id.* at 127-29.

Both Barbara Turner and Donald O'Bier testified that they had their residences broken into and found several items stolen.  RR 44 at 31, 46-48.  These stolen items were identified by Debra Walls as items that Mr. Hearn, along with Mr. Runnels, had pawned to her pawn shop.  *Id.* at 17-22.

Darwin Murry testified that he saw Mr. Hearn and another unknown person start a fire in a house across the street from Mr. Murry's house.  *Id.* at 55.  When he confronted the two boys, Mr. Murry said that Hearn pulled out a gun and shot at Mr. Murry until the magazine was empty. *Id.* at 57-59.  Mr. Murry was not hit.  *Id.* at 59.

### 2.     The Penalty-Phase Defense

***The defense called only two life-history witnesses***: Wanda Ross Bell, Yokamon's maternal aunt, and Susan Dianne Johnson, Yokamon's mother.  *See generally* RR 44 at 87-145. Because counsel failed to conduct or commission a reasonable investigation into Yokamon's background and upbringing, the information the jury learned about Yokamon's life history was superficial and grossly misleading.  Although the two life-history witnesses were close family members, their testimony was devoid of detail and failed to provide the jury with an accurate and complete picture of Yokamon's harrowing life.  Ms. Johnson and Ms. Ross Bell testified in broad terms regarding the following:

### a.     *Testimony About Yokamon's Mother*

_____Ms. Johnson was 16 years of age at the time of Yokamon's birth on November 6, 1978. RR 44 at 129.  Ms. Ross Bell and Ms. Johnson testified that prior to 1991,  Yokamon's mother was drug-free and stable.  *Id.* at 96, 117, 134.  Ms. Johnson became addicted to crack cocaine in 1991, following the death of her own mother, Yokamon's maternal grandmother.  *Id.* at 97-98,

13

135.  There was conflicting testimony about whether Yokamon's mother continued to do drugs between 1991 and 1995, when she and Yokamon resided in the home of Pearly Mike, Yokamon's maternal aunt.  Ms. Ross Bell testified that Yokamon's mother stopped using drugs, but drank alcohol in Ms. Mike's garage.  *Id.* at 103.  Yokamon's mother, on the other hand, testified that she continued to regularly use crack cocaine.  *Id.* at 136-137.  After residing in the home of Ms. Mike for approximately three years, Yokamon's mother left with a man.  *Id.* at 104. She  subsequently moved into a shelter where she was involved in an altercation with another shelter resident.  *Id.* at 140.  As a result, Ms. Johnson was taken to a detox facility by the police. *Id*.  Ms.  Johnson mentioned she was in "rehab" on two separate occasions and that at times, she was homeless.  *Id.* at 138-139.  She also testified that she resided at Reconciliation Outreach, a "ministry," for approximately three years.  *Id.* at 139. Defense counsel questioned Ms. Johnson about whether she had been under the influence of drugs the day before she testified.  *Id.* at 143. Ms. Johnson denied it and commented that she was on medication for migraines.  *Id.* at 144.  She acknowledged she was not the mother she could have been to Yokamon.  *Id*.

### b.      *Testimony About Yokamon's Father*

Yokamon's mother was not married to Tony Massingill, Yokamon's biological father,  at the time of Yokamon's birth.  RR 44 at 90, 129-130.  Instead, she was married to Namon Earl Hearn, who went AWOL from the military.  *Id.* at 90, 129.  Mr. Massingill was sent to prison for approximately 5 years approximately 4 to 5 months after Ms. Johnson and Mr. Massingill met. *Id.* at 92-93, 131-132.  Neither Mr. Massingill nor Namon Hearn played a parental role in Yokamon's life.  *Id.* at 93, 132.

### c.      **Testimony About Yokamon's Maternal Grandfather**

14

Timothy Milton Ross, Yokamon's maternal grandfather, was the only man who ever paid any attention to Yokamon.  RR 44 at 95, 132.  Although Yokamon's maternal grandparents were separated, Mr. Ross visited the home of the maternal grandmother every day after work to see whether anyone in the family wanted anything.  *Id.* at 93-94, 132.  Mr. Ross died in 1985 of cancer.  *Id.* at 94, 133.  His death affected Yokamon greatly.  *Id.* at 95, 133.  According to Yokamon's mother, Yokamon became depressed, he stopped functioning in school,  and he "shut down quite a bit."  *Id.* at 133.

### d.      *Testimony About Yokamon's Living Arrangements*

As noted above, Ms. Ross and Ms. Johnson testified that prior to 1991, Ms. Johnson led a stable life.  According to both witnesses, Yokamon and his mother, who was working at the time, lived in North Dallas.  Yokamon, however, attended school in Oak Cliff, where his maternal grandmother resided.  RR 44 at 96.  Every morning, his mother dropped him off at school or at the home of Yokamon's grandmother, where Yokamon stayed in the afternoons until his mother picked him up after she got off work.  *Id.* at 96.

After Yokamon's mother developed a drug addiction, Yokamon and his mother needed a place to stay because Yokamon's mother became homeless.  *Id.*  at 100.  They resided with Ms. Ross Bell and subsequently with Pearly Mike, a maternal aunt who lived in Fort Worth, for a combined total of approximately 2 or 2.5 years. *Id.* at 102-103. When Ms. Johnson eventually left the home of her sister Pearly, Yokamon initially remained behind.  *Id.* at 104.  He subsequently joined his mother at the shelter where she was arrested for fighting with another shelter resident. *Id.* at 104, 140.  After Ms. Johnson's arrest, Child Protective Services took custody of Yokamon. *Id.* at 104-105, 141-142.  CPS initially placed Yokamon in the home of his paternal grandmother.

15

*Id.* at 105-106.  He was subsequently moved to the home of Ms. Ross Bell, where he resided

during the 1995-1996 school year.  *Id.*  According to Ms. Ross Bell, Yokamon failed to come

home after school one day.  *Id.* at 121.  Ms. Ross Bell later learned he was residing in the home

of a friend.  Ms. Ross Bell had concerns about Yokamon's well being when he initially left her

home, but she later believed he was fine once she saw him again.  *Id.* 119-120.

### e.  *Testimony About Yokamon's Functioning in School*

As noted above, Yokamon's mother testified that Yokamon "stopped functioning at

school" after his grandfather's death in 1985.  RR 44 at 133. Ms. Ross Bell testified that during

the 1995-1996 school year,  when Yokamon was residing in his home, Yokamon attended A.

Maceo High School.  *Id.* at 120.  According to Ms. Ross Bell, Yokamon did "okay" in school

when he applied himself and that at times, he did not apply himself. *Id* at 120-121.  She further

testified that Yokamon was expelled from school, but did not explain the reasons for the

expulsion.  *Id.* 123-124.

### f.  *Testimony About Yokamon's Relationships With Peers*

Other than perfunctory information about the effect that the death of Yokamon's maternal

grandfather had on Yokamon and that Yokamon did "okay" in school when he applied himself,

the jury only heard the following regarding how Yokamon functioned in day-to-day life:  that he

was a "follower".  RR 44 at 109-110.   And with respect to this trait, the jury only heard that

Yokamon was ashamed of the environment in which he grew up, that he tried to be like other

people, that he wanted to please others, and that he was "open to influence and suggestion from

other people that have more leadership than he does."  *Id.*

The jury learned nothing more of Yokamon's family and social history.

16

**B.      Trial Counsel's Inadequate Investigation**

**1.      Trial counsel's investigation into mitigating evidence in the instant case was woefully inadequate**

There can be no doubt that trial counsel for Yokamon were aware of many red flags suggesting the existence of powerful mitigating evidence  that would have prompted reasonable counsel to investigate obvious leads and to conduct a minimally adequate life history investigation.  Indeed, trial counsel elicited testimony, albeit superficial, incomplete and inaccurate, regarding the following red flags for mitigating themes:

- Young maternal age;
- Paternal incarceration;
- Lack of support, financial or otherwise, by father;
- Late onset of maternal drug addiction;
- Presence of maternal migraine headaches prior to trial;
- Depressive symptoms in Yokamon following maternal grandfather's death;
- Mother's instability following maternal grandmother's death; and
- Child Protective Services involvement.

Despite the fact that potentially powerful mitigating evidence stared trial counsel in the face (quite literally), they failed to act in a reasonable manner.  The following overwhelming evidence leads to one inescapable conclusion—that trial counsel conducted a woefully inadequate inquiry into Yokamon's life:

- Trial counsel called to the stand *only two witnesses* with personal knowledge of Yokamon's background and as will be shown in detail, *infra,* those witnesses provided  testimony that was superficial, incomplete, and inaccurate.  Notes of trial counsel Matt Fry strongly suggest that preparation for the punishment phase of the trial was exceedingly meager.  Mr. Fry's notes include a "to-do list" which only included the following notations related to lay witnesses for the punishment phase

17

of Yokamon's trial: "Get mother of [defendant] subpoenaed", "Get CPS caseworker

subpoenaed", and "Get [illegible] Wanda Bell subpoenaed."  Exhibit 2, Excerpts

from Notes of Trial Counsel Matt Fry (hereinafter "Matt Fry's Notes").[4]  Mr. Fry's

notes also include a notation that appears to be a list of potential mitigation

witnesses.  *Id.*  The list contains only five individuals, three of which are crossed out.

•   All the circumstances demonstrate that trial counsel made no effort to obtain any of

a myriad of records containing compelling mitigating evidence that was available at

the time of trial.  Trial counsel neither made reference to, nor introduced a single

record relating to Yokamon's life history or background during the sentencing phase.

In addition, trial counsel failed to elicit detailed information contained in the same

records that would have provided a complete and accurate picture of Yokamon's

harrowing life.  Furthermore, Mr. Fry's notes do not contain a single reference to

records collection or records review.  *See* Matt Fry's Notes (Exhibit 2).

The legion of records that were available at trial that trial counsel most assuredly

failed to obtain include:

1.   Birth records pertaining  to Yokamon;
2.   Social Security Administration records pertaining to Yokamon;
3.   Dallas County MHMR records pertaining to Yokamon;
4.   Dallas County Hospital District records pertaining to Yokamon;
5.   Dallas ISD records pertaining to Yokamon;
6.   Forth Worth ISD records pertaining to Yokamon;
7.   Dallas Can! Academy records pertaining to Yokamon;
8.   Child Protective Services records;
9.   Tarrant County MHMR Records pertaining to  Susan D. Johnson;
10.   Parkland Memorial Hospital records pertaining to Susan D. Johnson;

---

[4]Due to the voluminous nature of records in this case, Exhibits 3-7, 9, 10, 13, 14, 27, and 28 contain only excerpts of available records.  Should this Court or the State wish to view any of the records in their entirety, undersigned counsel will provide a full copy upon request.

11.    Social Security Earned Income Records pertaining to Susan D. Johnson;
12.    TDCJ records pertaining to Tony L. Massingill;
13.    Dallas ISD records pertaining to Tony L. Massingill;
14.    Texas Health and Human Services Commission Records pertaining to Yokamon;
15.    Tarrant County Juvenile Probation Records pertaining to Yokamon;
16.    Plano Police Department records pertaining to Toy L. Massingill; and
17.    Parkland Memorial Hospital Records pertaining to Tony L. Massingill.

• Trial counsel did not seek or have the assistance of a mitigation specialist to develop background evidence relating to Yokamon. There can be no doubt that by 1998, the critical role of the mitigation specialist in a capital case was beyond dispute. A subcommittee of the Committee on Defender Services of the Judicial Conference of the United States offered this summary:

> Mitigation specialists typically have graduate degrees, such as a Ph.D. or masters degree in social work and have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary materials for them to review. Although most often they assist counsel in assembling and interpreting the information needed in the penalty phase of a capital case, in some cases mitigation specialists are also called to testify about their findings.

> Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant.

Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. Pa. J.L. & Soc. Change, 237, 250-51

19

(2007-2008) (citing Subcommittee on Fed. Death Penalty Cases, Comm. on Defender

Serv. Judicial Conference of the U.S., Recommendations Concerning the Cost and

Quality of Defense Representation 14 (1998), *available at*

http://adwww2.americanbar.org/DeathPenalty_migrated/RepresentationProject/Pu

blicDocuments/federal%20judicial%20conference%20recommendations.pdf).

- Likewise, there is not a scintilla of evidence that trial counsel sought funding for or
  retained any mental health experts.

- The trial on the merits commenced on December 7, 1998, a little over *8 months* after
  trial counsel Matt Fry was appointed to represent Yokamon and *just over 4 months*
  after trial counsel Wayne Huff was appointed to represent Yokamon.  (Mr. Fry and
  Mr. Huff were appointed to represent Yokamon on March 30, 1998 and July 30, 1998
  respectively.)  It is inconceivable that counsel could have been able to conduct an
  adequate investigation within the trial schedule, even if they had the assistance of an
  experienced mitigation specialist—and they had no mitigation specialist.[5]

## 2.    The defense's punishment-phase closing argument reflects counsel's utter failure to develop and present meaningful mitigating evidence

Trial counsel's penalty-phase closing argument on behalf of Yokamon further reflects the

consequences of counsel's grossly inadequate investigation.  In his closing argument, trial

---

[5] It has been long understood that competent mitigation investigations are exceedingly complex and time consuming endeavors.  Russell Stetler, mitigation coordinator for two highly respected national death penalty defense resource projects, has noted, "Developing mitigation evidence through life-history investigation involves hundreds of hours of work—with meticulous attention to detail, painstaking efforts to decode and decipher old records, patience and sensitivity in eliciting disclosures from both witnesses and the client.  Even when multiple compelling themes have been identified, the task of presenting the evidence effectively to a jury remains formidable." Russell Stetler, "Mitigation Evidence in Capital Cases," *The Champion*, Jan./Feb. 1999, at 39.  There is no evidence whatsoever to suggest that any of these activities occurred prior to or during Yokamon's trial.

counsel Wayne Huff repeatedly and desperately tried to suggest to the jury that circumstances of Yokamon's life might  provide a reason for imposing a sentence less than death.  His fleeting and rambling references to mitigating evidence, however, reflect the fact the defense didn't have meaningful mitigating evidence with which to craft a real, deep, non-rebuttable story of mitigation.

In his desperate attempt to ask that the jury show mercy on Yokamon, Mr. Huff made reference to a negligible number of potentially mitigating circumstances, and his treatment of those mitigating themes was exceedingly superficial.  Mr. Huff suggested that the fact  "his mother went out and got on crack"; that "he had some relatives to take care of him"; that "the only father figure he ever had died when he was six years"; and that "his old daddy is in the pen" might be reasons for sparing Mr. Yokamon's life.   RR 44 at 177-181.  Mr. Huff, however,  was simply unable to provide any reason that the themes the defense introduced should persuade the jury to choose a life sentence over a death sentence.  For example, with respect to the incarceration of Yokamon's father, he stated, "Old daddy is in the pen, and *I guess he'd rather be stealing or whatever he did to get there* than to be at home with his son." *Id.*  at 179 (emphasis added).  With almost no effort, trial counsel could have learned that Mr. Massingill, Yokamon's biological father, was twice in prison for rape and struggled life-long with controlling his violent impulses, in part, because of intellectual deficits, and that his few efforts to care for Yokamon over weekends were so fraught with danger to Yokamon (because Mr. Massingill was living in a car) that Yokamon's mother stopped the visits.  Rather than obtaining this information—which he then could have used to explain that part of Yokamon's struggle in life was due to his father's genetic and social contributions to his impairments—Mr. Huff was left to "guess" about

21

Yokamon's father.  Mr. Huff's feeble attempts to explain to the jury how Yokamon's

background could have affected his well being and functioning reflect a complete lack of

knowledge about how the people in, and the circumstances of, Yokamon's life affected

Yokamon.

Lawyers cannot make a compelling mitigation argument without extensive and deep

information about their clients' lives.  That fundamental truth is clearly reflected in Mr. Huff's

struggle to make sense of the little he and the jury knew about Yokamon, leading him to present

a rambling and incoherent argument, without any clear direction, when Yokamon most needed

him to help the jury have insight into his life.  For example, with regard to how Yokamon's

mother's instability and crack use might have affected him, Mr. Huff stated,

> And [Yokamon's] mother came in an out of his life and in and out of rehab but—
> but you know, up until the time that he's in high school, you know, and just
> starting to be at that point in his life where he can go one way or the other, you
> know, that crack, that's more important. That's more important than he is.

*Id.*  at 180-181.  Mr. Huff's effort to understand how Ms. Johnson's addiction impacted

Yokamon is laudable, but without the information that is reflected in the records that trial

counsel did not have, Mr. Huff had no insight that he could pass on to the jury.

Tellingly—and ironically, quite truthfully—counsel repeatedly acknowledged to the jury

that  he did not know how Yokamon's life circumstances impacted Yokamon.  For example, with

respect to the impact that Yokamon's mother's addiction to crack may have had on Yokamon,

Mr. Huff asked the jury to consider what it would be like to have a mother who was on crack.  *Id.*

at 179.  Mr. Huff  immediately followed the question with a statement that he (Mr. Huff) did  not

know what it would be like to have a crack-addicted mother: *"I don't know about you, but I*

*wasn't raised around that.  I don't know*."  *Id.* (emphasis supplied).  Continuing in the same lack

of insight, Mr. Huff went on to state,  "[Y]ou've got a mother who, because of his [sic] own

personal drug problems, you know would rather do that, than have her—have her kid.  What's

that like? *I don't know*".  *Id.* at 180 (emphasis supplied).  Mr. Huff then speculated without

providing any meaningful insight, "[Y]ou must be next to nothing if your mother can't at least

stay off the crack."  *Id.*

     Thus, one need not look any further than defense counsel's closing argument to

understand that trial counsel had conducted no meaningful investigation into Yokamon's life.

Not only did Mr. Huff struggle to define mitigation, but he explicitly acknowledged that he did

not understand what mitigation was.  Counsel unequivocally stated, "***I don't really know what***

***mitigation means.***"  Clearly, he did not know what mitigation meant in Yokamon's case, because

he had not conducted the scope and depth of investigation that must be conducted to understand

"what mitigation means" in the life of his client.

     It was precisely the defense's complete failure to present meaningful mitigating evidence

that enabled the State to be dismissive of the paltry evidence the jury heard.  In ridiculing the

defense's case in mitigation, the prosecutor started to argue that the only thing the jury heard was

that when Yokamon was 13 or 14 years old, something happened to his mother.  *Id.* at 188.

Although the prosecutor did not complete his sentence, he went on to note that according to the

evidence presented at trial, Yokamon subsequently resided in "nurturing" environments.  *Id.*

Sadly, because of trial counsel's  failure to investigate, that was close to all the jury heard before

it chose the ultimate punishment for Yokamon.

### 3.     The prevailing standard of care at the time of Yokamon's trial mandated that the defense conduct a thorough social history

There can be no doubt that under the prevailing standard of care at the time of Yokamon's trial, trial counsel had a clear and unequivocal duty to conduct a thorough social history investigation and that their failure to do so, constituted deficient performance.

Authorities of every stripe, CCA opinions, as well as U.S. Supreme Court cases confirm that by the late 1990's, trial counsel's duty to conduct a comprehensive inquiry into the client's life and background when preparing to defend a capital case was well-settled.  For example, the State Bar of Texas 20th Annual Advanced Criminal Law Course took place in July of 1994, four years before Yokamon's trial.  Materials distributed at the State Bar course included a primer on defending capital cases at the sentencing phase.  Exhibit 3, Excerpts of *Capital Sentencing Strategy: A Defense Primer*, July 1994 (hereinafter "1994 State Bar Materials").  The materials reflect the expectation that defense counsel conduct a searching life history investigation:

> A thorough intergenerational life history ***must*** be developed, incorporating all life history documents and interviews with all first and second degree relatives, friends, [and] peers.  As relatives with histories of relevant physical illnesses (diabetes, endocrine/hormonal, and neurological) and mental illnesses are identified, obtain their medical and life history documents.

Exhibit 3 (1994 State Bar Materials) at 17–18 (emphasis added).  The standard of care required that the defense team search for all potentially relevant mitigating circumstances because the then-relatively new mitigation special issue made explicit that "everything about the circumstances of the underlying offense (or other prior bad acts), the defendant's character, and the defendant's record (read 'history') is relevant to the jury's final determination of the issue." *Id*. (emphasis in the original).

24

According to the 1994 State Bar Materials, an appropriate effort in collecting life history documents encompasses: birth certificates; birth records; prenatal records; church records; school records; educational records; childhood photographs; medical records; mental health records; work records; jail, court, and police records for family members; civil proceedings records; marriage records; social service agency records; Texas Youth Commission records; juvenile records; parole and probation records; military records; records from prior offenses (including attorney, jail, prosecution, court, and media records); records related to every co-defendant (including court, prosecution, jail, and attorney records); prison records; and prosecution records. *Id*. at 18–21.

State Bar course materials specifically instructed counsel to inquire into a broad range of topics, including:

- sexual and physical abuse;
- medical care, education, and nutrition;
- difficulty reading, speech impediments;
- nightmares, sleep disturbances, fear of the dark;
- withdrawal, quietness, shyness;
- rocking, biting, head banging during early childhood;
- anxiety, nervousness, crying,
- superstitions;
- fears;
- the parents' socio-economic history;
- client and family physical illness and disabilities;
- client and family mental illness and/or mental retardation;
- family history of suicide;
- a detailed drug and alcohol history, including age first used, frequency, amounts, effects, and so forth.

*Id*. at 17-21.

25

The 1994 State Bar training resources were hardly cutting-edge material.  They merely conformed to the national capital defense norms in place since the mid-1980's.  *See e.g.* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion, Aug. 1986, at pp. 16–17 ("Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory personnel....  A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present.... Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny."); *see also id*. at 16 ("[A]ttorneys are not trained in ... dealing with the psycho-social problems of their clients and explaining these to the jury.  Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that the do not have they skills to accomplish the goals of mitigation and to go and seek the assistance of psycho-social professionals who are skilled in these fields.  For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant.").

Decisions of the Texas Court of Criminal Appeals (CCA) applying *Strickland* to cases tried in the mid-1990's confirm that the 1994 State Bar Materials accurately described the prevailing standard of care in Texas.  For example, in *Ex parte Gonzales*, 204 S.W.3d 391, 393–96 (Tex. Crim. App. 2006), concerned with a trial that occurred in 1997, a year before Mr. Hearn's trial, the CCA held that trial counsel were deficient for not investigating whether there was a history of child abuse.  The CCA noted that the Supreme Court had made clear in *Penry v. Lynaugh*, 492 U.S. 302 (1989), that the pre-1991 Texas sentencing statute violated the Eighth

26

Amendment when it precluded consideration of mitigating evidence beyond the scope of the special issues.  In a footnote, the court catalogued numerous cases tried under the former statute in which counsel had investigated and presented mitigating evidence.  *Gonzales*, 204 S.W.3d at 396 n.32.

In 1991, the Texas capital sentencing "statute was amended to comprise a much broader range of mitigating evidence, namely, 'all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant.'" *Id*. at 397 (footnote omitted).  According to *Gonzales*, courts must assess counsel's preparation for the punishment phase in light of this development.  Relevant mitigating evidence clearly included "the defendant's childhood and his physical and mental health."  *Id.*

Judge Cochran wrote a concurring opinion in *Gonzales* further clarifying the applicable professional norms.  "[D]efense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty." *Ex parte Gonzales*, 204 S.W.3d at 400 (Cochran, J., concurring) (emphasis added).  Judge Cochran—like the 1994 State Bar Materials—emphasized that counsel's duty to investigate encompassed, at a minimum, a duty to inquire into specific areas of potential mitigation:

> Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the 'circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]'  At a minimum, defense counsel must privately quiz his client about any and all positive and negative facts about the defendant's upbringing, personality, social interactions, thoughts and feelings....  Like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic.  Such topics might include:

27

1.      Childhood accidents and injuries;

2.      Trips to the emergency room;

3.      Serious illnesses at any time;

4.      Physical abuse to the defendant or any other member of the family;

5.      Any sexual abuse to the defendant or any other member of the family;

6.      Size of the immediate family, and a history of the physical, educational, and emotional background of each member;

7.      The defendant's relationship with and attitudes toward every member of the family;

8.      Drug or alcohol use or abuse by himself and any or all members of the family;

9.      Any mental health treatment of any member of the family, including the defendant;

10.     The cohesiveness of the family;

11.     The family's standard of living and living conditions;

12.     Any and all available school records;

13.     Any record of learning disabilities;

14.     Childhood and adult social relationships with members of the same and opposite sex;

15.     Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;

16.     Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;

17.     Any and all traumatic experiences;

18.     Any and all especially proud moments;

19.     Membership in religious, social, educational, charitable organizations;

20.     The client's five best and worst memories.

*Id*. at 401.

The Supreme Court has indeed recognized that well before Yokamon's trial the prevailing professional norms required trial counsel to conduct a thorough life history investigation.  In *Wiggins v. Smith,* a case that was tried in 1989, the Court found that trial counsel's performance was deficient because counsel failed to investigate a plethora of

28

mitigating evidence that was available at the time of trial.  539 U. S. 510 (2003).   Drawing upon

the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel

in Death Penalty Cases, the Supreme Court's stated:

> Counsel's conduct similarly fell short of the standards for capital defense work
> articulated by the American Bar Association (ABA)—standards to which we long
> have referred as 'guides to determining what is reasonable.'  *Strickland, supra,* at
> 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495.  The
> ABA Guidelines provide that investigations into mitigating evidence 'should
> comprise efforts to discover *all reasonably available* mitigating evidence and
> evidence to rebut any aggravating evidence that may be introduced by the
> prosecutor.'  ABA Guidelines for the Appointment and Performance of Counsel
> in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).  Despite these
> well-defined norms, however, counsel abandoned their investigation of
> petitioner's background after having acquired only rudimentary knowledge of his
> history from a narrow set of sources. Cf. *id.,* 11.8.6, p. 133 (noting that among the
> topics counsel should consider presenting are medical history, educational history,
> employment and training history, *family and social history,* prior adult and
> juvenile correctional experience, and religious and cultural influences) (emphasis
> added);  1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 ('The
> lawyer also has a substantial and important role to perform in raising mitigating
> factors both to the prosecutor initially and to the court at sentencing....
> Investigation is essential to fulfillment of these functions').

539 U.S. at 524-525 (emphasis in original).[6]

Viewing the work of Mr. Hearn's lawyers through this lens, it is plain that his lawyers

ceased investigating mitigation when, like Mr. Wiggins' attorneys, they "acquired only

rudimentary knowledge of his history from a narrow set of sources."  By any measure of effective

attorney performance in relation to the sentencing phase of a capital case, Mr. Hearn's lawyers

performed deficiently.

---

[6] *See also Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) ("It is unquestioned that under the prevailing
professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation
of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

C.     **A Truer Picture**

Had trial counsel conducted an adequate investigation into Yokamon's life history and background, they would have given the jury a compelling picture of Yokamon's dreadful life, rather than the shallow and misleading picture it got.

1.     **Yokamon's parents were severely impaired and they failed to meet Yokamon's needs**

a.     *Yokamon's mother was severely impaired*

i.     *Long-term and severe substance abuse history*

The only witnesses with first-hand knowledge of Yokamon's life testified that Yokamon's mother led a stable life until 1991, when she became addicted to crack cocaine. There was also a fleeting reference that after 1991, Yokamon's mother drank alcohol in her sister Pearly Mike's garage.  No other information regarding Ms. Johnson's longstanding and severe substance abuse history was presented at trial.  The jury was, therefore, led to believe that Ms. Johnson was substance abuse free for the first 13 years of Yokamon's life and that she was generally able to meet Yokamon's needs.  Indeed, Ms. Ross Bell testified that Ms. Johnson was drug free prior to 1991.  RR 44 at 123.  In addition, the jury was left with the impression that the only drug to which Ms. Johnson was addicted was crack cocaine.  Nothing could be further from the truth.

With minimal effort, counsel could have discovered that contrary to what the jury was lead to believe to believe, Ms. Johnson was haunted by alcohol and cannabis addiction *beginning in her early childhood and continuing throughout her life and through Yokamon's entire life*.

During the course of the investigation into Yokamon's life history that undersigned counsel conducted in investigating his *Atkins* claim, our mitigation specialist interviewed Ms. Johnson, who reported that she was introduced to alcohol at the age of 4 by her father Timothy Milton Ross, who was described as an alcoholic.  Plano Police Department records, in fact, reflect that Mr. Ross had a substance abuse problem.  On January 8, 1972, Mr. Ross was involved in a car wreck.  According to the offense report, Mr. Ross was "very intoxicated" and "very belligerent".  Exhibit 4, Plano Police Department Records of Timothy M. Ross.  *Id.*  Mr. Ross, whose  blood alcohol concentration was .20, was arrested at the scene.  *Id.*  According to jail records, Mr. Ross'  behavior while incarcerated was "Bad".  *Id.*

Ms. Johnson began to drink alcohol on a regular basis by the age of 10 when she accompanied her father on road trips.  The man who introduced Ms. Johnson to alcohol when she was 4 years old and who became belligerent when he drank, Yokamon's maternal grandfather, was the same man who according to trial witnesses, was the only paternal figure Yokamon had.

Ms. Johnson's 1995 Tarrant County Mental Health and Mental Retardation Services (MHMR) records confirm her longstanding and severe alcohol addiction.  Exhibit 5, Excerpts of Tarrant County Mental Health and Mental Retardation Records of Susan D. Johnson (hereinafter "Susan D. Johnson's MHMR records").  Ms. Johnson was 34 years old at the time that MHMR administered the Addiction Severity Index, Fifth Edition to Ms. Johnson .  *Id.*   During the evaluation, she reported that during her lifetime, she drank alcohol on a "regular" basis for 27 years.[7]  *Id.*  She further reported that she drank alcohol on a daily basis during the preceding 30

---

[7] Alcohol/Drug Use scoring instructions for the Addiction Severity Index, Fifth Edition are available at http://www.tresearch.org/resources/instruments/ASI_Clinical_Training.pdf (last visited June 19, 2012).  According to the scoring instructions "Regular use = 3 or more times per week, binges, or problematic irregular use in which

days.  *Id.*   According to MHMR records, Ms. Johnson experienced the following alcohol-related

problems:

- Memory lapses/blackouts;
- Shakes/tremors;
- Drinking upon waking;
- Missing meals due to drinking;
- Fighting or quarreling with others;
- Illnesses during drinking; and
- Drunk in public arrests.

*Id.*

Ms. Johnson also suffered from lifelong addiction to cannabis.  Indeed, Ms. Johnson

informed MHMR officials in 1995  that marijuana (primo) was her drug of choice.  *Id.*  Ms.

Johnson further reported that she began using marijuana at the age of 10 and that she had used it

on a regular basis for 20 years.  *Id.*  At the time that Ms. Johnson was evaluated by MHMR, she

had used marijuana daily for the preceding 30 days.  *Id.*

It is noteworthy that the mental health professional who evaluated Ms. Johnson deemed

Ms. Johnson to be a reliable reporter. *Id.*  The interviewer found that the information obtained

during the evaluation was *not* significantly distorted by misrepresentations.  *Id.*  On a scale of 0

to 9, with 0 being "no treatment necessary" and 9 being "treatment needed to intervene in life-

threatening situation", Ms. Johnson's need for both alcohol and drug abuse treatment was rated a

---

normal activities are compromised."

7 by MHMR officials.[8]  *Id.*  She was diagnosed with alcohol, cannabis, and cocaine dependence. *Id.*

As will be discussed at length *infra*, MHMR officials noted concerns about Ms. Johnson's inability to meet Yokamon's needs precisely because of her "drug abuse" *as early as 1989, two years before Ms. Johnson's mother passed away and when Yokamon was 10 years old. See*  Exhibit 6, Excerpts of Dallas County Mental Health and Mental Retardation Records of Yokamon L. Hearn (hereinafter "Yokamon L. Hearn's MHMR Records").  Ms. Johnson also reported in 1989  a history of "[drinking] a lot of liquor."  *Id.*

### ii.        Serious psychiatric history

Just as Yokamon's jury did not hear any evidence of his mother's  lifelong addiction to alcohol and marijuana, the jury heard nothing about Ms. Johnson's longstanding and serious psychiatric history.  Following the death of her father in 1985, Ms. Johnson was treated at Parkland Memorial Hospital for anxiety for a year.  Yokamon L. Hearn's MHMR Records (Exhibit 6).  She was prescribed Doxepin.  *Id.*  Yokamon was 7 years old at the time.

During a 1989 screening interview with Dallas County Mental Health and Mental Retardation Center to determine Yokamon's mental health needs, Ms. Johnson also reported experiencing problems with depression and that "Yokamon senses when [mother] is depressed and will go into her room to check on her, stating he was just going to the bathroom."  *Id.*  She further informed mental health professionals that "she has always been a nervous person," *id.*, and, "[s]he says she holds everything in."  *Id.*  Yokamon was 10 years old at the time.

---

[8] Scoring instructions for severity ratings for the Addiction Severity Index, Fifth Edition are available at http://www.tresearch.org/resources/instruments/ASI_5th_Ed.pdf.

In addition, 1995 Tarrant County MHMR records pertaining to Ms. Johnson reveal that over her lifetime, she experienced a host of psychological problems, including:

- Serious depression, sadness, hopelessness, loss of interest, difficulty with daily function;
- Serious anxiety/tension-uptight, unreasonably worried, inability to feel relaxed;
- Trouble controlling violent behavior including episodes of rage, or violence;
- Serious thoughts of suicide; and
- Been prescribed medications for any psychological or emotional problem.

Susan D. Johnson's MHMR Records (Exhibit 5).  At the time of her evaluation in 1995 Ms. Johnson reported that she had attempted to commit suicide on three different occasions and was "in and out" of the hospital.  According to the records:

> [Ms. Johnson] shared that her mother took her to Parkland because [Ms. Johnson] attempted suicide-drinking and took pills.  Client reports she believes she has 'emotional problems.'  Client reports her problems are (1) Drug/alcohol use, (2) Grief over parents' deaths, (3) anger towards sisters, (4) being raped 4 years ago, (5) problems with her 16 yr. old son.  When drinking, client has been aggressive.  Also, client has 'gone off' on her sisters before.

*Id*.  It was noted that Parkland Memorial Hospital prescribed psychiatric medications, including Valium, to Ms. Johnson.  *Id.*  Furthermore, Ms. Johnson's records suggest that her mental distress led to social isolation.  She informed mental health professionals that she had "no close friends because she does not trust easily."  *Id.*

### iii.    Physical and sexual victimization

Yokamon's mother also experienced emotional, physical, and sexual victimization over her lifetime, about which Yokamon's jury never learned.  In 1995, Ms. Johnson informed mental health professionals that she sustained "beatings" at the hands of her parents.  Susan D.

Johnson's MHMR Records (Exhibit 5).  MHMR records relating to Ms. Johsnon  also reveal she

was raped by 3 men in the early 1990's and that "she never received any help or support."  *Id.*

Mental health records relating to Ms. Johnson also include the following notations:

> Client shared that her sisters were abusive to her throughout her childhood.  Client
> reports that they once locked her in a dark closet with rats for hours.  They put her
> in a bathtub of extremely hot water and burned her badly.  One sister pushed her
> into a hot stove, burning client's arm.  Client showed caseworker scars from this
> burn.  Client has a lot of resentment for her sisters.

*Id.*

### iv.      Long history of complicated migraines

During Yokamon's sentencing proceeding, Yokamon's mother testified that she was on

medication for migraines.  RR 44 at 144.  The jury, however, heard no evidence about Ms.

Johnson's long-running battle with severe migraines that left her disabled at times.  Indeed, Ms.

Johnson's medical records reflect that between 1996 and 1997 alone, Ms. Johnson was seen at

least 9 times at Parkland Memorial Hospital for debilitating migraines and that she suffered from

migraines *since she was 13 years old.*  Exhibit 7, Excerpts of Parkland Memorial Hospital

Records of Susan D. Johnson (hereinafter "Susan D. Johnson's Hospital Records")  In May of

1997, she reported that she experiences at least 1 migraine per week.  *Id.*  Ms. Johnson's typical

migraine pattern involved difficulty in speech and numbness.  *Id.*  A treating physician noted that

Ms. Johnson "suffers from migraine headaches that can be severe and disabling at times."  *Id.*

### v.      Inability to maintain stable employment

In support of their contention that Yokamon's mother led a stable life prior to 1991,

Yokamon's mother and aunt testified that Yokamon's mother "worked."  While it was true that

she had employment prior to 1991, the jury heard no evidence about her exceedingly unstable work history and dismal employment income. Social Security Administration records reflect that from 1978, when Yokamon was born, to 1991, when Yokamon was 13,  Ms. Johnson held a total of *17* different jobs.  Exhibit 8, Social Security Earned Income Records of Susan D. Johnson (hereinafter "Susan D. Johnson's Social Security Records).  From 1980 to 1984, when Yokamon was approximately  2 to 6 years old, she held 3 different jobs each year.  *Id.*  From 1978 to 1991, her average *employment income was less than $5,000 per year.  Id.*  She made as little as $738.18 in 1980, when Yokamon was just 2 years old. *Id.*

### b.       *Yokamon suffered neglect at the hands of his mother*

Given Ms. Johnson's severe impairments, it is not surprising that Yokamon suffered neglect at the hands of his mother. As will be discussed *infra*, Ms. Johnson refused to  follow through with school recommendations that Yokamon be tested for special education when he was in first grade.  She also failed to follow through with recommendations by the Dallas County Mental Health and Mental Retardation Center that Yokamon participate in individual and family counseling when Yokamon was 10 years old and *was experiencing suicidal ideations*.  Trial counsel failed to present any of this evidence to the jury.

In addition, the jury was left with the impression that prior to 1995, when Yokamon's mother was residing in a shelter and CPS took custody of him, Yokamon led a relatively stable life.  As discussed at length *supra,* Ms. Ross Bell and Ms. Johnson testified that prior to 1991, Yokamon  resided with his mother, who was stable and that between 1991 and 1995, Yokamon resided in the home of 2 aunts, where all his needs were met.

Yokamon's life, however, was marked by a great deal of instability.  Yokamon's mother resided with at least 4 different men (not including Yokamon's biological father) after Yokamon was born.  From the time Yokamon was born until he was 18 years of age, he resided in at least 9 separate households, not including the times that Mr. Hearn resided in shelters with his mother.

It is noteworthy that juvenile probation records reflect the fact that Ms. Johnson abandoned Yokamon in the care of his aunt Pearly Mike in 1994.  Exhibit 9, Excerpts of Tarrant County Juvenile Probation Records of Yokamon L. Hearn.  Ms. Mike informed juvenile authorities that she "cannot find [Yokamon's] mother."  *Id.*  The juvenile probation officer noted there was "little [Ms. Mike] can legally do with her nephew without his mother's consent."  *Id.*  The probation officer agreed to call child welfare authorities in an effort to determine what, if anything, the State could do to remedy the situation.  *Id.*

With respect to the circumstances surrounding the involvement of  Child Protective Services (CPS)  in 1995, the jury also did not hear critical details and the information it heard was inaccurate.  Yokamon's mother testified that following an altercation at the shelter where she and Yokamon were residing, she was taken to "detox."  RR 44 at 140.  She further stated that staff at the shelter had indicated that Yokamon could stay at the shelter, but that when she returned, CPS had already taken custody of Yokamon.  *Id.* at 140-141.  Ms. Ross Bell testified that CPS initially placed Yokamon with his paternal grandmother, but was subsequently "released to [Ms. Ross Bell]".  *Id.*  at 105-106.

CPS records, however, reveal that Yokamon was taken into custody because Ms. Johnson was taken to jail and that following her release from jail, she failed to immediately make contact with Yokamon.  Exhibit 10, Excerpts of Child Protective Services Records (hereinafter "CPS

Records"). Contrary to Ms. Johnson's testimony, she was never taken to a detox facility by the police. *Id.* In fact, she was released from jail at 3:00 a.m., the day after her arrest. *Id.* The removal caseworker noted, "[Ms. Johnson] has *abandoned* her son and her whereabouts are unknown." *Id.* State officials entered a finding of *neglectful supervision* against Ms. Johnson. *Id.*

CPS noted that the following sources of concern represented a "clear threat to the immediate or short-term safety" of Yokamon:

- A parent's . . . substance abuse;
- A parent's lack of social support;
- A parent's lack of parenting skills; and
- A lack of money, or a parent's inability to manage money well enough to meet the children's basic needs.

*Id.*

Notwithstanding the fact that Ms. Johnson was immediately released from jail and was not in a detox facility, as the jury was lead to believe, CPS caseworkers determined that Ms. Johnson "was not allowed to take [Yokamon] overnight because she was unable to provide shelter for him." *Id.*

### c. *Yokamon's father was also severely impaired*

As discussed above, the only evidence that the jury heard about Tony Massingill, Yokamon's biological father, was that he was in prison at the time of Yokamon's birth, that Yokamon "did not have a life with him," and that Mr. Massingill died of leukemia. RR 44 at 92-93, 129-131. The jury, however, failed to hear significant and compelling evidence that, like

38

Yokamon's mother, Mr. Massingill exhibited  impaired functioning which led to his utter

inability to function as a responsible parent.

### i.       *Extensive and serious criminal history*

Mr. Massingill had an extensive and serious criminal history involving violence.  Mr.

Massingill was convicted of rape of a child younger than 17 years, a second degree felony, when

Mr. Massingill himself was just 17 years old.  Exhibit 11, Texas Department of Corrections

Records of Tony L. Massingill (hereinafter "Tony L. Massingill's TDC Records").  On October

30, 1974, he was sentenced to serve 2 to 5 years in the Texas Department of Corrections (TDC).

*Id*.  He was released on parole on November 17, 1976.  *Id.*  Interestingly, Ms. Johnson was 16

years old herself when she conceived Yokamon.  Mr. Massingill was 19 years old at the time.

On March 29, 1978, when Ms. Johnson was pregnant with Yokamon, Mr. Massingill was

once again taken into custody, this time for rape.  *Id.*  He was convicted on October 9, 1978 and

once again sentenced to serve 2 to 5 years in TDC.  *Id.*   He was released under Mandatory

Supervision on October 24, 1980, when Yokamon was approximately two years old. *Id.*[9]

### ii.       *Cognitive deficits*

At the time of Yokamon's trial, there was ample evidence that his biological father

suffered from cognitive deficits, none of which Yokamon's jury heard.  Mr. Massingill obtained

an IQ score of 75, within the mental retardation range, on the California Mental Maturity Scale as

---

[9] At trial, the jury heard testimony that Yokamon's mother was married to a Namon Earl Hearn when she conceived and gave birth to Yokamon and that like Yokamon's biological father, Mr. Namon Hearn never provided any kind of support to Yokamon.  RR Vol. 44 at 90, 129-130.  What the jury didn't hear was that like Yokamon's biological father, Mr. Namon Hearn was sexually deviant.  Mr. Namon Hearn was convicted of aggravated sexual assault of a child in 1987.  The victim was 13 years old.  It is noteworthy that Ms. Johnson was merely 16 years old when she married Mr. Namon Hearn.  He, however, was 22 years old.

a 4th grade student.  Exhibit 12, Dallas ISD Records of Tony L. Massingill (hereinafter "Tony L. Massingill's Dallas ISD Records").

Mr. Massingilll's school records clearly reveal a pattern consistent with cognitive deficits. He was administered the California Achievement Test (CAT) on four separate occasions:  twice in 4th grade, once in 5th grade, and once in 6th grade.  *Id.*  His performance on the CAT was consistently substandard.  On the CAT total battery, Mr. Massingill obtained grade equivalent scores of 2.9 and 2.0 as a 4th  grade student; 2.1 as a 5th grade student; and 2.5 as a 6th grade student.  *Id.*  In addition, his grades were far below average.  In 7th grade, Mr. Massingill took a total of 13 classes during the entire school year.  *Id.*  His grades included 8 D's and 2 C's.  *Id.* The only A he received was in Physical Education.  *Id.*  As an 8th grade student, Mr. Massingill took 14 classes.  *Id.*  His grades included 9 D's and 1 F.  *Id.*  Mr. Massingill repeated 9th grade. *Id.*  The first time Mr. Massingill was in 9th grade, he took a total of 12 classes.  *Id.*  His grades included 7 F's and 1 D. *Id.*  According to school records, the highest grade Mr. Massingill attended was 9th grade.  *Id.*

Mr. Massingill's performance in the work setting while incarcerated in TDCJ was also consistent with subaverage intellectual functioning.  On June 30, 1975 and July 23, 1975, he received disciplinary write-ups for "not doing his work properly."  Tony L. Massingill's TDC Records (Exhibit 11).  Both offense reports include the following notation, "counseled with inmate several times but to no avail".  *Id.*

### iii.        *Substance abuse/violence history*

During a 1989 psychiatric evaluation of Yokamon, his mother reported that Yokamon's father was a "drug abuser".  She also described him as a violent man.[10]  Yokamon L. Hearn's MHMR Records (Exhibit 6).

> **d.    *Yokamon's father was unable to meet Yokamon's basic needs even during limited visitation***

Yokamon father failed to meet Yokamon's needs.  The jury was left with the impression that Yokamon had no contact with his biological father.  Contrary to what the jury heard, Yokamon's father kept Yokamon some weekends after his release from prison.  Mr. Massingill, however, was unable to provide an adequate environment for his son even during limited visitation.  In fact, visitation between Yokamon and his father stopped when Yokamon's mother learned that Yokamon's father was sleeping in a car. Yokamon L. Hearn's MHMR Records (Exhibit 6).

> **2.    Yokamon's relatives were reluctant to care for Yokamon and  had difficulty meeting his basic needs**

Based on testimony of Ms. Ross Bell, the jury was left with the impression that Yokamon's relatives gladly and willingly took care of Yokamon when his mother was not able to do so.  CPS records reflect a different picture.  Prior to CPS assuming emergency  custody of Yokamon in 1995, state officials contacted 3 relatives, including Ms. Ross Bell,  in an effort to secure a placement for Yokamon.  CPS Records (Exhibit 10).  Two maternal relatives, Ms. Mike

---

[10] On May 8, 1987, Mr. Massingill was taken to Parkland Memorial Hospital with a gunshot wound to the chest.  Exhibit 13, Excerpt of Parkland Memorial Hospital Records relating to Tony L. Massingill.  He remained in the hospital until May 11, 1987.  *Id.*  Although medical records contain no other information regarding the incident, it suggest the possibility that Mr. Massingill's environment was violent.

and Kendra Ross, refused to care for Yokamon. *Id.* Ms. Ross Bell was noncommital. *Id.* CPS

records include the following entries:

> Ms. Hearn was released from jail at 3:00 A.M. on 4-25-95. Maternal Aunt, Pearly
> Mike was asked to take Yokamon but expressed that she did not have the
> resources to care for him. Another Maternal Aunt, Wanda Bell was also located.
> Ms. Bell would not commit to care of Yokamon at the time of the phone
> conversation. Further attempts were made to contact Ms. Bell to obtain
> information on a Paternal Grandmother in Dallas. Ms. Bell's phone answering
> machine was on therefore the information could not be obtained. No other
> information was offered or given by family members that were contacted.

*Id.* The following notation was made regarding Kendra Ross, "Ms. Kendra Ross, MAU, stated

she would not take Yokamon and did not want to talk about the situation." *Id.* A CPS worker

noted, "[Yokamon] does not like his mother and he wants to live with his aunt. His aunt will not

take him because of his mother's drug use and violent behavior. The family is *tired* of taking

care of Ms. Hearn's child." *Id.* (emphasis added). It was precisely because family members

were unwilling or incapable of assuming responsibility of Yokamon after his mother failed to

care for him and failed to arrange for his care that CPS was granted temporary managing

conservatorship of Yokamon and that he was initially placed in a shelter by CPS.

Ms. Johnson's paramour, an "unknown White male", at the time of CPS's involvement

also failed to provide a safety net for Yokamon. When a CPS caseworker contacted him in

efforts to locate Ms. Johnson, he denied knowing her whereabouts. *Id.* According to CPS

records, "[h]e was extremely drunk and seemed angry with Susan and Yokamon . . ." *Id.*

There was nothing to suggest from the trial testimony of Ms. Ross Bell or Ms. Johnson

that Yokamon's relatives had difficulty meeting Yokamon's most basic needs when Yokamon

was in their care. To the contrary, the jury was left with the impression that while relatives could

not afford fancy clothes or shoes, Yokamon "did not want for anything" while in the care of family members.  State of Texas documents reflect otherwise.  As noted above, Ms. Mike informed CPS that she was unable to care for Yokamon as she could not afford to do so.  Also, on June 22, 1995, after CPS took custody of Yokamon,  state officials completed a home study on Ms. Ross Bell's household, where Yokamon was eventually placed.  *Id.*  Residing in the home at the time were Ms. Bell and her 3 (or 4)  biological children.  The family's total monthly income was a mere *$606.00*: $226.00 in AFDC allotment and $380.00 in food stamp allowance. *Id.*  While Ms. Ross Bell initially insisted she could meet Yokamon's needs, less than two months later, she sought financial assistance from CPS for Yokamon's care.  *Id.*  According to CPS records.  "Relative needs assistance with obtaining clothes and bedroom furniture for Yokamon . . . . She is single with 4 children of her own and needs the assistance to get the household up for Yokoman [sic]."  *Id.*

### 3.     Yokamon had a mental health history that included suicidal ideations

At trial, Yokamon's mother and maternal aunt cursorily mentioned that the death of Yokamon's maternal grandfather in 1985 affected Yokamon greatly.  His mother indicated that following the loss of his grandfather, Yokamon became depressed and stopped functioning at school.  Given defense counsel's utter failure to investigate Yokamon's life history it is perhaps not surprising that the jury never heard that in *1989* (four years after the death of Yokamon's grandfather), when Yokamon was 10 years old, he was taken to Parkland Memorial Hospital's Emergency Room for *suicidal ideations*, that it was the opinion of mental health professionals that impaired parenting was adversely affecting Yokamon, that individual and family therapy

were recommended, and that Yokamon's mother failed to follow through with the recommended treatment because of her drug problem.

Yokamon was taken to Parkland Memorial Hospital at the suggestion of a school counselor because Yokamon had written a note stating "I wish to die tonight and never see the world again."  Exhibit 14, Excerpts of Parkland Memorial Hospital Records of Yokamon L. Hearn (hereinafter "Yokamon L. Hearn's Parkland Hospital Records).  The jury that sentenced Yokamon to death never heard this.  According to medical records, Yokamon wrote this note in response to news a teacher, whom he identified as his "best friend", was leaving the school.  *Id.*

Yokamon was discharged from the hospital with a referral to Crisis Intervention Service of Dallas County MHMR.   *Id.*  The following impressions were noted during the MHMR screening interview:

> Yokamon seems to be very angry at father who rarely visits him and gave him used toys for his birthday.  Mother states that she used to sit down with Yokamon and talk to him like an adult.  This may be stressful for Yokamon who may feel helpless.  *It seems that mother's depression and/or anxiety may be affecting Yokamon.*

> Yokamon could benefit from individual therapy to help cope with feelings of sadness and anger.  Mother could also benefit from individual [sic] to help cope with her father's death and *learn effective ways to be a parent to Yokamon*.

Yokamon L. Hearn's MHMR records (emphasis added).  Additional concerns regarding Ms. Johnson's parents skills were noted: "[Yokamon] does not seem to have adequate skills for expressing himself *mostly because it seems his mother cuts him off when he is doing it naturally*."  *Id.* (emphasis added).

44

A psychiatric evaluation conducted on January 16, 1989 as part of the MHMR screening

process  also suggested that Yokamon was being adversely affected by exposure to violence,

about which the jury heard nothing.  The psychiatrist noted that Yokamon's mood was mildly

despondent during the interview.  She noted:

> He claimed that he is both sad and angry.  He claimed that what makes him angry
> is when mother [sic] buys him pictures of somebody being killed.  He claimed he
> gets sad when his cousin gets beat up.  He claimed when he was in second grade
> he beat up a boy.  He claimed that his mother moved him to another school in
> January 1989 because mother did not like the school where he used to go because
> kids beat up other kids.  Since January, he claimed that he has nightmares of
> people jumping out of airplanes and trying to kill him.

*Id.*  MHMR diagnosed Yokamon with Adjustment Disorder with Depressed Mood.  *Id.*  Mental

health professionals recommended individual and family therapy for Yokamon.  *Id.*  Yokamon,

however, was only seen for 2  family therapy sessions.  *Id.*  According to the discharge summary,

"mother has a problem with drug abuse and could not be relied upon to bring him in."  *Id.*

### 4.       Yokamon suffered from brain damage

As with virtually all other aspects of Yokamon's life, the jury that sentenced Yokamon to

death did not have the benefit of knowing that starting in utero and throughout his childhood,

Yokamon was exposed to "risk" factors known to be associated with brain damage; that

Yokamon did, in fact, suffer from brain dysfunction; and that Yokamon  exhibited life-long

impairments associated with that brain damage.

#### a.       *Yokamon was exposed to risk factors associated with brain dysfunction.*

##### i.       *In-utero exposure to alcohol and serious complications at birth*

45

Yokamon was extensively exposed to alcohol *in utero*.  Dianne Johnson, Yokamon's

mother, reported that she drank heavily during the first six months of her pregnancy.[11]  According

to Ms. Johnson, she routinely passed out from heavy alcohol consumption while she was

pregnant with Yokamon.  At birth, Yokamon did not breathe for the first minute of his life and

exhibited poor reflexes.  Yokamon L. Hearn's Parkland Hospital Records (Exhibit 14).  His first

Apgar score—an index of well-being at birth—was very low (2 on a scale of 1-10).  Yokamon L.

Hearn.  *Id.*

Due to the discovery of this history during the investigation of Mr. Hearn's *Atkins* claim,

counsel for Yokamon asked that Pablo Stewart, M.D.,  a psychiatrist specializing in treating

patients with substance abuse examine the relevant information to determine whether Yokamon

has Fetal Alcohol Syndrome.  After reviewing the history of Yokamon's mother's alcohol

ingestion during her pregnancy with Yokamon, Yokamon's birth records, and numerous

photographs of Yokamon's face,[12] Dr. Stewart concluded that the data "strongly supports a

diagnosis of FAS [Fetal Alcohol Syndrome]."  Exhibit 15, Assessment of Yokamon Hearn for

Fetal Alcohol Syndrome by Pablo Stewart, M.D. (hereinafter "Fetal Alcohol Syndrome

Assessment").   As Dr. Stewart explained in his report,

> Fetal Alcohol Syndrome (FAS) is a pattern of mental and physical defects which
> develops in some unborn babies when the mother drinks too much alcohol during
> pregnancy.  A baby born with FAS may be seriously handicapped and require a
> lifetime of special care.  Some babies born with alcohol-related birth defects,

---

[11] As noted previously, Ms. Johnson became pregnant with Yokamon at the age of 17 and gave birth at the age of 18.

[12] Certain abnormal facial features provide "classic signs that are uniquely characteristic of FAS." Fetal Alcohol Syndrome Assessment ( Exhibit 15), at 2.

including smaller body size, lower birth weight, and other impairments, do not have all the classic FAS symptoms. These symptoms are sometimes referred to as Fetal Alcohol Effects (FAE). Researchers do not all agree on the precise distinctions between FAS and FAE. There is agreement, however, on the cause of FAS/FAE. Alcohol in a pregnant woman's bloodstream circulates to the fetus by crossing the placenta. There, the alcohol interferes with the ability of the fetus to receive sufficient oxygen and nourishment for normal cell development in the brain and other organs.

*Id.* at 1.

At the time of Yokamon's trial, it was well-established that prenatal exposure to alcohol can lead to detrimental effects throughout the life span, including changes to the brain which cause cognitive deficits. *See* Paul D. Connor & Ann P. Streissguth, *Effects of Prenatal Exposure to Alcohol Across the Life Span*, Issue No. 3., 20 Alcohol Health & Research World 170 (1996). It was also understood that cognitive deficits, in turn, lead to impairments in day-to-day functioning. *Id*.

### ii.     Possible exposure to lead

Yokamon was also likely exposed to lead poisoning as a child, and lead poisoning in children has been linked to brain damage, neuro-behavioral dysfunction and learning problems. *See* H.L. Needleman et al., *The Long-Term Effects of Exposure to Low Doses of Lead in Children: An 11-Year Follow-Up Report*, 322(2) New Eng. J. Med., 83, 83-88 (1990). The state of Texas has recognized lead poisoning as a severe threat to the health and well-being of children. Indeed, in 1995, the 74th legislature passed a law requiring that elevated blood lead levels in children under age 15 be reported to the Texas Department of State Health Services. Texas Department of State Health Services Texas Childhood Lead Poisoning Prevention Program, *Toward a Lead-Safe Texas: Texas Strategic Plan to Eliminate Child Lead Poisoning by*

*2010* at 6, July 2007-June 2008, *available at*

*http://www.dshs.state.tx.us/lead/pdf_files/tx_clppp_sp_07.pdf* (last visited Oct. 14, 2008).

The state of Texas did not commence monitoring blood lead levels until Yokamon,

whose date of birth is November 6, 1978, was well over 15 years of age.  Data from the Centers

for Disease Control and Prevention (CDC), however, suggest that Yokamon was at risk for lead

poisoning as a youth.  A 1997 CDC publication for state and local public health officials noted

that "Lead-based paint in homes is the most important remaining source of lead exposure for

U.S. children."  Centers for Disease Control & Prevention, Screening Young Children for Lead

Poisoning: Guidance for State and Local Pub. Health Officials 13 (1997).

The CDC went on to warn that:

> 83% of all homes built in the United States before 1978 still contain some lead
> based paint at a concentration of at least one $mg/cm_2$ (U.S.Environmental
> Protection Agency, 1995). The older the house, the more likely it is to contain
> lead-based paint and to have a higher concentration of lead in the paint. Housing
> built before 1950 poses the greatest risk of exposure to children. Such housing is
> present in every state.

*Id.* at 13-14.

As a youth, Yokamon's  primary place of residence was his maternal grandmother's

house which is located at 5166 Burnside Avenue, Dallas, Texas 75241.  The house, which is still

owned by the family and is in great disrepair, was built in 1924.  Dallas Central Appraisal

District, Account #00000319858, *available at*

*http://www.dallascad.org/AcctDetailRes.aspx?ID=00000319858000000#History* (last visited

Oct. 14, 2008).  It is noteworthy, the state of Texas has identified the entire 75241 zip code as a

48

high risk area for lead poisoning. Texas Department of State Health Services, *Blood Lead Screening and Testing Guidelines for Texas Children: Quick Reference Guide*, Mar. 26, 2008, *available at http://www.cfhp.com/Providers/ProviderManuals/STAR/Exhibit29.pdf* (last visited June 22, 2012).

### b.      *Neuropsychological testing confirms that Yokamon had brain damage*

During the course of the investigation of Mr. Hearn's *Atkins* claim, a psychologist, Dale G. Watson, Ph.D., conducted a neuropsychological evaluation of Yokamon in April of 2007. Exhibit 16, Neuropsychological Report of Dale G. Watson, Ph.D. (hereinafter "Dr. Watson's Report"). This testing revealed "mild neuropsychological deficit" in the left hemisphere of Yokamon's  brain "frequently associated with structural brain damage," *id*. at 2 & n.4, leading Dr. Watson to conclude that Yokamon "does show evidence of brain-dysfunction." *Id*. at 3.

Dr. Watson found that Yokamon's brain dysfunction affected him in the following ways:

•      Yokamon "is likely a poor auditory learner and is slow to learn though he is able to retain information once learned."

•      Yokamon "ha[d] an impulsive style [such] that his responses were fast but inaccurate."

•      Yokamon "demonstrated limitations in verbal (but not non-verbal) problem solving including concrete thinking, poor deductive verbal reasoning abilities, cognitive inflexibility, and problems with verbal inhibition."

49

• Yokamon "exhibited limited problem solving abilities and specific problems in the 'Learning to Learn' ability.  In other words, he was slow to understand the underlying requirements of the task [in a test designed to test learning abilities] despite ongoing feedback designed to allow him to learn the sorting principles [inherent in the test]."

Dr. Watson further found that these neuropsychological impairments were the underlying cause of impairments in daily living that Mr. Hearn exhibited and that are discussed at length *infra*:

> The implications of these deficits are consistent with an individual with a history of school failure, difficulties paying attention to conversations, poor problem solving, concrete verbal thinking, who is slow to learn from experience and despite an impulsive style displays a slowness in processing information.  Many of his difficulties are on verbally mediated tasks so he will face challenges in his daily life when confronted with tasks that require complex communications, verbal reasoning and verbal learning.... Mr. Hearn's neuropsychological deficits appear to underlie the previous findings of deficits in adaptive functions particularly in the area of Conceptual functioning.  Conceptual functions involve the areas of language abilities (receptive and expressive), reading and writing, and self-direction.

Dr. Watson's Report (Exhibit 16) at 3-4.  Moreover, Dr. Watson concluded that Mr. Hearn's deficits in brain functioning "are likely developmental in nature."  *Id*. at 4.

### c.    *Yokamon exhibited life-long impairments in day-to-day functioning*

The jury that determined that Yokamon did not deserve to live heard almost no information regarding his day to day functioning.  The jury only heard that Yokamon became depressed, stopped functioning in school, and shut down following the death of his grandfather, and that he was a follower.  Had Yokamon's trial attorneys conducted a minimally adequate

50

investigation, the jury would have learned that Yokamon exhibited an inability to meet demands

of day to  day living and that his impairments are consistent with brain damage.  Yokamon's

impairments included substandard school performance, poor receptive language skills,

inadequate social skills, and scant work history.[13]

### i.     *Substandard school performance*

Despite the fact that Yokamon's school records reflect a well-established pattern of

substandard performance in educational settings, the jury never heard about his grossly and  long

lasting deficient performance.  For example, as a Kindergarten student, Yokamon received

"Needs Improvement" in all academic subjects:  Readiness, Mathematics, and Social Studies.

Exhibit 17, Dallas ISD Records of Yokamon L. Hearn (hereinafter "Yokamon L. Hearn's Dallas

ISD Records").  Yokamon continued to perform deficiently in first grade.  He obtained the

following grades as a first grader:  65 in English/Language Arts, 70 in Mathematics, 72 in Social

Studies, 73 in Science Health, 74 in Fine Arts, and 77 in Physical Education.  *Id.*  According to

elementary school records, Yokamon's performance was so substandard that he was retained in

first grade.  *Id.*

---

[13] During the course of litigating Yokamon's *Atkins* claim, undersigned counsel sought the assistance of Dr. James Patton, a mental retardation expert.  To assess Mr. Hearn's adaptive behavior, Dr. Patton reviewed Mr. Hearn's school records, prison records, and medical records; the school and medical records of his mother, Susan Diane (Hearn) Johnson; the school and prison records of his father, Tony Massingill; and numerous memoranda of interviews with lay witnesses who have known Mr. Hearn most of his life.  Dr. Patton conducted personal interviews with seven of these witnesses—Mr. Hearn's mother, five of his cousins, and a former teacher.  Finally, Dr. Patton conducted a standardized measure of adaptive behavior, the *Adaptive Behavior Assessment System – Second Edition (ABAS-II) – Adult Form* (Harrison & Oakland, 2003), with the person most knowledgeable about Mr. Hearn's adaptive behavior prior to the age of eighteen.  *See* Exhibit 2 to Subsequent Application for Post-Conviction Writ of Habeas Corpus, *Ex Parte Hearn*, CCA Cause No. WR-50116-03 at 2-4.  Based on all these sources of information, Dr. Patton concluded that Mr. Hearn has significant limitations in adaptive behavior.  *Id.* at 5-7.

Yokamon's first grade teacher confirmed that Yokamon's school records are indicative of significant performance problems.  She reported that a reading grade of 65 in first grade indicates serious academic deficiencies.  She stated that the decision to retain a student in first grade was an extremely serious one and only made when serious concerns regarding a student's functioning were noted.  She further stated that a review of Yokamon's first grade records suggest that Yokamon could have benefitted from special education services.  A family member confirmed that Yokamon's first grade teacher recommended that Yokamon be tested for special education, but that Ms. Johnson, Yokamon's mother,  refused to make the necessary arrangements.

After repeating first grade, Yokamon's grades improved in second and third grades.  His scores, however, began to decline again by fourth grade.  From fourth to sixth grades, Yokamon's grades in academic classes hovered mostly in the 60's and 70's.  *Id.*  In the Spring semester of sixth grade, for example, Yokamon obtained a 66 in Language Arts, a 71 in Mathematics,  a 63 in Social Studies, a 75 in Science and Health, a 63 in Reading, and an 85 in Physical Education.  *Id.*  In 5th grade, Yokamon was administered the Texas Assessment of Academic Skills (TAAS) test.  *Id.*  He failed to meet minimum requirements for the reading and math portions of the test.  *Id.*

Yokamon's functioning in school continued to decline as a middle school and high school student.  By the second semester of seventh grade, Yokamon obtained the following grades:  50 in Language Arts, 55 in Reading Improvement, 53 in Texas History, 56 in Math (PH), 50 in Life Science, 78 in PE-Aerobics, and 51 in Math (Mastery).*Id.*   He was once again administered the TAAS test as a seventh grade student.  *Id.*  This time, Yokamon failed to master basic skills in all

52

subjects:  math, reading, and writing.  *Id.*  As a result of deficient performance in reading,

Yokamon was placed in reading improvement classes as a seventh and ninth grade student.  *Id.*

In addition to failing first grade, Yokamon repeated ninth grade.  Yokamon attended ninth

grade for the first time during the 1994-1995 school year. The first time he was in ninth grade,

Yokamon failed seven out of eleven classes.  Exhibit 18, Fort Worth ISD Records of Yokamon

L. Hearn (hereinafter "Yokamon L. Hearn's Fort Worth ISD Records").  His grades fell far below

passing.  For example, he received a 50 in the first semester of Reading Improvement and a 33 in

the second semester.  *Id.*  He received a 21 in English in the first semester and a 25 in the second

semester.  *Id.*  He received a 19 in Algebra in the first semester and a 52 in the second semester.

*Id.*   In the second semester, he received a 33 in Social Studies, 51 in Career and Technology

Education, and 50 in ROTC.  *Id.*  He barely passed classes for which he received partial credit.

For example, he received a 64 the first semester and a 70 the second semester in Physical

Science, he received 76 the first semester and a 10 the second semester in World Geography.  *Id.*

Yokamon attended ninth grade for the second time during the 1995-1996 school year.

Yokamon L. Hearn's Dallas ISD Records (Exhibit 17).  With the exception of his first semester

grade in ROTC, Yokamon's grades the second time he was in ninth grade were in the 70's. *Id.*

During the 1996-1997 school year, Yokamon was enrolled in a total of sixteen courses.

Out of the sixteen courses, he obtained credit for only one class.  His grades were once again far

below passing.  During the first semester of the 1996-1997 school year, Yokamon obtained the

following grades:

English                              50
Geometry                             49

53

| | |
|---|---|
| Science | 50 |
| Band | 80 |
| ROTC | 62 |
| TAAS Tutoring | 53 |
| Food Science and Nutrition | 50 |
| Construction Graphics | 50 |

*Id.*

Yokamon was tutored for the TAAS during the 1995-1996 school year, the second time he was in ninth grade. *Id.* He obtained a 70 in the first semester and a 67 in the second semester. *Id.* During the 1996-1997 school year, he was once again placed in a TAAS tutoring program as a tenth grade student. *Id.* His score for the same class in the first semester of his tenth grade declined to a 53. *Id.*

As a ninth grade student at Polytechnic High School, Yokamon ranked 257 out of 274. Exhibit 19, Educational Records of Yokamon L. Hearn Contained in CPS Records. In addition, he ranked 174 out of 200 students in March 1997 at A. Maceo Smith High School. Yokamon L. Hearn's Dallas ISD Records (Exhibit 17). Yokamon dropped out of school during the second semester of the year he was in the tenth grade. *Id.*

In July 1997, Yokamon applied to the Dallas Can! Academy. Dallas Can! Is part of an umbrella organization, Texas Can!, whose mission is to "target academically at-risk youth who had trouble succeeding in a traditional high school environment." Exhibit 20, Dallas Can! Academy Records of Yokamon L. Hearn.

Family members consistently confirm that Yokamon struggled with all academic subjects. One cousin explained that Yokamon "learned at a slower pace and needed extra

attention." Yokamon received assistance from family members with school assignments. Family members shared the opinion that Yokamon could have benefitted from special education services.

### ii.      Impairments in receptive language skills

Life history witnesses indicated that Yokamon had a difficult time understanding and following directions. His cousin, Zamin Bell, reported that she noticed he had trouble understanding what others said to him, if the communication was not simple. Yolanda Mike, another one of his cousins, also reported that he had problem understanding what was said to him. She recounted that Yokamon attempted to cook greens, after being instructed by his aunt, Pearly Mike. He was, however, unable to follow the directions and the greens turned out to be almost inedible. Yokamon also had great difficulty in understanding how to wash clothes. He struggled with separating colors from whites. His cousin, Ladonna Ross, tried to explain to and show him how to ride a bike; but, she reported that he could not get it. She also reported that he had a difficult time understanding the symbols or color-coding associated with simple games. Hubert West, Yokamon's ROTC teacher, indicated that, while many of the students at A. Maceo Smith High School are at the lower level of performance, as compared to a wider population of students, Yokamon seemed to operate at an even lower level. Mr. West also reported that Yokamon had trouble with drill team activities because he could not follow the complex instructions given by the drill instructors and basically could not "think on his feet."

### iii.      Inadequate social skills

Nearly all of Yokamon's relatives indicated that he did not have many friends in the neighborhood or at school.  Zamin Bell described Yokamon as a "loner."  Yolanda Mike reported that he kept to himself and never had a group of friends.  Yokamon seemed to be fortunate that he had benefactors (i.e., his cousins) around him for support

Witnesses also reported that Yokamon seemed to be very gullible.  Two of his cousins provided examples of his gullibility.  Zamin Bell, who indicated that she thought he was "used" by others, described the following example: Yokamon wanted to respond to an ad where one could make "$500/week doing something related to music."  He bought the whole idea while Ms. Bell recognized it as a scam.  Ladonna Ross recounted another incident in which he was talked into using his ID card to pawn a ring that had been stolen by others.

<em><strong>iv.        Dismal work history</strong></em>

Yokamon's employment records also reflect an inability to function adequately in the work setting.  Ms. Ross Bell testified that she encouraged Yokamon to search for a job in January of 1998, which suggests, of course, that Yokamon was unemployed.  According to Social Security Administration records, Yokamon began working in 1996, between the ages of 17 and 18.  Exhibit 21, Social Security Administration Earned Income Records of Yokamon L. Hearn (hereinafter "Yokamon L. Hearn's Social Security Records").  From to 1996 to 1998, he held 3 separate jobs.  *Id.*  He made *less* than $3,000 during the 2 to 3 years he worked.  *Id.*  In 1996, Yokamon made a mere $371.31 while employed at Auto Marketing Inc. in 1997.  *Id.*  The most he ever earned in one job was $1,361.98.  *Id.*

Yokamon's income was, indeed, so low that he qualified for income assistance when he was 17 and 18 years old.  From September 1, 1996 to April 30, 1997, he was active in the Temporary Assistance to Needy Families (TANF) database.  Exhibit 22, Texas Health and Human Services Commission Records of Yokamon L. Hearn.

>    **D.      There Is a Reasonable Likelihood That Effective Investigation of Mr.
>             Hearn's Life Would Have Made a Difference in Mr. Hearn's Sentence**

Based on the evidence presented to it, the jury had every reason to believe that Mr. Hearn's life was not severely impacted by his mother's crack addiction and his father's absence from his life.  Life seemed to be pretty normal for Yokamon until his mother developed a drug problem when he was about 13, and even then, his relatives took him in and cared for him as one of their own children during the periods that his mother was incapacitated.  His father was never a part of his life, so even though the absence of a father was hard, it did not distinguish Yokamon from any other kid who grew up in a single-parent family.  This picture of Yokamon's life made it easy for the prosecutor to dismiss the facts as mitigating, which he did when he ridiculed the defense evidence and argument by saying, "if their theory is true, then if your mom was ever a crack dealer ... you can't get the death penalty...."  RR 44 at 185.

An effective investigation into Yokamon's life would have changed this profoundly, because it would have revealed, primarily through irrefutable records, the enormous gulf between the life of a child who grows up in a family, extended or not, that is able to care for him and meet his needs even through hard times, and the life of a child in a family whose cumulative inadequacies, actions, and inactions virtually destroyed him.  The life of the first child is the life

Yokamon's jury thought he had.  The life of the second child is the life he had.  Had the jury heard about Yokamon's real life, they would not have sentenced him to death.

The destruction of Yokamon Hearn at the hands of his family began moments after he was conceived.  For the first six months he was growing in his mother's womb, his system was infused with the alcohol his mother drank every day.  The alcohol stunted the development of Yokamon's brain and nearly killed him by the time he was born, causing him not to breathe for a whole minute and leading the medical staff attending his delivery to rate his well-being as a 2 on a scale of 1-10.

Born into the life of a mother who was herself still a child and struggling to take care of herself, Yokamon was barely fed, clothed, and housed.  His mother earned less than $800 during Yokamon's second year of life and an average of less than $5000 per year during his entire childhood.  Over the course of Yokamon's lifetime, his mom struggled not only with poverty but also with mental illness and drug and alcohol abuse.  He witnessed her suffering and her struggles and was deeply impacted by it, always vigilant about her well-being.  As Yokamon's MHMR records noted, when he was 10 years old, "Yokamon senses when [mother] is depressed and will go into her room to check on her, stating he was just going to the bathroom." Yokamon L. Hearn's MHMR Records (Exhibit 6).

Also at the age of 10, Yokamon began feeling depressed and suicidal.  His turmoil came to the attention of a school counselor, because a teacher, whom he identified as his best friend, announced she was leaving the school, and Yokamon wrote, "I wish to die tonight and never see the world again."  Yokamon L. Hearn's Parkland Hospital Records (Exhibit 14).  Taken to the emergency room at Parkland Memorial Hospital, mental health professionals concluded that

58

impaired parenting was adversely affecting Yokamon.  *Id*. Referral to MHMR for further

followup showed that the inadequacies in both of Yokamon's parents were having profound

consequences for him:

> Yokamon seems to be very angry at father who rarely visits him and gave him
> used toys for his birthday.  Mother states that she used to sit down with Yokamon
> and talk to him like an adult.  This may be stressful for Yokamon who may feel
> helpless.  It seems that mother's depression and/or anxiety may be affecting
> Yokamon.

> Yokamon could benefit from individual therapy to help cope with feelings of
> sadness and anger.

Yokamon L. Hearn's MHMR Records (Exhibit 6).  And,  a psychiatrist, noting that Yokamon's

mood was mildly despondent during the interview, wrote,

> He claimed that he is both sad and angry.  He claimed that what makes him angry
> is when mother [sic] buys him pictures of somebody being killed.  He claimed he
> gets sad when his cousin gets beat up.  He claimed when he was in second grade
> he beat up a boy.  He claimed that his mother moved him to another school in
> January 1989 because mother did not like the school where he used to go because
> kids beat up other kids.  Since January, he claimed that he has nightmares of
> people jumping out of airplanes and trying to kill him.

*Id*.  Overwhelmed by fear, anger, and sadness arising from the circumstances of his life at age 10,

Yokamon had a chance, because caring professionals were there to help him.  Instead, his mother

failed to bring him back for proposed therapy, as noted cryptically in his records:  "[M]other has

a problem with drug abuse and could not be relied upon to bring him in."  *Id*.

The pillar-to-post existence thrust upon Yokamon by his mother's episodic absences due

to substance abuse, mental illness, or arrests related to both meant that, during his entire life,

Yokamon was frequently passed off to his mother's sisters.  These were the same sisters whom

his mother reported as abusive to her throughout her life:

> Client [Ms. Johnson] shared that her sisters were abusive to her throughout her
> childhood.  Client reports that they once locked her in a dark closet with rats for
> hours.  They put her in a bathtub of extremely hot water and burned her badly.
> One sister pushed her into a hot stove, burning client's arm.  Client showed
> caseworker scars from this burn.

Susan D. Johnson's MHMR Records (Exhibit 5). Taking care of Yokamon was not easy.

Feeding and clothing him on already-inadequate budgets, in which one aunt was trying to care for

her 3-4 children and herself on $600 per month, was impossible.  The years of trying to be a

safety net for the child of a sister they held lifelong anger and resentment for took a terrible toll.

Far from being welcomed into their homes, Yokamon's maternal aunts resented him because of

the extra burden his mother thrust upon them.  Thus, prior to CPS assuming emergency custody

of Yokamon in 1995 when he was 16 years old, state officials contacted three relatives, including

Ms. Ross Bell,  in an effort to secure a placement for Yokamon.  Yokamon L. Hearn's MHMR

Records (Exhibit 6).  Two maternal relatives, Ms. Mike and Kendra Ross,  refused to care for

Yokamon.  *Id.*  Ms. Ross Bell was noncommital.  A CPS worker noted, "The family is *tired* of

taking care of Ms.  Hearn's child."  *Id*.

Yokamon's father was not an option.  After he got out of prison in the early 1980's,

Yokamon's mother attempted to have him take care of Yokamon on weekends.  This effort came

to an abrupt and permanent halt when she learned that Yokamon's father was homeless and

living in a car.

60

The chronic sadness, anger, and suicidal thinking that pervaded Yokamon's life, and for which he never got help, was overlaid on a brain that was damaged by alcohol when he was a fetus.  Because Yokamon grew up in an area of Dallas that was known to present a high risk of lead poisoning to children, Yokamon's brain damage may well have gotten worse as he grew into adolescence.  What we know is that, because damage to his brain from the time he began developing kept him from having the internal resources that most people have, he suffered great difficulties:   He struggled mightily in school from the time he started to the time he dropped out. He had much trouble learning, solving day-to-day problems, understanding fully what others said to him, and controlling strong emotional impulses.  Because his cognitive impairments tended to isolate him from others, he struggled to be accepted and to be somebody.

It was this child, not quite 19½ years old, who got caught up on March 25, 1998 in a random search for someone to rob that then turned into a kidnapping and a murder, all in a matter of a short period of time and all without any considered plan to do any harm to the robbery victim.  *See* Exhibit 23, Sworn Statements of Delvin J. Diles, Dwight P. Burley, and Theresa S. Shirley, Mr. Hearn's Codefendants (each stating that there was no plan to kill anyone that night, and that the idea to kill Mr. Meziere happened spontaneously during the course of the robbery). This child, who was chronically angry, sad, and suicidal from early in his life because of the suffering of his parents and their inability to take care of him, who was a burden and a resentment to those who were forced into trying to care for him, and who had a brain that disserved him the most when he needed it to function at its best, this child who wanted to be somebody, and after a terrible set of mistakes that led to the murder of Mr. Meziere, tried to be somebody by boasting about what he had done—this child did not need the jury to finish the

destruction that his family nearly accomplished on its own.  He needed, instead, to be kept safe from further harm, and to be prevented from doing further harm.  He needed, instead, to be treated as he was, a tragic victim of the circumstances of his life rather than the evil victimizer that the prosecution falsely portrayed him to be and that his lawyers could not, because of their ineffective assistance, counter.

Had the jury known the real Yokamon Hearn, they would not have sentenced him to death.

In *Strickland v. Washington*, the Supreme Court set out the following framework for analyzing the prejudice component of a claim of ineffective assistance of trial counsel:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

466 U.S. at 695-96.  There can be no question in light of the foregoing analysis that trial counsel's failure to conduct a reasonably competent mitigation investigation for Mr. Hearn "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture...."  Absent counsel's errors, the sentencing decision reasonably likely would have been different.

62

**Procedure:  Why the Court Should Treat This Petition as a First Petition
Rather Than a Successive Petition**

As we noted in the Introduction, the ineffective assistance of trial counsel claim presented

here (the "*Wiggins* claim") was not raised in Mr. Hearn's first state habeas corpus application.

The facts supporting the claim were readily discoverable then, in 1999-2000, just as they were

when undersigned counsel discovered them in the course of investigating Mr. Hearn's *Atkins*

claim between 2004 and 2007.  There was no legitimate reason, strategy or otherwise, for this

claim not to have been raised in the state habeas application.  The only reason the claim was not

raised was that state habeas counsel provided ineffective assistance.  Moreover, the failure to

present an available *Wiggins* claim in a first state habeas proceeding in Texas bars any attempt to

present it in a subsequent habeas application under Texas' abuse of the writ rules.  Under the

longstanding law of the Fifth Circuit, claims presented to the federal habeas courts in these

circumstances are deemed procedurally defaulted when they are raised in a federal habeas

petition.[14]  Thus, for this Court to be able to consider Mr. Hearn's *Wiggins* claim on the merits,

---

[14]As the Supreme Court held in *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), though normally a
state court must explicitly apply a procedural bar in order for review to be barred, that rule

> [d]oes not apply if the petitioner failed to exhaust state remedies and the court to which the
> petitioner would be required to present his claims in order to meet the exhaustion requirement
> would now find the claims procedurally barred. In such a case there is a procedural default for
> purposes of federal habeas regardless of the decision of the last state court to which the petitioner
> actually presented his claims. *See Harris v. Reed*, 489 U.S. 255, 269-270 (1989) (O'Connor, J.,
> concurring);  *Teague v. Lane*, 489 U.S. 288, 297-298 (1989).

*See also Keeney v. Tamayo-Reyes,* 504 U.S. 1, 9-10 (1992) (holding that an unexhausted claim is defaulted on
federal review if the claim would now be found procedurally barred by the state court).

   The Fifth Circuit has consistently found  unexhausted claims, which would be barred by Texas' abuse-of-
the-writ doctrine if raised in a successive state habeas petition, procedurally barred.  *See, e.g., Ogan v. Cockrell*, 297
F.3d 349, 358 n.6 (5th Cir. 2002) (citing *Horsley v. Johnson*, 197 F.3d 134, 137 (5th Cir. 1999)); *Martinez*, 255 F.3d
at 239; *Finley*, 243 F.3d at 215;  *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998) (Texas' abuse-of-the-writ
doctrine is regularly and strictly applied) (citing *Emery v. Johnson*, 139 F.3d 191, 201 (5th Cir. 1997));  *Nobles v.
Johnson*, 127 F.3d 409, 423 (5th Cir. 1997); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam)

he must be able to show "cause" for this procedural default and sufficient "prejudice" to overcome it.

In Mr. Hearn's case, federal habeas counsel—the same attorney who had been appointed as lead state habeas counsel—also failed to present his *Wiggins* claim in his first federal habeas petition. As a result, his claim faces a second procedural obstacle: abuse of the writ. Under this doctrine, "[a] claim presented in a second or successive habeas corpus application under [28 U.S.C.] section 2254 that was not presented in a prior application shall be dismissed..." unless the claim relies on a retroactive new rule of constitutional law, or relies on facts that could not have been previously discovered and those facts show by clear and convincing evidence that he would not have been convicted but for the constitutional violation. 28 U.S.C. § 2244(b)(2). On its face, Mr. Hearn's *Wiggins* claim does not satisfy either exception to the abuse of the writ rule of preclusion, because it is not based on a new, retroactive rule of constitutional law, and it is based on facts that were previously discoverable and do not call into question the viability of his conviction.

Before March 20, 2012, there would have been no way for Mr. Hearn to overcome procedural default or abuse of the writ. Because of the Supreme Court's decision in *Martinez v. Ryan*, ___ U.S. ___, 132 S.Ct. 1309, on March 20, 2012, however, there is now a way for Mr.

_____

(dismissal is independent and adequate state bar).

Mr. Hearn concedes that the claim raised here would be barred as an abuse of the writ if he now tried to present it to the state courts. *See* Tex. Code Crim. Proc. Article 11.071 § 5(a)(1)-(3)(allowing a claim to be considered in a subsequent habeas application only where the factual or legal basis of the claim was previously unavailable, or where the prisoner can show by a preponderance of the evidence that he would not have been convicted, or by clear and convincing evidence that he would not have been sentenced to death, but for the constitutional violation). The claim Mr. Hearn presents herein would not qualify under either the second (non-conviction) or third (non-death-sentence) provision, and because the evidence supporting the claim was available at the time of the first state habeas proceeding, would not qualify under the first provision.

Hearn to overcome both procedural barriers to the consideration of the claim he presents in this petition.

**I.** ***Martinez* Has Provided a Basis for Arguing "Cause" to Overcome the Procedural Default and for Arguing that This Petition Should Not Be Treated as "Second or Successive"**

**A.    Mr. Hearn Can Now Show Cause for the Procedural Default**

Prior to *Martinez*, ineffective assistance of state habeas counsel could not provide "cause" for the default occasioned by the failure to raise an available claim in state habeas proceedings. Ineffectiveness of counsel could provide cause if the prisoner had a constitutional right to counsel, *Murray v. Carrier*, 477 U.S. 478, 477-78 (1986), but there was no constitutional right to counsel in state habeas proceedings. *See Coleman v. Thompson*, 501 U.S. at 752 ("[t]here is no constitutional right to an attorney in state post-conviction proceedings") (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987);  *Murray v. Giarratano,* 492 U.S. 1 (1989)).[15]

The Supreme Court changed this rule in *Martinez v. Ryan*:

---

[15]Through February, 2012, the Fifth Circuit consistently followed this rule, holding that attorney ineffectiveness in state habeas proceedings could not establish cause for the default in failing to raise a claim in such proceedings.  *See Ayestas v. Thaler*, 462 Fed. App'x 474, 482 (5th Cir. 2012); *Cantu v. Thaler*, 632 F.3d 157, 165-66 (5th Cir. 2011); *Woodfox v. Cain*, 609 F.3d 774, 793 (5th Cir. 2010); *Balentine v. Quarterman*, 324 Fed. App'x 304, 305-06 (5th Cir. 2009); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008); *Rachal v. Quarterman*, 265 Fed. App'x 371, 376 (5th Cir. 2008); *Diaz v. Quarterman*, 228 Fed. App'x 417, 424 (5th Cir. 2007); *Ruiz v. Quarterman*, 460 F.3d 638, 644 (5th Cir. 2006); *Nenno v. Quarterman*, 489 F.3d 214, 217 (5th Cir. 2006); *Whitaker v. Quarterman*, 200 Fed. App'x 351, 356 (5th Cir. 2006); *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004); *Bagwell v. Dretke*, 372 F.3d 748, 756 (5th Cir. 2004); *Campbell v. Dretke*, 117 Fed. App'x 946, 956 (5th Cir. 2004); *Elizalde v. Dretke*, 362 F.3d 323, 329 (5th Cir. 2004); *Dudley v. Dretke*, 77 Fed. App'x 741, 742 (5th Cir. 2003); *Martinez v. Johnson*, 255 F.3d 229, 239 (5th Cir. 2001); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001); *In re Goff*, 250 F.3d 273, 274-75 (5th Cir. 2001); *Etheridge v. Johnson*, 209 F.3d 718, 8 (5th Cir. 2000); *Jones v. Johnson*, 171 F.3d 270, 276 (5th Cir. 1999); *Fairman v. Anderson*, 88 F.3d 635, 643 (5th Cir. 1999); *Callins v. Johnson*, 89 F.3d 210, 212-13 (5th Cir. 1996).

> This opinion qualifies *Coleman* by recognizing a narrow exception:  Inadequate
> assistance of counsel at initial-review collateral proceedings may establish cause
> for a prisoner's procedural default of a claim of ineffective assistance at trial.

132 S.Ct. at 1315.[16]  What changed between *Coleman* and *Martinez* is that the Court could no

longer tolerate the unfairness of precluding consideration of trial ineffectiveness claims in these

circumstances.  The Court explained:

> Claims of ineffective assistance at trial often require investigative work and an
> understanding of trial strategy.  When the issue cannot be raised on direct review,
> moreover, a prisoner asserting an ineffective-assistance-of-trial-counsel claim in
> an initial-review collateral proceeding cannot rely on a court opinion or the prior
> work of an attorney addressing that claim. [Citation omitted.] To present a claim
> of ineffective assistance at trial in accordance with the State's [habeas corpus]
> procedures, then, a prisoner likely needs an effective attorney.
>
> The same would be true if the State did not appoint an attorney to assist the
> prisoner in the [state habeas corpus] proceeding. The prisoner, unlearned in the
> law, may not comply with the State's procedural rules or may misapprehend the
> substantive details of federal constitutional law. [Citation omitted.]  While
> confined to prison, the prisoner is in no position to develop the evidentiary basis
> for a claim of ineffective assistance, which often turns on evidence outside the
> trial record.
>
> A prisoner's inability to present a claim of trial error is of particular concern when
> the claim is one of ineffective assistance of [trial] counsel.  The right to the
> effective assistance of counsel at trial is a bedrock principle in our justice system.
> It is deemed as an "obvious truth" the idea that "any person haled into court, who
> is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is
> provided for him." *Gideon v. Wainwright,* 372 U.S. 335, 344 (1963). Indeed, the
> right to counsel is the foundation for our adversary system.

*Martinez v. Ryan*, 132 S.Ct. at 1317.

---

[16]"Initial-review collateral proceedings" are the "proceedings which provide the first occasion to raise a
claim of ineffective assistance at trial."  *Id.*

"To overcome the default," 132 S.Ct. at 1318, a petitioner must, then, make two showings:  (1) a showing of cause— that "counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668 (1984)," and (2) a showing of prejudice—"that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.  Cf. *Miller–El v. Cockrell,* 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)."[17]  132 S.Ct. at 1318-19.

Mr. Hearn has already made the latter showing, "that [his underlying ineffective assistance of trial counsel] claim has some merit," 132 S.Ct. at 1318, in connection with his pleading of the claim, *supra*.  He will make the showing that his state habeas counsel was ineffective under the standards of *Strickland v. Washington* in a subsequent section of this argument, *infra*.[18]

### B.      Mr. Hearn Can Now Show that This Petition Should Not Be Treated as "Second or Successive"

*Martinez* also provides the basis for Mr. Hearn's argument that, in the circumstances of his case, his petition should not be treated as a "second or successive" petition.

---

[17]*Miller-El* makes clear that this showing of merit need "not demonstrate an entitlement to relief."  537 U.S. at 337.  The court must instead "ask whether th[e] [claim] [i]s debatable amongst jurists of reason," and "[t]his threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id*. at 336.

[18]Mr. Hearn will also address *infra* the threshold issue of whether state habeas proceedings in Texas "provide the first occasion to raise a claim of ineffective assistance at trial," 132 S.Ct. at 1315, which is the precondition for asserting that the ineffectiveness of state habeas counsel was cause for the procedural default at issue here.

The present habeas petition is the third federal habeas corpus petition Mr. Hearn has filed. The first was filed by attorney Jan Hemphill on March 4, 2002.  *Hearn v. Cockrell*, No. 3:01-cv-02551-D, docket item 9.  The second was filed by undersigned counsel on July 27, 2005, after the Fifth Circuit authorized Mr. Hearn under 28 U.S.C. § 2244(b)(3) to file a successive petition raising an *Atkins* claim.  *Hearn v. Dretke*, No. 3:04-cv-00450-D, docket items 24 (Fifth Circuit order) and 26 (petition for writ of habeas corpus).  Even though the present petition is the third petition filed, that fact alone does not determine whether it will be treated as a "second or successive" petition that is subject to the abuse of the writ rules of 28 U.S.C. § 2244(b).

As the Supreme Court observed in the context of a second petition raising a claim of incompetence to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), "While the later filing 'may have been the second time that [the prisoner] had asked the federal courts to provide relief on his *Ford* claim,' the Court declined to accept that there were, as a result, 'two separate applications, [with] the second ... necessarily subject to § 2244(b)."  *Panetti v. Quarterman*, 551 U.S. 930, 944-45 (2007) (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643 (1998)).  As the Court then explained in *Panetti*, "The phrase 'second or successive' is not self-defining.  It takes its full meaning from our case law, including decisions predating the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214."[19]  *Id*. at 943-44.  Thus,

> The Court has declined to interpret "second or successive" as referring to all §
> 2254 applications filed second or successively in time, even when the later filings
> address a state-court judgment already challenged in a prior § 2254 application.

---

[19]AEDPA is the statute that put in place the current version of the abuse of the write rule, 28 U.S.C. § 2244(b).

*Id*. at 944.

The question presented, then, is whether this third petition must be treated as "successive" and dismissed under 28 U.S.C. § 2244(b)(2) for failure to meet the criteria for the consideration of claims presented in successive petitions, or whether this petition must be treated as a first petition.

We submit that the petition should be treated as a first petition due to three factors.  First, Jan Hemphill, the lead state habeas counsel for Mr. Hearn, provided ineffective assistance in state habeas proceedings, because she failed to identify the potential *Wiggins* claim and made no effort of any sort to investigate such a claim or indeed any claim of ineffectiveness of trial counsel.  She is thus the attorney responsible for the procedural default of Mr. Hearn's *Wiggins* claim.  Second, Ms. Hemphill was also appointed as Mr. Hearn's only federal habeas counsel in his first federal habeas proceeding.  She also provided ineffective assistance in that proceeding, because, again, she failed to identify the potential *Wiggins* claim, made no effort of any sort to investigate such a claim, and did not raise any claim that trial counsel were ineffective.[20]  Ms. Hemphill is thus the attorney responsible for not raising Mr. Hearn's *Wiggins* claim in his first federal petition and causing him to have to raise it for the first time in a non-first-in-time federal habeas petition, which until *Martinez* would have meant with certainty that Mr. Hearn had forfeited any federal review of his claim.  Third, the decision in *Martinez* represents a critical reversal for the Supreme Court on the question of whether the ineffectiveness of collateral counsel in failing to raise a claim of ineffectiveness of trial counsel has legal relevance.  *Martinez* holds that it does have legal relevance.  That holding has as much significance for determining

---

[20]Mr. Hearn will address Ms. Hemphill's ineffectiveness in the first federal habeas proceeding, *infra*.

whether Mr. Hearn's petition must be treated as a first petition or a successive petition as it does

for determining whether there is cause for the procedural default of this claim.

In determining whether the petition at issue in *Panetti* would be treated as a first or

successive petition, the Court explained that "[t[he phrase 'second or successive'.... takes its full

meaning from our case law, including decisions predating the enactment of the Antiterrorism and

Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214." 551 U.S. at 943-44.  In the

course of undertaking this inquiry in *Panetti*, the Court noted that "AEDPA's purposes ... [were]

to 'further the principles of comity, finality, and federalism.'" *Id*. at 945.  Continuing, the Court

wrote,

> These purposes, and the practical effects of our holdings, should be considered
> when interpreting AEDPA.  This is particularly so when petitioners "run the risk"
> under the proposed interpretation of "forever losing their opportunity for any
> federal review of their unexhausted claims." *Rhines v. Weber,* 544 U.S. 269, 275
> (2005).

551 U.S. at 945-46.  In interpreting Congress' intent in enacting the AEDPA, and in particular its

intent to preclude review of most claims raised in "second or successive" habeas petitions, the

Court reiterated its view that Congress generally does not intend for habeas petitioners to lose

their opportunity for federal habeas review.  Thus, the Court continued,

> [I]n *Castro* [*v. United States*, 540 U.S. 375 (2005),] we resisted an interpretation
> of the statute that would "produce troublesome results," " create procedural
> anomalies," and "close our doors to a class of habeas petitioners seeking review
> without any clear indication that such was Congress' intent."  540 U.S. at 380,
> 381.

551 U.S. at 946.

70

The theme that the interpretation of the provisions of AEDPA not foreclose federal habeas review of a petitioner's claims was echoed in *Martinez*.  Though the procedural issue in question in *Martinez* was procedural default, an issue that Congress has not addressed in the AEDPA, rather than abuse of the writ, which Congress had addressed in the AEDPA, the *Martinez* Court was equally concerned that procedural deficiencies not unfairly preclude review of trial counsel's ineffectiveness.  Thus, the Court framed the rationale for its decision in *Martinez* as, "To protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel...," 132 S.Ct. at 1315, and emphasized that, without the change in law that it decided to make in *Martinez*, procedural defaults by state habeas counsel will continue to preclude review of such claims altogether:

> When an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim.  This Court on direct review of the state proceeding could not consider or adjudicate the claim. [Citations omitted.]  And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims.

*Id*. at 1316.  For these reasons, the Court deemed that its decision to allow federal habeas review of trial ineffectiveness claims when state habeas counsel ineffectively failed to raise the claims, "acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim."  *Id*. at 1318.

In reaching this conclusion, the *Martinez* Court looked back to its pre-AEDPA decision in *McCleskey v. Zant*, 499 U.S. 467, 490 (1991), for guidance.  *Martinez*, 132 S.Ct. at 1318.  In *McCleskey*, the Court decided that "the same [cause and prejudice] standard used to determine

whether to excuse state procedural defaults should govern the determination of inexcusable

neglect in the abuse-of-the-writ context."[21]   The Court then amplified the similar equitable

concerns and issues underlying both procedural default and abuse of the writ doctrines:

> The prohibition against adjudication in federal habeas corpus of claims defaulted in state court is similar in purpose and design to the abuse-of-the-writ doctrine, which in general prohibits subsequent habeas consideration of claims not raised, and thus defaulted, in the first federal habeas proceeding.  The terms "abuse of the writ" and "inexcusable neglect," on the one hand, and "procedural default," on the other, imply a background norm of procedural regularity binding on the petitioner. This explains the presumption against habeas adjudication both of claims defaulted in state court and of claims defaulted in the first round of federal habeas. A federal habeas court's power to excuse these types of defaulted claims derives from the court's equitable discretion.  [Citations omitted.]  In habeas, equity recognizes that "a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks."  [Citation omitted.]  For these reasons, both the abuse-of-the-writ doctrine and our procedural default jurisprudence concentrate on a petitioner's acts to determine whether he has a legitimate excuse for failing to raise a claim at the appropriate time.

499 U.S. at 490.

Drawing upon this equitable framework, in which "a background norm of procedural

regularity binding on the petitioner ... explains the presumption against habeas adjudication both

of claims defaulted in state court and of claims defaulted in the first round of federal habeas," *id*.,

the *McCleskey* Court recognized that when a petitioner "has a legitimate excuse for failing to

raise a claim at the appropriate time," he should be allowed to show that excuse, or cause, and

gain consideration of the defaulted claim.  *Id*.  Imported almost directly into *Martinez*, the Court

explained that procedural default rules "reflect an equitable judgment that only where a prisoner

is impeded or obstructed in complying with the State's established procedures will a federal

---

[21]The cause and prejudice standard for determining whether a successive petition amounted to an abuse of the writ was replaced by the criteria in 28 U.S.C. § 2244(b)(2), referred to *supra*, when AEDPA was enacted

habeas court excuse the prisoner from the usual sanction of default." 132 S.Ct. at 1318. The Court then made its breakthrough decision that ineffective state habeas counsel so "impede[s] or obstruct[s] [a habeas petitioner] in complying with the State's established procedures," that "a federal habeas court [must] excuse the prisoner from the usual sanction of default." *Id*.

This recognition, that a state habeas lawyer's ineffectiveness should not as a matter of equity preclude the consideration of claims defaulted by state habeas counsel, applies with equal force to a federal habeas lawyer's ineffectiveness in failing to raise claims in the first federal habeas proceeding. As *McCleskey* noted, procedural default and abuse of the writ doctrines are both rooted in the same equitable principles. To be sure, Congress has constricted the federal courts' equitable discretion in determining whether a claim raised in a successive petition can be excused from the abuse of the writ bar. However, as *Panetti* so clearly recognized, the threshold question of whether a non-first-in-time petition will be treated as "second or successive" has not been the subject of Congressional action, but has instead been left to the courts' discretion. 551 U.S. at 943-44. And the determination of whether a petition is "'second or successive'" must be determined "from our case law, including decisions predating the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)...." *Id*.

Case law that begins with *McCleskey* and now includes *Martinez* should thus govern the determination of whether a non-first-in-time federal habeas petition raising a claim of trial counsel's ineffectiveness for the first time in any court should be treated as successive. The equities that led the Court to make the decision it made in *Martinez* should lead the courts now to determine that the ineffective assistance of federal habeas counsel in these circumstances requires the treatment of a non-first-in-time federal habeas petition as a first petition.

73

While *Panetti* supports this conclusion, the Court in *Panetti* was also concerned that a judicial determination to treat a non-first-in-time petition as a first rather than successive petition be in keeping with Congressional intent.  *See Panetti*, 551 U.S. at 945 ("[w]e conclude, in accord with this precedent, that Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture presented here").  Congressional intent supports the determination to treat a non-first-in-time federal habeas petition raising a claim of trial counsel's ineffectiveness for the first time in any court as a first rather than successive petition when the claim was not raised in the first federal habeas proceeding because of the ineffectiveness of federal habeas counsel in that proceeding.

Prior to the passage of the AEDPA, Congress enacted 21 U.S.C. § 848(q), which provided for the appointment of counsel in federal capital trial proceedings and federal capital habeas proceedings (under 28 U.S.C. §§ 2254 or 2255) in the federal courts.[22]  In *McFarland v. Scott*, 512 U.S. 849 (1994), the Court had occasion to interpret Congressional intent with respect to various aspects of this statutory right to counsel.  Germane to the issue in Mr. Hearn's case, the Court explained that in enacting this provision, Congress made

> a determination that quality legal representation is necessary in capital habeas corpus proceedings in light of "the seriousness of the possible penalty and ... the unique and complex nature of the litigation."  § 848(q)(7).  An attorney's assistance prior to the filing of a capital defendant's habeas corpus petition is crucial, because "[t]he complexity of our jurisprudence in this area ... makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law."

---

[22]This provision was recodified in 2006 as 18 U.S.C. § 3599.

74

*Id*. at 855-56.  In explaining that counsel appointed pursuant to § 848(q) must be available prior to a prisoner's scheduled execution, the Court noted that "the [statutory] right to counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's habeas claims."  *Id*. at 858.  And indeed, in a very recent decision by the Supreme Court referring to *McFarland* and this right to counsel, the Court referred explicitly to "the myriad ways that § 3599 seeks to promote effective representation for persons threatened with capital punishment." *Martel v. Clair*, ___ U.S. ___, 132 S.Ct. 1276 (2012).  Thus, Congress *intended* that counsel appointed to represent indigent petitioners in capital federal habeas corpus proceedings provide effective assistance.

For these reasons, there is no dissonance between Congressional intent and the rule advocated by Mr. Hearn.  This Court should determine that Mr. Hearn's present non-first-in-time petition raising a claim of trial counsel's ineffectiveness for the first time in any court should be treated as a first rather than successive petition, because the claim presented here was not raised in the first federal habeas proceeding due to the ineffectiveness of federal habeas counsel in that proceeding.  In keeping with the analytical framework utilized in *Panetti*, the Court should "conclude ... that Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture presented here...."  551 U.S. at 945.

### C.    Response to Arguments that Respondent Is Likely to Make

Respondent will undoubtedly argue that the Fifth Circuit's decision in *Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012), forecloses Mr. Hearn's argument.  However, *Adams* does not control.  The circumstances of the defaulted claims in Mr. Adams' case were markedly different from the circumstances in Mr. Hearn's case.  State habeas counsel failed to raise two claims of

75

ineffective assistance of trial and appellate counsel for their "failure to ensure that the jury was properly instructed in the punishment phase of his trial." *Id*. at 315. In a subsequent state habeas proceeding, new state habeas counsel raised these claims, and the CCA held that the claims were procedurally barred. *Id*. In his federal habeas proceeding, the district court held on July 26, 2010, nearly two years before the Supreme Court's decision in *Martinez*, that the claims were procedurally defaulted and rejected Adams' argument that the ineffectiveness of state habeas counsel established cause for the default. *Id*. The Fifth Circuit affirmed this ruling in 2011. *Id*. at 316.

In the wake of *Martinez* and facing an execution date, Adams filed a Fed.R.Civ.Proc, 60(b)(6) motion arguing that *Martinez* overturned the basis for the district court's decision to dismiss the two ineffectiveness of counsel claims as procedurally defaulted and required that the court re-examine the default ruling. *Id*. The district court granted a stay of execution pending disposition of the 60(b)(6) motion, but on the State's appeal the Fifth Circuit dissolved the stay, holding that Adams 60(b)(6) motion was without merit, "[b]ecause the *Martinez* decision is simply a change in decisional law and is 'not the kind of extraordinary circumstance that warrants relief under Rule 60(b)(6)....'" *Id*. at 320.

Obviously, these circumstances are quite different from those in Mr. Hearn's case, because Adams' federal habeas counsel in the first petition raised the defaulted claims and attempted to secure review of the claims by arguing that the default was due to state habeas counsel's ineffectiveness. However, Adams also filed a new federal habeas petition in the district court seeking review of the same claims, arguing that his petition should be treated as a

76

first rather than "second or successive" petition.[23]  Adams' argument in support of his new

petition did not present to the Fifth Circuit the argument that Mr. Hearn presents

here—demonstrating that the determination of whether a non-first-in-time federal habeas petition

should be treated as a first rather than a successive petition is an equitable determination, to be

guided by Supreme Court's longstanding view that, "without any clear indication that such was

Congress' intent," *Castro v. United States*, 540 U.S. at 380, Congress does not generally intend

for procedural rules to foreclose all consideration of claims of ineffectiveness of trial or appellate

counsel, particularly when a petitioner "has a legitimate excuse for failing to raise a claim at the

appropriate time."  *McCleskey v. Zant*, 499 U.S. at 490.  Instead, Adams argued that

> his second-in-time habeas petition is not successive because "the Supreme Court
> has consistently determined that a petition filed after [a] technical procedural
> barrier is removed is not 'second or successive.' " Adams argues that his case is
> similar to the Court's decisions in *Panetti*, *Slack*, and *Martinez–Villareal* because
> his two ineffective assistance of counsel claims in his initial federal habeas
> petition were dismissed on purely "technical" grounds—for procedural default.
> Adams asserts that *Martinez* has removed this technical barrier to federal habeas
> review of his claims, and therefore we should not treat his petition as "second or
> successive."

679 F.3d at 321-22.  Without bringing to the Fifth Circuit's attention the equitable principles that

the Supreme Court has used to make the judgment whether a second-in-time petition is "second

or successive" for purpose of applying the abuse of the writ doctrine, invoking instead only a

mechanical argument that was unique to the cases cited (*Panetti*, *Slack*, and *Martinez-Villareal*),

Adams invited the mechanical response that the Fifth Circuit provided:

---

[23]As in Mr. Hearn's case, because the claims raised in Mr. Adams' second-in-time federal petition were focused on constitutional error in the sentencing phase of his trial, his claims could not meet the requisites of 28 U.S.C. § 2244(b)(2) for consideration in a successive petition.

We reject Adams's argument and conclude that his habeas petition is clearly successive. We have stated that "a later petition is successive when it: 1) raises a claim challenging the petitioner's conviction or sentence that was or could have been raised in an earlier petition; or 2) otherwise constitutes an abuse of the writ." *In re Cain,* 137 F.3d 234, 235 (5th Cir.1998) (citations omitted); *see United States v. Orozco–Ramirez,* 211 F.3d 862, 867 (5th Cir.2000) (finding the *In re Cain* standard "consistent with the Supreme Court's views as expressed in" *Martinez–Villareal* and *Slack*).

In his second-in-time habeas petition, Adams raises two claims—ineffective assistance of trial and appellate counsel for failing to ensure the jury was properly instructed in the punishment phase of his trial—that are identical to the two claims presented in his initial federal habeas petition, filed with the district court in 2009. Thus, pursuant to *In re Cain,* because Adams has raised claims that were already brought in a prior petition, we must construe his second-in-time habeas petition as successive.

679 F.3d at 322.

As we have demonstrated, the Supreme Court has explained that the determination of whether a later petition will be treated as "second or successive" cannot be based simply on the fact that the later petition raises claims that *could* be deemed successive (either because the claims were raised or were not raised but could have been raised in the first petition). Rather, that there must be a determination of this question based on the circumstances of the case, Congressional intent, and the equities involved. The Fifth Circuit did not take this approach to this question in *Adams*. Had the argument that Mr. Hearn presents here been presented to the Fifth Circuit by Mr. Adams, we submit that the outcome would have been different.

Respondent may also argue that AEDPA's one-year statute of limitations, 28 U.S.C. § 2244(d), bars his *Wiggins* claim, because the factual basis of his claim could have been discovered in time to bring the claim in his first federal habeas proceeding in 2002, and in fact was discovered by 2007 yet the claim is just now being presented. The answer to this argument

78

is that, until the Supreme Court decided *Martinez*, there was an "impediment to filing an application [(petition for writ of habeas corpus)] created by State action in violation of the ... laws of the United States." 28 U.S.C. § 2244(d)(1)(B). The state action was the appointment of an attorney for Mr. Hearn in state habeas proceedings (which are part of the criminal proceeding itself) who failed to provide effective assistance. *See Cuyler v. Sullivan*, 446 U.S. 335, 343-45 (1980) (holding that in subjecting a person to a criminal proceeding, the state is involved in state action against the defendant and is therefore properly characterized as engaging in "state action" when an attorney for the defendant, appointed or privately retained, provides ineffective assistance or suffers from a conflict of interest). The "impediment" this created for Mr. Hearn— procedural default of the filing of the *Wiggins* claim—was an absolute barrier to the presentation of the *Wiggins* claim in federal court. Though this impediment was not a violation of the "laws of the United States" prior to the decision in *Martinez*, in the wake of *Martinez* the impediment was removed because *Martinez* changed the laws of the United States to no longer to give effect to this form of state action, in effect rendering that form of state action unlawful under the laws of the United States. That change occurred on March 20, 2012, and Mr. Hearn has filed his *Wiggins* claim slightly more than three months later. Thus, his claim is timely filed.

II.     **The Holding of *Martinez* Applies to Texas, Because State Habeas Proceedings Provide the First Occasion to Raise a Claim of Ineffective Assistance at Trial for All Ineffectiveness Claims Based, As Mr. Hearn's Claim Is, on Evidence Outside the Trial Record**

   A.     **The Circumstances in Which the *Martinez* Rule Applies**

   The State of Arizona, where *Martinez* arose, does not permit a prisoner to raise ineffective assistance of counsel claims on direct appeal, requiring prisoners to file such claims

for the first time in state collateral proceedings.  When a state collateral proceeding "provide[s]

the first occasion to raise a claim of ineffective assistance at trial," *Martinez*, 132 S.Ct. at 1315, it

takes on special significance.  Such proceedings, which the *Martinez* Court denominated "initial-

review collateral proceedings," *id.*, are

> in many ways the equivalent of a prisoner's direct appeal as to the
> ineffective-assistance claim. This is because the state habeas court "looks to the
> merits of the clai[m]" of ineffective assistance, no other court has addressed the
> claim, and "defendants pursuing first-tier review ... are generally ill equipped to
> represent themselves" because they do not have a brief from counsel or an opinion
> of the court addressing their claim of error.

*Id.* at 1317.  In a direct appeal, for these very reasons, the Sixth and Fourteenth Amendment right

to counsel applies to assure that a person whose constitutional claims are being considered for

the first time are provided effective counsel.  *See Halbert v. Michigan,* 545 U.S. 605, 617 (2005);

*Douglas v. California,* 372 U.S. 353, 357–358 (1963).  Because the right to counsel is not

constitutionally guaranteed in collateral proceedings, however, *Coleman v. Thompson*, 501 U.S.

at 752, there is no constitutionally protected right to effective assistance of counsel in an initial-

review collateral proceeding, which, as in Arizona, nevertheless provides the first opportunity for

a claim of trial ineffectiveness to be reviewed.  This problem—the need for effective counsel in a

initial-review collateral proceeding—could have been solved by declaring that prisoners

engaging in initial-review collateral proceedings have a Sixth and Fourteenth Amendment right

to counsel.  However, the Court declined this option.  *Martinez*, 132 S.Ct. at 1315.

The Court recognized that there are sound practical reasons for adjudicating ineffective

assistance of counsel claims in collateral proceedings, even though doing so deprives the prisoner

of constitutionally-guaranteed counsel to help safeguard one of the most basic trial rights:

Ineffective-assistance claims often depend on evidence outside the trial record. Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim. *Ibid.* Abbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim. *See* Primus, *Structural Reform in Criminal Defense*, 92 Cornell L.Rev. 679, 689, and n. 57 (2004) (most rules give between 5 and 30 days from the time of conviction to file a request to expand the record on appeal). Thus, there are sound reasons for deferring consideration of ineffective-assistance-of- trial-counsel claims until the collateral-review stage, but this decision is not without consequences for the State's ability to assert a procedural default in later proceedings. By deliberately choosing to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims.

*Id.* at 1318.

For these reasons, the Court settled on the alternative that became the holding in *Martinez*: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. This was deemed a sufficient safeguard against the ineffectiveness of initial-review collateral proceeding counsel in presenting or failing to present claims of trial counsel's ineffectiveness.

Accordingly, the threshold that must be met for the rule of *Martinez* to apply in other state is that initial review-collateral proceedings provide the first opportunity to raise a claim of trial counsel's ineffectiveness.

**B.    *Martinez* Applies to Texas Because, Pursuant to Texas Law as Determined by the State's Highest Criminal Court, *Relief* on an Extra-Record Ineffective Assistance of Counsel Claim Is Only Available in Post-Conviction Proceedings**

Texas law envisions that the first challenge to trial counsel's effectiveness—where that challenge relies upon evidence outside the record—will be in the state habeas corpus proceedings:

> Experience has taught us that in most instances where the claim of ineffective assistance of counsel is raised, the record on direct appeal is simply not in a shape, perhaps because of the very alleged ineffectiveness below, that would adequately reflect the failings of trial counsel.  Indeed, in a case such as this, where the alleged derelictions primarily are errors of omission de hors the record rather than commission revealed in the trial record, collateral attack may be just the vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record.

*Ex parte Duffy*, 607 S.W.2d 507, 513 (Tex. Crim. App. 1980), *overruled on other grounds by, Hernandez v. State*, 988 S.W.2d 770 (Tex. Crim. App. 1999).  In fact, as demonstrated below, state law affirmatively precludes relief on an ineffective assistance claim raised on direct appeal if all of the facts necessary to adjudicate the claim are not contained within the four corners of the appellate record.

An allegation that trial counsel was ineffective is a quintessential example of an extra-record claim that must be pressed in habeas corpus proceedings.  Litigants raising a claim under *Strickland v. Washington,* first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms," and second, must demonstrate prejudice by showing "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.

Satisfying either prong of the *Strickland* test most often requires the submission of extra-record evidence.  For example, when preparing for trial, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

-82-

unnecessary." *Strickland*, 466 U.S. at 691.  When assessing counsel's performance, courts look not only to the trial record of the case but to trial counsel's reasons for their actions: "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court." *Loyd v. Whitley,* 977 F.2d 149, 158 (5th Cir. 1992) (footnote omitted).  Resolving the pivotal *Strickland* inquiries requires explanation of counsel's rationale for their actions or omissions.  This, of course, requires the submission of extra record evidence.

Based on *Strickland*, Texas law imposes a mandatory presumption on direct review that trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Ex parte Varelas*, 45 S.W.3d 637, 629 (Tex. Crim. App. 2001).  Thus, unless trial counsel explains an omission on the trial record, stating for example that he simply forgot request an instruction, or, where the issue is inadequate investigation (as here), outlines on the record what pre-trial investigation was performed, defendants who raise an ineffectiveness claim on direct review automatically lose on the first prong of *Strickland* by operation of Texas law.  The Court of Criminal Appeals has consistently enforced this presumption and reversed lower courts that failed to do so.  The Texas court recently reversed a lower court of appeals for precisely this reason because "direct review is usually an inadequate vehicle for raising such a claim":

> For a claim of ineffective assistance of counsel to succeed, the record must demonstrate both deficient performance by counsel and prejudice suffered by the defendant.  An ineffective-assistance claim must be "firmly founded in the record"

and "the record must affirmatively demonstrate" the meritorious nature of the claim. "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped." This statement is true with regard to the "deficient performance" prong of the inquiry, when counsel's reasons for failing to do something do not appear in the record. Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it."

*Menefield v. State*, 363 F.3d 591, 592–93 (Tex. Crim. App. 2012) (footnotes omitted). *See also*

*Rylander v. State*, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App. 2003) (reversing court of appeals'

decision on ineffective assistance claim and noting that the court was not "deciding on this direct

appeal whether appellant did or did not receive effective assistance of counsel ... [and that]

Appellant may still submit his ineffective assistance of counsel claim for review on the merits in

an application for writ of habeas corpus"); *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex.

Crim. App. 2003) (reversing lower court's grant of relief on direct review and noting "[we] have

held several times that in cases like this the record on direct appeal is simply undeveloped and

cannot adequately reflect the failings of trial counsel") (citations omitted); *Thompson v. State*, 9

S.W.3d 808, 814–15 (Tex. Crim. App. 1999) (same); *Jackson v. State*, 877 S.W.2d 768, 771–72

(Tex. Crim. App. 1994) (same).

Ineffectiveness claims based on the failure to investigate and present evidence require

both an assessment of counsel's pretrial preparation and consideration of any assertions of

strategy or reasoning by trial counsel, *see Strickland,* 466 U.S. at 691. This evidence will not be

made a part of a Texas appellate record because of a variety of circumstances identified by the

Texas courts, any one of which would independently preclude an adequate record upon which to

assess trial counsel's performance:

> [T]he trial record ordinarily does not reflect counsel's reasons for doing or failing
> to do actions of which the defendant complains. ***While expansion of the record
> may be accomplished in a motion for new trial, that vehicle is often inadequate***
> because of time constraints and because the trial record has generally not been
> transcribed at this point.... Further, mounting an ineffective assistance attack in a
> motion for new trial is inherently unlikely if trial counsel remains counsel during
> the time required to file such a motion. Hence, in most ineffective assistance
> claims, a writ of habeas corpus is essential to gathering the facts necessary to
> adequately evaluate such claims.

*Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (emphasis supplied); *see also*

*Thompson v. State*, 9 S.W.3d 813–14 ("[i]n the majority of instances, the record on direct appeal

is simply undeveloped and cannot adequately reflect the failings of trial counsel"); *Ex parte

Varelas*, 45 S.W.3d at 629 ("[i]n most cases, the record on direct appeal is 'inadequate to

develop an ineffective assistance claim' because 'the very ineffectiveness claimed may prevent

the record from containing the information necessary to substantiate such a claim'") (quoting *Ex

parte Torres*, 943 S.W.2d at 475); *Ex parte White*, 160 S.W.3d 46, 49 (Tex. Crim. App. 2004)

(same).[24]

Likewise, almost all errors of omission will likewise require extra-record evidence to

prevail on *Strickland*'s second prong. The claim at issue in this case and in *Martinez*—a claim

that counsel failed to investigate and present evidence—is one that requires the investigation,

presentation and consideration of substantial extra record evidence. State habeas counsel must

---

[24]In Texas, it is only in habeas corpus proceedings that counsel are provided funding for investigators and experts—funding that is critical to the investigation and presentation of claims of ineffective assistance of counsel. *See* Tex. Code Crim. Proc. Art. 11.071, § 3. No comparable funding is provided for counsel on direct appeal. The statutory scheme thus recognizes the essential extra record nature of habeas corpus proceedings.

submit the evidence that trial counsel should have discovered, which often includes extensive

social history documents as well as affidavits from witnesses who could have testified at trial.

"Claims of ineffective assistance at trial often require investigative work and an understanding of

trial strategy." *Martinez*, 132 S.Ct. at 1317. *See Wiggins v. Smith*, 539 U.S. at 535 (habeas

counsel introduced evidence of the "kind of troubled history we have declared relevant to

assessing a defendant's moral culpability"); *Rompilla v. Beard*, 545 U.S. 374, 391 (2005)

(assessing the impact of "the material post-conviction counsel found").

Accordingly, as in *Martinez*, the first and only opportunity for a prisoner to secure relief

on the vast majority of ineffective assistance of trial counsel claims in Texas is in state habeas

corpus proceedings:

> While defendants in criminal cases in Texas are not legally prohibited from
> challenging the effectiveness of their trial counsel on direct appeal, such claims
> typically call for extensive factual development beyond what is disclosed in the
> appellate record, and thus, ***as a practical matter, post-conviction habeas corpus
> is the first opportunity to raise them***. *Thompson v. State,* 9 S.W.3d 808 (Tex.
> Crim. App. 1999).

*Ex parte Balentine*, No. WR-54,071-03, at Dissenting Statement, 2 n.5 (Tex. Crim. App. June 14,

2011) (Price, J., dissenting, joined by Johnson and Alcala. JJ., to failure to grant stay during the

pendency of *Martinez*.) (emphasis supplied).[25] *See also Ex parte Hernandez*, 2012 WL 1060079,

at *1 (Tex. Crim. App. Mar. 26, 2012) at *1 ("[w]hile defendants in criminal cases in Texas are

not absolutely prohibited by law from challenging the effectiveness of their trial counsel on direct

appeal, such claims typically call for extensive factual development beyond what is disclosed in

---

[25]The Court of Criminal Appeals' majority did not in any respect dispute this conclusion, nor would there
have been any basis in Texas law to do so.

the appellate record, and thus, as a practical matter, post-conviction habeas corpus is the first

opportunity to raise them") (citation omitted).  This fact, that relief is unavailable on direct

review, has been repeatedly and consistently reiterated by the Court of Criminal Appeals.

In *Thompson v. State*, 9 S.W.3d at 814, after discussing at length the stringent

requirements under *Strickland,* and the burden of overcoming the "strong presumption that

counsel's conduct fell within the wide range of reasonable professional assistance," the CCA

held that the record was inadequate because it was "silent as to why appellant's trial counsel

failed to object to the State's persistent attempts to elicit inadmissible hearsay."  The opinion

contains a strong warning to courts of appeals and litigants regarding the difficulties inherent in

adjudicating ineffective assistance claims on direct appeal:

> A substantial risk of failure accompanies an appellant's claim of ineffective
> assistance of counsel on direct appeal.  Rarely will a reviewing court be provided
> the opportunity to make its determination on direct appeal with a record capable
> of providing a fair evaluation of the merits of the claim involving such a serious
> allegation.  ***In the majority of instances, the record on direct appeal is simply
> undeveloped and cannot adequately reflect the failings of trial counsel***.  *Jackson
> v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998)....  "Indeed in a case such
> as this, where the alleged derelictions primarily are errors of omission de hors the
> record rather than commission revealed in the trial record, collateral attack may be
> ***the*** vehicle by which a thorough and detailed examination of alleged
> ineffectiveness may be developed and spread upon a record."  *Jackson v. State*,
> 973 S.W.2d at 957. [Footnotes omitted].

*Id.* at 814–815 (emphasis added).  *See also Bone v. State*, 77 SW 3d 828, 835 (Tex. Crim. App

2002) (citing *Jackson* language); *Ex parte Varelas*, 45 S.W.3d at 629–30 ("[i]n most cases, the

record on direct appeal is 'inadequate to develop an ineffective assistance claim' because 'the

very ineffectiveness claimed may prevent the record from containing the information necessary

to substantiate such a claim'") (citations omitted); *Rylander v. State,* 101 S.W.3d 107 (Tex.

-87-

Crim. App. 2003) (claim of ineffective assistance of counsel requiring non-record evidence uniformly rejected; appellant encouraged to raise the claim in habeas corpus); *Mitchell v. State,* 68 S.W.3d 640, 643 (Tex. Crim. App. 2002) ("[g]enerally the record on direct appeal will not be sufficient to show the counsel's representation was so deficient as to meet the first part of the Strickland standard."... [and thus, habeas corpus] "usually is the appropriate vehicle to investigate ineffective-assistance claims") (citations omitted); *Lopez v. State,* 343 S.W.3d 137, 143 (Tex. Crim. App 2011) ("ineffective assistance claims are generally not successful on direct appeal" because the record "is usually inadequately developed and 'cannot adequately reflect the failings of trial counsel," such claims "are more appropriately urged in a hearing on an application for writ of habeas corpus.").

Even after *Martinez*, the Texas courts continue to preclude relief on direct review of extra-record ineffective assistance of counsel claims. *See e.g. Velez v. State,* ___ S.W.3d ___, 2012 WL 2130890, at *35 (Tex. Crim. App. June 13, 2012) (denying relief on direct appeal because the record is insufficient to show "that counsel's representation was lacking in tactical and strategic decision making.").

The fact that post-conviction proceedings provide the exclusive avenue for review of many ineffective assistance claims was one of the considerations that drove some members of the Texas court to dissent from a holding that Texas law does not require court-appointed capital habeas corpus counsel to perform competently:

> If the defendant's habeas counsel performs deficiently, a meritorious claim [of ineffective assistance of trial counsel] may not be adequately raised or investigated. Applicants only get one shot at habeas corpus relief. If the attorney appointed on his first writ is incompetent, then a defendant, who was deprived of

effective assistance of counsel at trial, has *no means* to enforce his constitutional right to affective assistance of counsel at trial.

*Ex parte Graves,* 70 S.W.3d 103, 124–25 (Tex. Crim. App. 2002) (Price, J., dissenting) (emphasis added). *See also Ex parte Rojas,* 2003 WL 1825617, at *1 (Tex. Crim. App. Feb. 12, 2003) (unpublished) (Price, J., dissenting) (Article 11.071 habeas corpus proceeding is the "one opportunity to raise claims not based solely on the record").

The absence of the availability of relief has prompted the Texas court to admonish direct appeal counsel to refrain from raising ineffective assistance of counsel claims on direct review:

> This case stands for a very simple proposition: As a general rule, one should *not* raise an issue of ineffective assistance of counsel on direct appeal. This is so because a trial record is generally insufficient to address claims of ineffective assistance of counsel in light of the "strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). [Footnote omitted].
>
> * * * *
>
> A trial record is directed to the issues of guilt/innocence and punishment. And we review that record with an eye toward the errors allegedly committed in relation to those issues. However, in order to effectively argue an issue of ineffective assistance of counsel, a record focused on the conduct of trial or appellate counsel should be developed. Such a record is generally best developed in the context of a hearing held in relation to an application for writ of habeas corpus.

*Jackson v. State,* 877 S.W.2d 768, 772–773 (Tex. Crim. App. 1994) (Baird, J., concurring).

Finally, other Texas entities with expertise in the Texas post-conviction process have determined that post-conviction is the exclusive process for vindicating most ineffective assistance of counsel claims. The State Bar of Texas Task Force on Habeas Counsel Training and Qualification—comprised of Court of Criminal Appeals judges, trial judges, experienced

-89-

defense counsel, and even one of the senior counsel for Respondent in these proceedings (Don

Clemmer)—has recognized that state post-conviction is the lone avenue for securing relief on the

type of claim at issue here:

> Habeas proceedings are the only opportunity available to those sentenced to death
> to raise post conviction claims of prosecutorial misconduct or ineffective
> assistance of trial counsel and to present evidence not developed or discovered
> during trial—including evidence as to the actual innocence of the applicant.

Task Force Report, Apr. 27, 2007 (available at

http://www.aclutx.org/files/SBOT%20Task%20Force%20Final%20Report%20Signed.pdf).

This is not to say—nor is it required for *Martinez* to apply—that state law mandates that

ineffectiveness claims can *only* be raised in state habeas proceedings.  In Texas, claims of trial

counsel's ineffectiveness can be *raised* on direct appeal.  But there is no remedy on direct review

unless the claim is confined to and dependent only upon review of the paper record—or all

necessary evidence is submitted in a motion for new trial, which must be filed within 30 days of

judgment, and almost invariably by *trial* counsel.  *Martinez* recognized the inadequacies in this

approach.  *Id.* at 1318 ("Abbreviated deadlines to expand the record on direct appeal may not

allow adequate time for an attorney to investigate the ineffective-assistance claim.").  Likewise,

the Texas Court of Criminal Appeals itself recognizes the inadequacy of the Texas motion for

new trial as a vehicle for adjudicating ineffective assistance of counsel claims.  *Ex parte Torres*,

943 S.W.2d 4 at 475 ("[w]hile expansion of the record may be accomplished in a motion for new

trial, that vehicle is often inadequate because of time constraints and because the trial record has

generally not been transcribed at this point"); *Jackson v. State,* 877 S.W.2d at 773, fn. 3

(addressing difficulties of developing a sufficient record on a motion for new trial).  In this case,

as in many—if not all—capital cases with extensive trial records, the trial transcript was not prepared until well after the deadline for filing a motion for new trial.[26]  The 30-day time frame renders it impossible to conduct the sort of investigation necessary to reveal the inadequacies at issue in connection with a *Wiggins* claim such as the one presented here.  In addition, without a trial transcript to review, identifying and raising an ineffective assistance of counsel claim based upon omissions discernible ***from a trial record*** in a motion for new trial is simply impossible.[27]

The ineffectiveness claim at issue in *Martinez*, and at issue here, are claims of ineffective assistance of counsel that rely upon non-record evidence.  Thus, post-conviction review was the initial review proceeding for *Martinez* purposes.  Any gloss that disregards this reality repudiates the language, spirit, and intent of *Martinez*.

### C.    The Unpublished and Non-Precedential Decisions of the Fifth Circuit Are Neither Dispositive Nor Grounded in an Accurate Understanding of Texas Law

Mr. Hearn anticipates that the Respondent will assert, based on unpublished orders of the Fifth Circuit, that *Martinez* is inapplicable to Texas cases.  In fact, the question has yet to be resolved by the court of appeals.[28]  Thus, this Court must address the issue in the first instance.

---

[26]It was filed as the Reporter's Record on August 16, 1999.  *See Hearn v. State*, Tex. Crim. App. No. 73,371 (8/16/99 Docket Entry).  The motion for new trial was due January 10, 1999, thirty days after the sentence was imposed, *see* T.R.A.P. 21.4.  (Sentence was imposed on December 11, 1998.  RR Vol. 44 at 200-201.)

[27]Before a movant is entitled to a hearing on a motion for new trial alleging ineffective assistance of counsel, a movant must "allege sufficient facts from which a trial court could reasonably conclude *both* that counsel failed to act as a reasonably competent attorney *and* that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different."  *Smith v. State*, 286 S.W.3d 333, 340–41 (Tex. Crim. App. 2009) (emphasis in original).  Accordingly, the facts must be developed prior to the 30-day deadline for filing.  When direct appeal counsel having no participation in the trial proceedings is appointed, and no transcript is available for review within the 30-day deadline for filing a motion for new trial, presenting and adjudicating ineffective assistance of counsel claims—record or non record—in a motion for new trial is a practical impossibility.

[28]Unpublished opinions issued January 1, 1996, or later are not precedent.  Fifth Circuit Rule 47.5.4.

What can be gleaned from the unpublished orders to date is that members of the Fifth Circuit appear to have adopted two divergent approaches to *Martinez*. The first approach looks at how the state in question routes litigation of ineffective assistance of counsel claims and whether post-conviction proceedings will be the first ***practical*** opportunity to raise the claim. The second approach looks to whether it is technically possible to raise some claims of ineffective assistance on direct review. If the answer to that question is "yes," the analysis ends without consideration of whether state post-conviction proceedings are nonetheless the first and only available proceeding in which relief may be obtained for the vast majority of ineffective assistance of counsel claims, or even whether it was possible to raise the ineffectiveness claim at issue on direct appeal. Adopting the second, hyper-technical approach here would mean that most Texas litigants for whom it is impossible to raise an ineffective assistance of counsel claim on direct review will be excluded from the equitable safety valve established in *Martinez* solely because some other litigant could raise a completely different species of ineffective assistance of counsel claim on direct review. Because this result eviscerates the holding of *Martinez*, this Court should—like one of the first Fifth Circuit panels to address the question—adhere to the rule of *Martinez* and adopt the first approach.

In *Lindsey v. Cain*, 2012 WL 1366040, at *1 (5th Cir. Apr. 19, 2012), the first panel of the Fifth Circuit to address the application of *Martinez*, the court concluded that "[w]hen a state, like Louisiana, requires that a petitioner raise an ineffective assistance of counsel claim on collateral review," a petitioner may establish cause for a procedural default pursuant to *Martinez*. *Id*. As another member of the Fifth Circuit noted in a later case, Louisiana's handling of ineffective assistance of counsel claims is materially indistinguishable from Texas' approach:

Louisiana, like Texas, allows a prisoner to raise ineffective assistance of counsel on direct appeal "when the record contains sufficient evidence to decide the issue and the issue is properly raised by assignment of error on appeal." *State v. Brashears*, 811 So.2d 985 (La. App. 5 Cir. 2002). *See also State v. Williams*, 738 So.2d 640,651-652 (La. App. 5 Cir. 1999) ("Ineffective assistance of counsel claims are most appropriately addressed on application for post conviction relief, rather than on direct appeal, so as to afford the parties adequate opportunity to make a record for review. However, when an ineffective assistance claim is properly raised by assignment of error on direct appeal and the appellate record contains sufficient evidence to evaluate the claim, the reviewing court may address the ineffective assistance claim in the interest of judicial economy.").

Order, *Ibarra v. Thaler*, No. 11-70031, slip op. at 6 (5th Cir. June 28, 2012) (Graves, J., dissenting) (non-dispositive order denying Mr. Ibarra's motion for a remand to the district court) (attached as Exhibit 24). The technical ability to raise some ineffective assistance of counsel claims on direct review in Louisiana, when the appellate record contains sufficient evidence to decide the issue, was not enough to defeat the application of *Martinez* to Louisiana.[29]

The majority of the *Ibarra* panel adopted the opposite position. Relying on the fact that "Texas defendants may first raise ineffectiveness claims before the trial court following conviction via a motion for new trial, ***when practicable***," the panel opined that *Martinez* did not apply to Texas. *Ibarra, supra*, slip op. at 7–8. Of course, the operative language here is "when practicable." As described, *supra*, the Texas Court of Criminal Appeals has stated that it will most often be impracticable in Texas to raise an ineffective assistance of counsel claim in this manner: "While expansion of the record may be accomplished in a motion for new trial, ***that***

---

[29]*See also Wessinger v. Cain*, 2012 WL 1752683, at *2 (M.D. La. May 16, 2012) (applying *Martinez* to Louisiana after noting that "there is a jurisprudential rule in Louisiana that ineffective assistance claims are generally best suited for post-conviction proceedings. *State v. Hamilton*, 699 So.2d 29, 31 (La.1997). The Louisiana Supreme Court applied this rule to Wessinger's ineffective assistance at trial claim. *State v. Wessinger*, 736 So.2d 162, 195 (La.1999).").

*vehicle is often inadequate* because of time constraints and because the trial record has generally not been transcribed at this point." *Ex parte Torres*, 943 S.W.2d at 475.  Thus, the logic of the *Ibarra* majority would deny the benefit of *Martinez* to the entire State of Texas because a handful of litigants *might in theory* be able to raise their ineffective assistance of counsel claims on direct appeal.

Another Fifth Circuit panel, without the benefit of post-*Martinez* briefing from the parties, opined that Texas should be excluded from the *Martinez* ruling based on similarly flawed reasoning.  In *Gates v. Thaler*, 2012 WL 2305855 (5th Cir. June 19, 2012) (unpublished), the briefing was complete well before *Martinez* was decided.  *See Gates v. Thaler*, No. 11-70023 (June 19, 2012) (the last filing prior to the opinion was filed on October 26, 2011, five months before the *Martinez* decision).  Thus, neither party had briefed the decision or its application to Mr. Gates's case.  Nonetheless, the panel anticipated that Mr. Gates "may contend" that *Martinez* applied to his case, and then proceeded to reject the argument that Gates might have raised.  *Id*. at *6.  The panel noted that a capital defendant can raise, and the Court of Criminal Appeals will consider, a claim of ineffective assistance of counsel on direct review, citing *Narvaiz v. State*, 840 S.W.2d 415, 434 (Tex. Crim. App. 1992).

The *Gates* panel was correct, in so far as the analysis went:  it is true that capital defendant can raise an ineffective assistance of counsel claim on direct review, and the Court of Criminal Appeals will consider it.  However, what the Court of Criminal Appeals will not do is *grant relief* on any ineffective assistance claim that requires extra-record facts.  This is true of even the most ostensibly record-bound claims, such as complaints about trial counsel's failure to lodge a meritorious objection.  As described, *supra*, even these claims require factual

-94-

development about whether counsel had a strategic reason for not objecting.  Absent any factual

development, on direct review the Court of Criminal Appeals will "presume [that trial counsel]

... rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment." *Ex parte Varelas*, 45 S.W.3d at 629.  Thus, the observation that

ineffective assistance of counsel claims can be raised on direct appeal in Texas is true to the same

extent that it is true that litigants may deliberately by-pass state court remedies and raise claims

for relief for the first time in federal habeas corpus proceedings.  Petitioners can indeed raise

such claims, and federal courts can consider and deny such claims on the merits.  28 U.S.C.

§ 2254(b)(2).  However, relief is not available to such litigants, and neither is it available to

Texas defendants who seek to raise extra-record ineffective assistance of counsel claims on direct

review.

As Chief Judge Jones acknowledged after *Gates*, "[n]o published opinion from this court

has yet considered *Martinez*'s applicability to Texas cases." *Ibarra v. Thaler*, *supra*, slip op. at

6.  For the reasons described above, *Martinez*—by which this Court is clearly bound—compels

the conclusion that Mr. Hearn may establish cause for his procedurally defaulted ineffective

assistance of trial counsel claim based on the ineffective representation of state habeas counsel.[30]

---

[30]Mr. Hearn notes that another circuit has already construed *Martinez* to apply to states like Texas.  In Oregon, as in Texas, there is no absolute bar to raising ineffective assistance of counsel claims on direct appeal, but claims that rely on facts outside the record cannot reasonably be asserted on direct appeal.  *Compare State v. Robinson*, 550 P.2d 758 (Or.App.1976) ("Appellant contends on appeal that his trial counsel was incompetent.  This issue, except in rare instances, is one which can be properly resolved only in a postconviction proceeding in which evidence can be taken.  *See, Turner v. Cupp*, 1 Or.App. 596, 465 P.2d 249 (1970)."), *with Ex parte Torres*, 943 S.W.2d at 475 ("in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims").

Knowing that it was technically possible to raise at least some ineffective assistance of counsel claims on direct review in Oregon, the Ninth Circuit nonetheless held that *Martinez* applied to Oregon petitioners in § 2254 proceedings: "For the purposes of our review in this case, therefore, *Martinez* instructs that Sexton may establish cause for his procedural default of his new ineffective assistance of trial counsel claims, because the State of Oregon

III.    **Mr. Hearn Was Provided Ineffective Assistance by the Attorneys Appointed to Represent Him in His First State Habeas Proceeding Due to Their Failure to Investigate and Present the Ineffective Assistance of His Trial Attorneys**

Mr. Hearn was represented in his original state habeas proceeding by attorneys Jan Hemphill and Dean Swanda.  Ms. Hemphill was appointed to represent Mr. Hearn on October 5, 1999.  Exhibit 25, Billing Records of Jan Hemphill (hereinafter "Jan Hemphill's Billing Records").[31]  Mr. Swanda commenced work on Mr. Hearn's case thirteen months later, on November 18, 2000.  Exhibit 26, Billing Records of Dean Swanda (hereinafter "Dean Swanda's Billing Records").  Ms. Hemphill and Mr. Swanda filed Mr. Hearn's state habeas corpus application just one month after Swanda was appointed, on December 14, 2000.  Jan Hemphill's Billing Records (Exhibit 25).  Neither attorney conducted any investigation into a possible claim that trial counsel provided ineffective assistance in connection with the sentencing phase of Mr. Hearn's trial.  To do so, the attorneys would have had to conduct an extensive investigation into Mr. Hearn's life, and they did not do that.  They should have conducted such an investigation. The standards governing the representation of a condemned prisoner in habeas corpus proceedings in Texas in 1999-2000 required that they do so.  Their failure to do so amounts to ineffective representation in Nr. Hearn's first state habeas corpus proceeding.

A.    **Texas' Capital Habeas Statute, as Well as the Contemporaneous Standard of Care, Mandates That Capital Habeas Corpus Counsel Conduct a Thorough Extra-Record Investigation**

---

required Sexton to raise them in a collateral proceeding, *State v. Robinson*, 550 P.2d 758 (Or. App. 1976)." *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012).  The panel nonetheless denied Mr. Sexton's request for a remand to the district court in light of *Martinez* based on its determination that trial counsel was not ineffective.  *Id*.

[31]Due to the voluminous nature of records in this case, Exhibits XX contain only relevant excerpts of available records.  Should this Court or the State wish to view any of the records in their entirety, undersigned counsel will provide a full copy upon request.

The core duties of capital habeas corpus counsel are enumerated in Tex. Code Crim. Proc. art. 11.071, the statute governing state habeas proceedings in capital cases, under which Ms. Hemphill and Mr. Swanda were appointed.  Additionally, the Court can ascertain the duties of capital habeas counsel from evidence reflecting the contemporaneous standard of care, such as training publications.  *See*, *e.g.*, *Padilla v. Kentucky*, 130 S.Ct. 1473, 1482 (2010) (looking to, *inter alia*, state and city bar publications to establish prevailing norms of criminal defense practice).  From these sources it is clear that investigating beyond the trial record is the most fundamental duty of habeas corpus counsel.

### 1.    Texas' capital habeas corpus statute *requires* that appointed counsel conduct an extra-record investigation

Article 11.071 of the Texas Code of Criminal Procedure governs Texas capital habeas corpus proceedings.  Tex. Code Crim. Proc. art. 11.071 § 1.  The appointment of counsel is mandatory unless waived by the prisoner.  *Id*. at § 2.  The habeas statute *requires* that counsel conduct an extra-record investigation:

Investigation of Grounds for Application

Sec. 3. (a) On appointment, counsel *shall* investigate expeditiously, *before and after* the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.

*Id*. at § 3 (emphasis supplied).  That the required investigation is an extra-record endeavor is clear from the statutory command to investigate even before the appellate record is finalized. Counsel must be thorough and exercise reasonable diligence to uncover the factual basis for every available claim.  *Id*. at § 5(e) (claims are not reviewable in any subsequent habeas

applications, and are thus waived, unless "the factual basis was not ascertainable through the exercise of reasonable diligence" when the prior application was filed).

Investigation is so fundamentally important that Texas courts are obligated to grant all reasonable investigative funding requests. *Id.* at § 3(c); § 3(d).  The statute extends prepayment of expert and investigative fees "to investigate and present potential habeas corpus claims." *Id.* at § 3(b).  In fact, the statute authorizes appointed counsel to "incur expenses for habeas corpus investigation, including expenses for experts, without prior approval by the convicting court or the court of criminal appeals." *Id.* at § 3(d).

> ## 2.   The contemporaneous standard of care in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation

One year after the 1995 passage of article 11.071 overhauled capital habeas corpus proceedings and established a right to counsel, the State Bar of Texas published the third edition of the Texas Criminal Appellate Manual.  Exhibit 27, Excerpt, Texas Criminal Appellate Manual 1996, 3d ed. (hereinafter "Texas Criminal Appellate Manual")  (the introduction to the manual, an unnumbered page, describes its publication history).  One of the chapters in the State Bar Manual was a primer for defense counsel litigating capital habeas corpus cases. *Id.*  The State Bar Manual confirms that, by 1996, the prevailing standard of care in capital habeas corpus representation compelled counsel to conduct extensive investigation of facts outside the trial record.

The manual begins with "essential ideas to bear in mind" when considering the habeas corpus litigation, the first two of which stress the need to investigate the case:

> *1. State habeas litigation is not the same as a direct appeal. Habeas litigation concentrates on developing and presenting facts outside the appellate record* which, in conjunction with facts in the record, raise important constitutional claims. Habeas counsel must know the appellate record, but cannot be bound to it, or they will offer their clients nothing more than another attempt at a direct appeal.

> *2. Writ practice requires investigation.* You can't learn about, develop, and present facts outside the record if you don't investigate the case. *Investigation for a writ can be as intensive as investigation in preparation for trial. This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel.* It is impossible to accurately evaluate the effectiveness of counsel without knowing what the counsel in question knew or could have known.

*Id.* at 4 (emphasis supplied).

The State Bar Manual repeatedly emphasizes the paramount importance of extra-record fact development:

> Facts outside the record are critical to a successful writ application. Those facts must be sought out through investigation.... Because of the nature of habeas claims, habeas counsel must investigate not only the client's background and the facts that gave rise to the offense, but also the investigation by police and defense counsel and the actions of the jury. There is no quick and easy way to do this and counsel will almost certainly need the help of a trained investigator to do an efficient and complete job....

*Id.* at 31.

Ten pages—almost 25%—of the State Bar Manual are dedicated to describing the scope and depth of the requisite investigation. *Id.* at 31–40. Of course, any investigation begins with the client, and the State Bar Manual describes the "[t]opics to cover" during client interviews:

> (1) Your client['s] version of the facts of the offense; (2) his or her relationship with the trial and direct appeal lawyers; (3) anything the client found strange, unusual or objectionable about the trial or direct appeal; (4) *your client's social*

-99-

> *history, including his or her background, education, family history, medical*
> *history, drug abuse history, etc.*  You should strive to know more about your
> client and his or her history than any other lawyer has known, and perhaps more
> than his own family has known, to ensure that you are aware of and can use all
> beneficial information that might come from that knowledge.

*Id*. at 32–33 (emphasis supplied).[32]  Given this broad range of topics, the State Bar Manual

advises habeas counsel that "the information you need from your client cannot be obtained in just

one interview," and thus "the more conversations you have, the more likely it is that you will win

the inmate's trust and uncover additional helpful and highly relevant information."  *Id*. at 33.

Client interviews, though critical, "must serve as the beginning, not the end, of

[counsel's] investigation":

> [The client's family] may shed light on mitigating evidence that was not presented
> at trial, or guilt/innocence phase evidence that was suggested to trial counsel, but
> not presented.  *They will certainly have things to tell you about your client's*
> *background that you can get nowhere else that could contribute substantially to*
> *the development of claims* concerning mental disorders, mental limitations, or
> drug abuse.  You will also want to ask them about their contacts with trial
> counsel, as part of your investigation into trial counsel's investigation.

*Id*. at 33–34 (emphasis supplied).

Habeas counsel must also meet with trial counsel or, at a minimum, obtain trial counsel's

files:

> [Y]ou should always, at the first meeting with [trial counsel], request their files.
> The files and all the notes in them belong to the client, not the lawyer, and you
> should insist on them being turned over to you....  [H]aving access to the file is
> vital, for it will tell you a lot about what information the lawyers had and what
> they were doing before, during and after the trial.  Be sure that the file you receive

---

[32]This standard essentially mirrors the Court or Criminal Appeals' determination that, in a 1997 trial, capital
defense counsel had a duty to interview the client about specific aspects of his social history.  *Ex parte Gonzales*,
*supra*, 204 S.W.3d at 400–01.

includes all notes of the lawyers as well, for those notes are also the property of
the client.

*Id*. at 34.

The above steps are merely preliminary measures: "Your record review, and interviews of

your client, his or her family, and trial counsel will give you a pretty good idea of what some of

the important issues may be in the case.  That will allow you to focus your energy on developing

information relevant to those issues." *Id*. at 34–35.  The State Bar Manual subsequently

describes three basic methods for investigating the case.

First, habeas counsel must collect a wide variety of records, a lengthy process that begins

early in the representation: "It is vital to start gathering records as early in your writ preparation

process as possible.  Records collection is time-consuming and is sometimes contested by

agencies who are the custodians of records.  It is preferable to deal with these disputes early in

the investigation rather than in the last weeks or days before the writ application is due." *Id*. at

35.  The State Bar Manual describes some of the records that should be gathered in every case:

- Prison records: "Be sure to request all prison records from every previous
incarceration of your client in any institution, as well as his or her time on death
row....  Those records may contain very important information concerning your
client's mental and medical condition." *Id*.

- School Records: "School records are another valuable source of information.
Through them you can find out about learning and mental difficulties your client
was having throughout school that your client may be too embarrassed to tell you
about or does not think are important.  The records may include I.Q. tests or other
testing that is quite helpful in learning how your client was able to function as he
or she developed." *Id*.

- Medical and mental health records: "Medical and mental health records should be
sought from any care provider who treated your client.  When getting these

records, particularly from mental health professionals, make sure you specifically request all the records the care provider has, including handwritten or dictated notes made at or shortly after interviews or times of testing." *Id.*

- Criminal records of witnesses: "Criminal records of all important witnesses at the trial should be checked in the county of conviction and any counties where they have spent substantial time.  You may find that some non-law enforcement witnesses had good reason to cooperate with the state at the trial, due to pending charges against them.  You may also find that some witnesses had prior convictions that could have been used to impeach their testimony at trial." *Id*. at 35-36.

In addition to these fundamental documents, the State Bar Manual includes a five-page "Investigative Source List," *id*. at Appendix I, that itemizes numerous other sources of relevant documents.

Second, habeas counsel must collect information from all relevant law enforcement agencies:

Always seek access to the district attorney's files and law enforcement agency files regarding the capital offense and any other offenses that you believe will be relevant to any of your claims, including offenses committed by key state's witnesses, such as jailhouse informants....  [I]t [is] important to energetically seek access to the files of every law enforcement agency that may have generated information regarding your client.

*Id*. at 36.

Third, habeas counsel must obviously interview witnesses and, when possible do so in person: "As you begin to focus on the claims you want to pursue, you will identify people who have important information about those claims.  Some may have testified at trial.  Others may never have been called or perhaps were even unknown at the time of trial.  You or your investigator need to interview these people in person, if at all possible." *Id*. at 37.  The State Bar

-102-

Manual observed that "it should be clear that the services of an experienced criminal or habeas investigator are invaluable in efficiently and comprehensively gathering the information necessary for a writ application." *Id*. at 38.  "Other experts will likely be needed, too," including mental health and medical experts.  *Id*.

In sum, both the statute that governed habeas counsel's appointment and the contemporaneous standard of care in capital habeas corpus proceedings mandated that counsel conduct substantial investigation.  As their billing records reveal, however, Ms. Hemphill and Mr. Swanda wholly failed to investigate Mr. Hearn's case.

### B.   How State Habeas Counsel Spent Their Time: They Conducted No Meaningful Investigation of Facts Outside the Record

The scope of Ms. Hemphill's work on behalf of Mr. Hearn is documented in the voucher she submitted to the trial court.  Jan Hemphill's Billing Records (Exhibit 25).  The trial court appointed Ms. Hemphill to represent Mr. Hearn in state habeas corpus proceedings on October 5, 1999.  *Id*.  She filed Mr. Hearn's application for writ of habeas corpus more than 14 months later, on December 14, 2000.  *Id*.  On February 19, 2001, Ms. Hemphill billed the court a grand total of 32.80 hours for work on Mr. Hearn's state habeas petition over the course of 14 months.  *Id*.

In the 14 months between her appointment and the filing of Mr. Hearn's application, Ms. Hemphill spent precious little time working on Mr. Hearn's case.  In fact, for the first 7 months of Ms. Hemphill's representation, she billed a mere 30 minutes—time she spent securing her appointment and informing Mr. Hearn and the Texas Department of Criminal Justice of her appointment.  *Id*.  She devoted nearly 25% of her time on Mr. Hearn's case to administrative and

mechanical tasks such as informing Mr. Hearn of her appointment, preparing and filing a motion

for extension, and copying and filing Mr. Hearn's habeas application.  *Id*.  Ms. Hemphill spent

nearly 50% of her time reviewing the trial record and district clerk files.  *Id*.  Ms. Hemphill split

her remaining 10 hours between corresponding with Mr. Hearn and his family (2.5 hours) or with

co-counsel (3.7 hours) and conducting record-based factual development of Mr. Hearn's legal

claims (5.0 hours).  *Id*.

The following chart graphically depicts the time Ms. Hemphill spent on the case and what

she did in that time:



Co-counsel Dean Swanda focused his work entirely on reviewing the record and drafting

the petition.  Dean Swanda's Billing Records (Exhibit 26).  In fact, Mr. Swanda did not begin

work on Mr. Hearn's case until November 18, 2000, more than 13 months after Ms. Hemphill was appointed to represent Mr. Hearn and less than 1 month before counsel filed Mr. Hearn's habeas application.  *Id*.  In the short time he worked on Mr. Hearn's case, Mr. Swanda spent a total of 61.20 hours on the case.  *Id*.  All 61 hours were devoted to reviewing the trial record and drafting Mr. Hearn's state habeas application—in a 60/40 split.  *Id*.  Nearly 40 percent or 23 hours of Mr. Swanda's time was spent reviewing the record and the remaining 60 percent or 36 hours was spent drafting Mr. Hearn's petition. The remaining 2 hours was spent meeting and corresponding with Ms. Hemphill.

Comparing what Ms. Hemphill and Mr. Swanda did to what the State Bar manual prescribes, Hemphill and Swanda fell woefully short of the mark:

•        The State Bar calls for counsel to interview the client multiple times in order to ascertain the client's understanding of his social history, "including his or her background, education, family history, medical history, drug abuse history, etc."  Texas Criminal Appellate Manual (Exhibit 27) at 33.  Ms. Hemphill fell far short of obtaining this information from Mr. Hearn.  Ms. Hemphill documented a single 70 minute meeting with Mr. Hearn eight months after she was appointed to represent him.  Exhibit 28, Excerpts from Jan Hemphill's File at 1064 (Notes from meeting with Mr. Hearn).[33]  Between October 5, 1999 and December 14, 2000, Ms. Hemphill sent a single letter to Mr. Hearn—dated November 15, 1999—informing him of her appointment as his state habeas counsel and stating that she would visit him.  *Id.* at 1090 (Letter to Hearn, Nov. 15, 1999).  After meeting Mr. Hearn on June 5, 2000, Ms. Hemphill did not see,

---

[33]While Ms. Hemphill's voucher indicates that she met with Mr. Hearn for 90 minutes, her handwritten notes from that meeting state that she waited 20 minutes for "inmate to come to booth."

speak or write to Mr. Hearn again throughout the remaining six months she represented him in state habeas proceedings.  Jan Hemphill's Billing Records (Exhibit 25).[34]  In the course of her 70 minute meeting with Mr. Hearn, Ms. Hemphill's notes reflect that she did touch on some aspects of Mr Hearn's life history—his parents, his level of education, and his drug history.  Jan Hemphill's File (Exhibit 28) at 1069.  Ms. Hemphill also noted one quality about Mr. Hearn that should have led her to conduct investigation.  Her notes concerning her meeting reflect the following observation: "Hearn—baby faced ... not very intelligent—may be below normal."  Jan Hemphill's File (Exhibit 28)  at 1071.  Notwithstanding this very accurate observation, Ms. Hemphill conducted no investigation concerning it or any of the social history information she elicited.

•        The State Bar also says that counsel must interview family members, because "[t]hey will certainly have things to tell you about your client's background that you can get nowhere else that could contribute substantially to the development of claims concerning mental disorders, mental limitations, or drug abuse."  Texas Criminal Appellate Manual (Exhibit 27) at 33-34.  Ms. Hemphill did have contact with two family members, LaDonna and Wanda Ross.  However, the contact came about only because they initially contacted her.  Jan Hemphill's File (Exhibit 28) at 1033, 1076.  Despite this opportunity to begin to develop some important life history information, Ms. Hemphill squandered the opportunity.  She knew from Mr. Hearn that his mother, his cousin LaDonna, and his aunt Wanda were his closest living relatives.  She also knew from the trial record that his mother had substance abuse/neglect/abandonment problems, that his father was uninvolved in his life and was deceased at an undisclosed age, and that the

_____

[34]Her only contact with Mr. Hearn is documented as "6/5/00 Conf/client @ Terrell Unit, Livingston."

only set of grandparents Mr. Hearn could name were also deceased—yet she had not bothered to contact the Rosses or Yokamon's mother. *Compare* Jan Hemphill's File (Exhibit 28) at 1069 (Notes from meeting with Mr. Hearn) *with* Jan Hemphill's Billing Records (Exhibit 25).  When Wanda and LaDonna Ross contacted Ms. Hemphill on their own initiative to express their interest in Mr. Hearn's case, Ms. Hemphill did not take advantage of that opportunity to begin to explore the many questions that naturally arose from the trial record—about Mr. Hearn's and his mother's relationship, the rest of the family's feelings about having to care for Mr. Hearn when his mother abandoned him, or any information they knew about Tony Massingill.  Instead, Ms. Hemphill asked no questions of the Rosses.  She simply told them  "nothing's new; I'm trying to find const'l issues."  Jan Hemphill's File (Exhibit 28) at 1033.[35]

•       The State Bar mandates that counsel collect a wide variety of records, including prison records, school records, and medical and mental health records, because of the critical life history information that these records contain.  Texas Criminal Appellate Manual (Exhibit 27) at 35.  Ms. Hemphill knew the importance of getting such records because at their only meeting, Ms. Hemphill asked Mr. Hearn if he would sign a release of records (which she apparently intended to send later) and permit the release of case information to his family.  Jan Hemphill's File (Exhibit 28)  at 1070 ("send [Hearn] release forms").  However, Ms. Hemphill never sent the release forms to Mr. Hearn in the time that she represented him, and she never saw Mr. Hearn

---

[35]In failing to take the opportunity to develop mitigating evidence when the opportunity presented itself, Ms. Hemphill acted as she had in at least one Texas capital case in which she was trial counsel.  In that case, *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003), the Fifth Circuit found Hemphill provided ineffective assistance in failing to investigate mitigating evidence where three of the defendant's sisters attended his trial, and each indicated their willingness to testify, but neither Ms. Hemphill nor her co-counsel made any effort to speak with them, much less call them to the stand.  *Id.* at 368.

again so she could not have gotten the releases from him in person.  Jan Hemphill's Billing

Records (Exhibit 25).  Ms. Hemphill's voucher thus indicates, and the state habeas application

she ultimately submitted on Mr. Hearn's behalf shows, that Ms. Hemphill did not seek to obtain

Mr. Hearn's prison records, school records, or his medical and mental health records.  *Id.*

•       The State Bar mandates that counsel collect information from the district

attorney's and other law enforcement agencies' files. Texas Criminal Appellate Manual  (Exhibit

27), at 36.  Ms. Hemphill never did this.  Jan Hemphill's Billing Records (Exhibit 25).

Ironically, the district attorney's files included Mr. Hearn's school records, CPS records, and

other records concerning Mr. Hearn and his mother, but Ms. Hemphill missed yet another

opportunity to find these critical records.

•       Finally, the State Bar mandates that counsel interview numerous witnesses who

may have information concerning the client's life history, and urges counsel to secure the

assistance of a mitigation specialist or investigator to assist in identifying and interview such

witnesses.  Ms. Hemphill did not bill for a single minute for interviewing witnesses or seek

payment for an investigator or mitigation specialist, because she neither interviewed nor had

someone else interview any witnesses.  Jan Hemphill's Billing Records (Exhibit 25).

C.       **Ms. Hemphill and Mr. Swanda Provided Ineffective Assistance to Mr. Hearn
         in His State Habeas Proceeding**

Ms. Hemphill and Mr. Swanda did not raise any claim in the state habeas application that

trial counsel provided ineffective assistance.  They could not do so, because they failed to

undertake the investigation that is mandated in connection with state habeas corpus

representation.  They did not know that counsel failed to investigate Mr. Hearn's life history,

because they did not investigate his life history.  Had they done the investigation required of

habeas counsel, they would have found what undersigned counsel found when we investigated

Mr. Hearn's *Atkins* claim.  To conduct an *Atkins* investigation, counsel must conduct a mitigation

investigation.  That is all we did, and we found the enormous body of mitigating evidence set

forth in this application.  Ms. Hemphill and Mr. Swanda indisputably provided ineffective

assistance to Mr. Hearn in his first state habeas proceedings.  Their "representation fell below an

objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), as

defined by the Texas capital habeas statute and the contemporary performance standards of the

Texas Bar.

## IV.     Representing  Mr. Hearn in His First Federal Habeas Proceeding, Ms. Hemphill Repeated Her Ineffective Performance as State Habeas Counsel by Failing to Conduct Any Investigation of Ineffective Assistance by Mr. Hearn's Trial Attorneys

On December 5, 2001, Ms. Hemphill was appointed as counsel to represent Mr. Hearn in

his first federal habeas proceeding.  *Hearn v. Cockrell*, No. 3:01-cv-02551-D, docket item 5.  No

other attorney was appointed.  *Id*.

According to the standard of postconviction practice existing at that time, expressed in

the American Bar Association's *Guidelines for the Appointment and Performance of Defense*

*Counsel in Death Penalty Cases* (Rev. Ed. February 2003) [hereafter "Guidelines"],[36] as federal

habeas counsel Ms. Hemphill was bound to perform as follows:

---

[36]Despite the publication date, nearly two years after Hemphill's appointment, the Introduction to the *Guidelines* notes that the revised edition of the *Guidelines* "is the product of a two-year long drafting effort" that began in April, 2001.  Thus, the *Guidelines* address the standard of practice in effect during the time Hemphill represented Mr. Hearn in federal habeas proceedings.

C.      Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules.  Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

....

E.      Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to:

1.      maintain close contact with the client regarding litigation developments; and

2.      continually monitor the client's mental, physical and emotional condition for effects on the client's legal position;

3.      keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments; and

4.      continue an aggressive investigation of all aspects of the case.

Guideline 10.15.1(C), (E)—Duties of Post-Conviction, 31 Hofstra L. Rev. 913, 1079-80 (2003).[37]

The Commentary to these guidelines amplifies the standard of care in more specific terms in a section titled "The Labyrinth of Post-conviction Litigation, B. Collateral Relief—State and Federal":

Ultimately, ***winning collateral relief in capital cases will require changing the picture that has previously been presented***.  The old facts and legal arguments—those which resulted in a conviction and imposition of the ultimate

---

[37]The *Guidelines* were published in the Hofstra Law Review.  Cites are thus to the Hofstra Law Review.

punishment, both affirmed on appeal—are unlikely to motivate a collateral court to make the effort required to stop the momentum the case has already gained in rolling through the legal system. Because an appreciable portion of the task of post-conviction counsel is to change the overall picture of the case, Subsection E(3) requires that they keep under continuing review the desirability of amending the defense theory of the case, whether one has been formulated by prior counsel in accordance with Guideline 10.10.1 or not.

For similar reasons, ***collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation in accordance with Guideline 10.7. (Subsection E(4))***. As demonstrated by the high percentage of reversals and disturbingly large number of innocent persons sentenced to death, the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case. That may be because of information concealed by the state, because of witnesses who did not appear at trial or who testified falsely, because the trial attorney did not conduct an adequate investigation in the first instance, because new developments show the inadequacies of prior forensic evidence, because of juror misconduct, or for a variety of other reasons.

***Two parallel tracks of post-conviction investigation are required. One involves reinvestigating the capital case; the other focuses on the client.*** Reinvestigating the case means examining the facts underlying the conviction and sentence, as well as such items as trial counsel's performance, judicial bias or prosecutorial misconduct. ***Reinvestigating the client means assembling a more-thorough biography of the client than was known at the time of trial, not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing issues to fundamental questions of competency and mental-state defenses.***

As with every other stage of capital proceedings, ***collateral counsel has a duty in accordance with Guideline 10.8 to raise and preserve all arguably meritorious issues.*** These include not only challenges to the conviction and sentence, but also issues which may arise subsequently. Collateral counsel should assume that any meritorious issue not contained in the initial application will be waived or procedurally defaulted in subsequent litigation, or barred by strict rules governing subsequent applications.

31 Hofstra L. Rev. at 1085-86 (emphasis supplied).

Thus, to meet the standard of care, Ms. Hemphill should have

(1)     focused on changing the picture of Mr. Hearn and his case by developing new

facts relevant to both the crime and Mr. Hearn;

(2)     conducted a thorough new investigation, which included

(3)     "assembling a more-thorough biography of the client than was known at the time

of trial, not only to discover mitigation that was not presented previously, but also to identify

mental-health claims which potentially reach beyond sentencing issues to fundamental questions

of competency and mental-state defenses"; and

(4)     preserved all meritorious issues.

Ms. Hemphill did none of this.  Instead, according to her carefully maintained

timesheets,[38] in the 47.25 hours she spent representing Mr. Hearn, she spent 35.55 hours

assembling Mr. Hearn's federal habeas petition, which was a collection of issues taken from the

direct appeal brief and the state habeas application she prepared for Mr. Hearn,[39] and writing a

---

[38]We do not have access to Ms. Hemphill's CJA 30 vouchers.  However, we do have her file.  She kept thorough records of her time in her file, so we believe that the time we report is reasonably accurate.

[39]These issues, none of which reflected any investigation into the circumstances of the crime or of Mr. Hearn's life, were as follows:

I.      The state deprived petitioner of qualified trial counsel by failing to comply with the appointment procedure prescribed by TX Code of Crim. Pro. art. 26.052 (based on the motion for new trial hearing).

II.     The evidence is legally insufficient to prove beyond a reasonable doubt a probability that petitioner would commit criminal acts of violence that would constitute a continuing threat to society.

III.    The trial court erred in admitting evidence of Petitioner's written confession.

IV.     The prosecutor failed to offer an adequate racially neutral explanation for the state's exercise of a peremptory strike on potential juror No. 86, Glenn Brown.

V.      The trial court erred by denying petitioner's motion to voir dire prospective jurors on the law of minimum parole eligibility.

VI.     The trial court erred in denying petitioner's motion to instruct the jury on the law of forty-year minimum

supporting brief.  *See* Exhibit 29 (table reflecting the time entries in Ms. Hemphill's files).  In the remaining 11.7 hours Ms. Hemphill billed for representing Mr. Hearn, she read the CCA direct appeal opinion; prepared a motion for her appointment and a case budget; talked with an attorney colleague about federal writs, an investigator who was working with her to gather data on the race and jury-venire issue, Mr. Hearn's cousin about the status of the case, and a public defender and others about the race/jury-venire issue; read information provided by her investigator, conducted online research, and read emails and a law journal about the race/jury-venire issue; and worked on a to-do list about the race/jury-venire issue.  Exhibit 29 (table reflecting the time entries in Ms. Hemphill's files).  Never once did Ms. Hemphill bill for time investigating the case or Mr. Hearn's life.

Thus, despite the prevailing standard of care for federal habeas counsel, Ms. Hemphill complied in no respect with that standard.  Her performance was utterly deficient under the "objective standard of reasonableness" by which *Strickland v. Washington*, 466 U.S. at 688 requires counsel's performance to be measured.

---

parole eligibility for defendants convicted of capital felonies.

VII. – XVII.
   All these issue allege that the Texas death penalty scheme generally or with respect to the law of minimum parole eligibility and the 10/12 rule violate petitioner's rights under the Fifth, Sixth, Eighth, and/or Fourteenth Amendments of the United States Constitution.

XVIII.   Dallas County's venire-selection process violates petitioner's rights to an impartial jury consisting of a representative cross-section of the community.

XIX.   The cumulative effect of the above enumerated constitutional violations denied petitioner due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

## Conclusion and Prayer for Relief

For these reasons, we respectfully request that the Court grant the following relief:

1.      Grant Mr. Hearn's motion to proceed *in forma pauperis*.

2.      Stay Mr. Hearn's execution scheduled for July 18, 2012.

3.      Determine that this petition will be treated as if it were the first federal habeas petition filed by Mr. Hearn.

4.      Find cause for the procedural default of the *Wiggins* claim and prejudice due its validity.

5.      Hold an evidentiary on the merits of the *Wiggins* claim.

6.      Grant the writ as to the *Wiggins* claim,

Respectfully submitted,

NAOMI TERR                         RICHARD BURR

1927 Blodgett Street               PO Box 525

Houston, Texas 77004               Leggett, Texas 77350

(713) 222-7788                     (713) 628-3391

(713) 222-0260 (fax)               (713) 893-2500 ( fax)

s/ Richard Burr

Counsel for Yokamon Laneal Hearn

-114-

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2012, I electronically filed the foregoing petition, along with its exhibits, with the Court using the ECF system which sent notification of the filing to Naomi E. Terr, co-counsel for the Petitioner, and Georgette P. Oden, counsel for the Respondent.

/s/ Richard Burr