# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN  DISTRICT OF TEXAS
# DALLAS DIVISION

## NO. _____

---

### YOKAMON LANEAL HEARN,

**Petitioner,**

**v.**

### RICK THALER
**Director, Texas Department of Criminal Justice Institutional Division,**

**Respondent.**

---

---

## EXHIBITS TO
## PETITION FOR A WRIT OF HABEAS CORPUS
### (Capital Case)

### Volume 3

---

**NAOMI TERR**                 **RICHARD BURR**
**1927 Blodgett Street**       **PO Box 525**
**Houston, Texas 77004**      **Leggett, Texas 77350**
**(713) 222-7788**             **(713) 628-3391**
**(713) 222-0260 (fax)**       **(713) 893-2500 (fax)**
**NaomiTerr@aol.com**        **dick.burrandwelch@gmail.com**

**Counsel for Yokamon Laneal Hearn**

# INDEX OF EXHIBITS

Volume 1

Exhibit 1:     Order Setting Execution Date

Exhibit 2:     Notes of Trial Counsel Matt Fry (Excerpts)

Exhibit 3:     *Capital Sentencing Strategy: A Defense Primer*, July 1994 (Excerpts)

Exhibit 4:     Plano Police Department Records of Tony L. Massingill (Excerpts)

Exhibit 5:     Tarrant County Mental Health and Mental Retardation Records of Susan D. Johnson (Excerpts)

Exhibit 6:     Dallas County Mental Health and Mental Retardation Records of Yokamon L. Hearn (Excerpts)

Exhibit 7:     Parkland Memorial Hospital Records of Susan D. Johnson (Excerpts)


Volume 2

Exhibit 8:     Social Security Earned Income Records of Susan D. Johnson

Exhibit 9:     Tarrant County Juvenile Probation Records of Yokamon L. Hearn (Excerpts)

Exhibit 10:    Child Protective Services Records (Excerpts)

Exhibit 11:    Texas Department of Corrections Records of Tony L. Massingill

Exhibit 12:    Dallas ISD Records of Tony L. Massingill

Exhibit 13:    Parkland Memorial Hospital Records of Tony L. Massingill (Excerpts)

Exhibit 14:    Parkland Memorial Hospital Records of Yokamon L. Hearn (Excerpts)

Exhibit 15:    Assessment of Yokamon Hearn for Fetal Alcohol Syndrome by Pablo Stewart, M.D.

i

Exhibit 16:      Neuropsychological Report of Dale G. Watson, Ph.D.

Exhibit 17:      Dallas ISD Records of Yokamon L. Hearn

Volume 3

Exhibit 18:      Fort Worth ISD Records of Yokamon L. Hearn

Exhibit 19:      Educational Records of Yokamon L. Hearn Contained in CPS Records

Exhibit 20:      Dallas Can! Academy Records of Yokamon L. Hearn

Exhibit 21:      Social Security Administration Earned Income Records of Yokamon L. Hearn

Exhibit 22:      Texas Health and Human Services Records of Yokamon L. Hearn

Exhibit 23:      Sworn Statements of Delvin J. Diles, Dwight P. Burley, and Theresa S. Shirley

Exhibit 24:      XX-Jim's Exhibit

Exhibit 25:      Billing Records of Jan Hemphill

Exhibit 26:      Billing Records of Dean Swanda

Exhibit 27:      Texas Criminal Appellate Manual 1996, 3d ed. (Excerpts)

Exhibit 28:      Jan Hemphill's File (Excerpts)

Exhibit 29:      Table Reflecting the Time Entries in Jan Hemphill's files

# EXHIBIT 18



## STATE OF TEXAS ACADEMIC ACHIEVEMENT RECORD (ACCREDITED)

**Full Legal Name** HEARN   YOKAMON
Last        First        Middle

**Student ID Number** ___   SSN/State ID Number ___
**Date of Birth** ___ **Sex** MALE **Ethnicity** B
**Parents or Guardian Name** SUSAN HEARN
**Current Address** ___ Street   City   State / Zip Code
**Home Phone** 817-336-1781

**District Name** FORT WORTH INDEPENDENT SCHOOL DISTRICT
**Name of School** POLYTECHNIC HS   **Phone No.** 817-5316200
**School Address** 1300 CONNER   FORT WORTH   TX 76105
Street   City   State / Zip
**Rank** ___ **No. in Class** ___ **Date of Ranking** ___ **Quartile** ___ **GPA** .5000
**Date Graduated** ___ Date of Certificate of Coursework Completion ___

___
Signature and Title of School Official
PAT DUNGY

**College Board Campus Code Number** 442555
**Graduation Program Type** ___

| | Advanced Measures | End of Course | TAAS Mastery | | |
|---|---|---|---|---|---|
| | | | Reading | Mathematics | Writing |
| | | | MO/YR | MO/YR | MO/YR |

| Course Category | Academic Year 9 1994-1995 CDC 220905 016 016 | | | | Academic Year — CDC | | | | Academic Year — CDC | | | | Academic Year — CDC | | | | Academic Year — CDC | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. | Credit | Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. | Credit | Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. | Credit | Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. | Credit | Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. | Credit |
| LANGUAGE ARTS | READ IMP1 | 50 | 33 | | | | | | | | | | | | | | | | | |
| | ENG 1AB | 21 | 25 | | | | | | | | | | | | | | | | | |
| | READ IMP1 | | 50 | | | | | | | | | | | | | | | | | |
| MATHEMATICS | ALG 1AB | 19 | 52 | | | | | | | | | | | | | | | | | |
| SCIENCE | PHYS SCI 1 | 64 | 70 | .5 | | | | | | | | | | | | | | | | |
| SOCIAL STUDIES | W HIST 1AB | | 33 | | | | | | | | | | | | | | | | | |
| | W GEO 1AB | 76 | 10 | .5 | | | | | | | | | | | | | | | | |
| ECON/FREE ENT. | | | | | | | | | | | | | | | | | | | | |
| HEALTH | HLTH ED 1A | 70 | | .5 | | | | | | | | | | | | | | | | |
| P.E./EQUIVALENT | ROTC 1AB | 78 | | .5 | | | | | | | | | | | | | | | | |
| OTHER LANGUAGES | | | | | | | | | | | | | | | | | | | | |
| FINE ARTS | | | | | | | | | | | | | | | | | | | | |
| TECH APPL. | | | | | | | | | | | | | | | | | | | | |
| CAREER TECH ED | CARINVES1A | | 51 | | | | | | | | | | | | | | | | | |
| SPEECH SP | | | | | | | | | | | | | | | | | | | | |
| OTHER ELECTIVES | ROTC 1AB | | 50 | | | | | | | | | | | | | | | | | |
| LOCAL CREDIT | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |

**OFFICIAL TRANSCRIPT**

**STUDENT RECORDS**

| 02/17/2004 | Total Credits for Year 2.0 | Total Credits for Year | Total Credits for Year | Total Credits for Year | Total Credits for Year |
|---|---|---|---|---|---|
| | ABSENCES 1st Sem 2nd Sem Total | ABSENCES 1st Sem 2nd Sem Total | ABSENCES 1st Sem 2nd Sem Total | ABSENCES 1st Sem 2nd Sem Total | ABSENCES 1st Sem 2nd Sem Total |
| PAGE 1 OF 1 | Regular School Year | Regular School Year | Regular School Year | Regular School Year | Regular School Year |
| 09 | Entry 04121995 Withdrew | Entry Withdrew | Entry Withdrew | Entry Withdrew | Entry Withdrew |
| | Reason | Reason | Reason | Reason | Reason |

* No credit given because of excessive absences.

Note: In the "Abbreviated Course Name" column, space is provided to the right of the dashed line for H = Honors Courses, P = Advanced Placement Courses, I = International Baccalaureate Courses, R = Summer School Courses, S = Special Education Courses taken with content modified as a result of an ARD decision. A = Articulated credit awarded for high school credit and for credit at a specific college named on the reverse side of this record.

E = credit awarded as a result of the Advanced Placement Examination Process. C = course taken by correspondence from an approved institution of higher education. T = Credit by exam with prior formal instruction. None of these three is used in computation of the grade point average.

In the "1st Sem Gr." and "2nd Sem Gr." columns, P = Passing.

# EXHIBIT 19

Dept. of Protective
Regulatory Services

**Child's Service Plan
EDUCATION LOG**

Form 2647
September 1992

SE PLAN–PART TWO

's Name   Vokamon Hearn

r the requested information, beginning with the child's school at the time of the initial placement.

| Enrolled | Name of School | Grade |
|---|---|---|
| 4/95 | Polytechnic High School | 9+L |
| ress | | Special Education |
| ormance–Strengths  ROTC. | | |
| ormance–Needs | | Date Withdrawn |

| Enrolled | Name of School | Grade |
|---|---|---|
| 9/94 | O.D. Wyatt | 9+L |
| ress | | Special Education |
| ormance–Strengths  ROTC. | | |
| ormance–Needs | | Date Withdrawn  4/95 |

| Enrolled | Name of School | Grade |
|---|---|---|
| 4/95 | Bridge Shelter (FWISD) | 9th |
| ress  115 W. Broadway. F.W. Tx 76104 | | Special Education |
| ormance–Strengths | | |
| ormance–Needs | | Date Withdrawn  5/95 |

| Enrolled | Name of School | Grade |
|---|---|---|
| 8/15/95 | Maceo Smith High School | 9th |
| ress  3030 Stag Rd. Dls. Tx 75241 | | Special Education |
| ormance–Strengths | | |
| ormance–Needs | | Date Withdrawn |

| Enrolled | Name of School | Grade |
|---|---|---|
| | | |
| ress | | Special Education |
| ormance–Strengths | | |
| ormance–Needs | | Date Withdrawn |

| Enrolled | Name of School | Grade |
|---|---|---|
| | | |
| ress | | Special Education |
| ormance–Strengths | | |
| ormance–Needs | | Date Withdrawn |

# APPLICATION FOR ENROLLMENT

FORT WORTH INDEPENDENT SCHOOL DISTRICT   *TRANSFER* (2)

| LOC | SS OR STATE ID NO. | LAST | STUDENT'S NAME (LEGAL) | FIRST | GRADE (NUMERICAL) | HOME ROOM (NUMERICAL) |
|---|---|---|---|---|---|---|
| 15 | ▓ | Hearn | | Vokamon | 9 | 106 |

| ENTRY DATE (NUMERICAL) YEAR MONTH DAY | ENTRY CODE 0 or 1 | ELIGIBILITY CODE 0-7 | ETHNIC 1,2,3,4 or 5 | HOME LANG. | SEX M/F | STUDENT'S BIRTHDATE (NUMERICAL) YEAR MONTH DAY | BIRTH CITY | BIRTH STATE (ABBREV.) | PROOF OF AGE (CHECK ONE) |
|---|---|---|---|---|---|---|---|---|---|
| 95 4 12 | | | 3 | LEP | M | ▓ | Dallas | Tx | BIRTH CERT. / AFFIDAVIT |

| HOME SCH. | HOUSE NO. | STREET | APT. | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|
| | ▓ | ▓ | | ▓ | 336 1781 |

| NAME OF PERSON WITH WHOM STUDENT LIVES | | RELATIONSHIP... PARENT ✓ | DATE ENTERED 6TH GRADE |
|---|---|---|---|
| LAST Hearn | FIRST Susan | ✓ | GUARDIANSHIP AFF. |

| LAST F.W.I.S.D. SCHOOL ATTENDED | (ACADEMIC) YEAR | OUT OF DISTRICT SCHOOL ATTENDED | CITY | STATE | CHECK ANY THAT APPLY |
|---|---|---|---|---|---|
| | 19 94-95 | O.D. Wyatt | Ft Worth | TX | MAGNET / TRANSFER |

IMMUNIZATION DATA: Rec'y 4-18-95

According to penal code 37.10, a person commits an offense if he knowingly makes a false entry in, or false alteration of a government record. This is a Class A misdemeanor. A person who knowingly falsifies information on this form is liable to the district if the student is not eligible for enrollment. The person is liable for the maximum tuition charged by the district for out of district students during the period in which the student is enrolled.

## Application of Parent for Transfer of Pupil

Name of Pupil _Yolanda Hearn_ _____ Ethnicity _B_ Grade _9cb_

Address (including zip code) _____ Phone No. _____

This application is made for transfer to _____ Texas High School _____ School for the following

reasons: _____

Date _4/9/95_ Signature of Parent/Guardian X _____

Approved by: _____

This application was not approved for the following reasons: _____

Principal _____ School No. _____

---

### STUDENT-PARENT TRANSFER AGREEMENT WAIVER
#### Fort Worth Independent School District
Policy Governing Participation in University Interscholastic League Sponsored Activities,
Fort Worth Independent School District Activities, and Other Contests

The Board of Education of the Fort Worth Independent School District approved the following policy effective March 1, 1979:

872. (Rules Governing U.I.L. Events and Other Contests)

All activities that are under the direction of the University Interscholastic League (U.I.L.) shall be strictly governed by the Constitution and Contest Rules as published by the U.I.L.

This policy covers literary and academic contests, music activities, and athletic contests. The Fort Worth Independent School District has local rules for athletics which are published in the Athletic Handbook. A complete listing of the U.I.L. activities is on the reverse side of this waiver.

The following has been developed in compliance with U.I.L. rules.

A student residing within the Fort Worth Independent School District, upon his/her first enrollment in high school, must enroll in and attend the high school in the district in which he/she resides or Trimble Technical High School in order to be eligible for U.I.L. activities. (Resides means with parent or guardian as defined in Article VIII, Section 13, Constitution and Contest Rules, University Interscholastic League.) A student who transfers from one high school to another within the City of Fort Worth will be ineligible for a period of one calendar year unless his/her parent or guardian moves into the school district to which the student has transferred.

I hereby certify that I, _____ (Parent/Guardian), and my child, _____ (Student) fully understand the policy governing participation in U.I.L. and other activities and contests in the Fort Worth Independent School District as indicated in the above policy.

I also understand that my child will be ineligible to participate in the contests and activities for a period of one year after the first day of enrollment in a school located in an attendance zone other than where we reside.

X _Sigrid D. Hearn_
Signature of Student                    Signature of Parent/Guardian

Address (including zip code) _____

Signature of Principal _____ Date _____

(This form is to be completed in the school from which the student is transferring—original to receiving school, copy to parent or guardian, copy for sending school.)

Form 233 R80

| NAME: HEARN | YOKAMON L | | | | | | | | FORT WORTH PUBLIC SCHOOLS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GRADE: 08  ADVISOR: | ID NO.: 041 | | | | | | | | FORT WORTH, TEXAS | | | | | | | | | |
| SCHOOL YEAR: 1993-94 | | | | | | | | | DR. DON R. ROBERTS, SUPERINTENDENT | | | | | | | | | |
| SCHOOL: HORIZONS ALTERNATIVE SCHOOL | | | | | | | | PRINCIPAL: WILLIAM GAY | | | | | | | | | |

| COURSE NUMBER | SUBJECT | SEM | SUBJECT GRADES | | | | | | CRED -IT | CITIZENSHIP | | | | ABSENCES | | | | | | TEACHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | EXAM | SEM. | FINAL | | 1 | 2 | 3 | | EXCUSED | | | UNEXCUSED | | | |
| | | | | | | | | | | | | | | 1 | 2 | 3 | 1 | 2 | 3 | |
| 0043-01 | ENGLISH 8A | 1 | | | | | | 64 | | | | | | | | | | | | WILSON |
| 0191-06 | INTR TECH IA | 1 | | | | | | 81 | | | | | | | | | | | | CRAWFORD |
| 0203-05 | MATH 8A | 1 | | | | | | 74 | | | | | | | | | | | | GRAY |
| 0273-02 | READING 8A | 1 | | | | | | 60 | | | | | | | | | | | | SMITH |
| 0303-04 | EARTH SCI A | 1 | | | | | | 50 | | | | | | | | | | | | DEASON |
| 0333-03 | US HIST 8A | 1 | | | | | | 61 | | | | | | | | | | | | PENA |
| 0390-07 | COMP LIT A | 1 | | | | | | 91 | | | | | | | | | | | | LISTER |
| 0498-01 | HOMEROOM 8 | 1 | | | | | | | | | | S | | | | | | | | | WILSON |
| 0006-07 | ART 88 | 2 | 85 | 85 | 85 | | | 85 | | E | S | S | | | | | | | | HANCOCK |
| 0043-01 | ENGLISH 8A | 2 | 80 | 92 | 92 | | 76 | 83 | | E | E | E | | | | | | | | WILSON |
| 0203-05 | MATH 8A | 2 | 82 | 88 | 88 | | 80 | 88 | | E | E | E | | | | | | | | GRAY |
| 0273-02 | READING 8A | 2 | 89 | 92 | 92 | | 76 | 91 | | S | E | E | | | | | | | | SMITH |
| 0303-04 | EARTH SCI A | 2 | 87 | 80 | 80 | | 66 | 82 | | S | E | E | | | | | | | | DEASON |
| 0333-08 | US HIST A | 2 | 88 | 87 | 87 | | 74 | 87 | | S | E | S | | | | | | | | PENA |
| 0390-08 | COMP LIT A | 2 | 94 | 94 | 94 | | | 94 | | S | E | S | | | | | | | | LISTER |
| 0498-01 | HOMEROOM 8 | 2 | | | | | | | | S | S | S | | | | | | | | | WILSON |

1. PARENTS ARE REQUIRED TO SIGN THIS REPORT CARD AND RETURN IT TO THE STUDENT'S HOMEROOM TEACHER.
2. TUTORIAL SERVICES WILL BE PROVIDED FOR STUDENTS WHO ARE NOT PASSING A COURSE AT THE END OF A SIX-WEEKS REPORTING PERIOD.
3. PARENTS OF A STUDENT WHO FAILS A SUBJECT ARE REQUESTED TO CALL THE SCHOOL SECRETARY AT 000-0000 AND HAVE HER SCHEDULE A CONFERENCE WITH THE SUBJECT TEACHER. EACH TEACHER HAS A PLANNING PERIOD THAT MAY BE USED TO SCHEDULE CONFERENCES WITH PARENTS.

| E = EXCELLENT | S = SATISFACTORY | N = NEEDS IMPROVEMENT | U = UNSATISFACTORY |
|---|---|---|---|
| I = INCOMPLETE | | IA = INSUFFICIENT ATTENDANCE FOR A GRADE | |
| 91-100=OUTSTANDING PROGRESS | 81-90=GOOD PROGRESS | 70-80=SATISFACTORY PROGRESS | 69-BELOW=FAILING |

PARENT'S SIGNATURE: _____     DATE: _____

t. Worth Independent School District.        * Department/Check
ounty-District-Campus: 220-905-016           Parent Approval:
D WYATT HIGH SCHOOL.                          Principal/Ass't Principal:
400 E. SEMINARY. DR                           Homeroom Teacher:                Librarian:
ORT WORTH, TX  76119                          Attendance Clerk:                Counselor: Johnson
817  531-6300                                 Nurse: MMike
                                              Cafe Mgr:              Dest: Boshear/Arlington/Heights.

* Student. Information *

Last Name: HEARN                              TEA ID #:                         Att. Cat:
First Name: YOKAMON       L.                      Grade:                        Spec Ed:
Generation:                                   Home Lang:                        Home Loc:132
       Sex: Male                              Ethnicity: Black, not. of Hispan  At. Risk:
Birthdate:                                    Lunch Code:            Privacy:   Migrant: __
                                              Entry Date: 08/24/1994            Chapter 1: __
                                              Withdraw Date: 03/29/1995         Gifted/Talented: __
                                              Withdraw Reason: 08               BIL/ESL:

        TAAS _ Math: _ _____        TAAS _ Reading: _ _____        TAAS _ Writing: _ _____

* Immunization Data *

        Date      Cmnt Type          Date      Cmnt Type          Date      Cmnt Type
     08/23/1994    6V  DIP-TET     08/13/1984    4V  POLIO      01/04/1991    2V  M M R

* 1st. Semester *                             Daily Attendance Cycle 1: 07
--------- Course ---------:                              Wthdrwl  Fee   Tchr
Num   Title          Teacher       Mrk Ctz FA UA  Mrk Ctz  Due   Init.   Books to return
1011  ENG 1AB        VICK           21   N  2   7  __  __   ___   ___    _____
5001  HLTH ED 1A     SOMERVILLE     70   S  0   4  __  __   ___   ___    _____
5951  ROTC 1AB       HOOPER         70   E  0   8  __  __   ___   ___    _____
7531  PHYS SCT1AB    RAY            64   S  0   8  __  __   ___   ___    _____

* 2nd Semester *                              Daily Attendance Cycle 2: 04
:--------- Course ---------:                            Wthdrwl  Fee   Tchr
Num   Title          Teacher       Mrk Ctz FA UA  Mrk Ctz  Due   Init.   Books to return
2840  CI 1A          WATSON         51   S  3   0  __  __   ___   ___    _____
3011  ENG 1AB        VICK           25   N  0   2  __  __   ___   ___    _____
5951  ROTC 1AB       HOOPER         85   E  0   5  __  __   ___   ___    _____
7531  PHYS SCT1AB    RAY            70   S  0   5  __  __   ___   ___    _____

* 3rd Semester *                              Daily Attendance Cycle 3: 07
:--------- Course ---------:                            Wthdrwl  Fee   Tchr
Num   Title          Teacher       Mrk Ctz FA UA  Mrk Ctz  Due   Init.   Books to return
3931  READ TMP1AB    HOLLIE         50   N  2   8  __  __   ___   ___    _____
5951  ROTC 1AB       HOOPER         56   N  0  13  __  __   ___   ___    _____
7051  ALG 1AB        DULANEY        19   S  14  0  __  __   ___   ___    _____
8011  W GEO 1AB      TUNSTLE        76   S  3   0  __  __   ___   ___    _____

* 4th Semester *                              Daily Attendance Cycle 4: 04
:--------- Course ---------:                            Wthdrwl  Fee   Tchr
Num   Title          Teacher       Mrk Ctz FA UA  Mrk Ctz  Due   Init.   Books to return
3931  READ TMP1AB    HOLLIE 098                          __  __   ___   ___    N/A
5951  ROTC 1AB       HOOPER 252                          __  __   ___   ___
7051  ALG 1AB        DULANEY 607                         __  __   ___   ___    NEED BOOK
8011  W GEO 1AB      TUNSTLE 601                         __  __   ___   ___    No book

                                        23.88 +L312)
                                          alg I
                                      (NEED ROTC
                                        SHIRT)

                                          (1)

)EMIC PROGRESS          POLYTECHNIC HIGH SCH              95/04/18
                S T U D E N T   S C H E D U L E
)DDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDD
· Selection    1 Add   2 Drop   3 Drop All   4 Transfer   5 Sort   6 Print

ИИИИИИИИИИИИИИИИИИИИИИИ Student Schedule *HR 106-Chappell* ИИИИИИИ;
udent: ▓▓▓▓▓▓▓OKAMON HEARN                    Hmrm: 106   Grade: 09  *5th* :

| NE | COURSE | SEC | TITLE | TA | SEM | MEETCODE | ROOM | TEACHER | | |
|----|--------|-----|-------|-----|-----|----------|------|---------|---|---|
| | 5951 | 1 | ROTC 1AB | N | 2 | 01 | 014 | 014 | DAVIS | *50-S F 50-S:* |
| | 7051 | 7 | ALG 1AB | N | 2 | 02 | 111 | 009 | McMINN | *50-S J 50-S:* |
| | 0533 | 1 | FREE PER 3 | N | 2 | 03 | HOME | 999 | OFF CAMPUS | : |
| | 0534 | 1 | FREE PER 4 | N | 2 | 04 | HOME | 999 | OFF CAMPUS | : |
| | 8033 | 4 | W HIST 1AB | N | 2 | 05 | 209 | 209 | LOWE | *50-S R 50-S:* |
| | 3931 | 1 | READ IMP1AB | N | 2 | 06 | 305 | 305 | LEVY | *50-S 50-S* |
| | 0537 | 1 | FREE PER 7 | N | 2 | 07 | HOME | 999 | OFF CAMPUS | : |
| | 0538 | 1 | FREE PER 8 | N | 2 | 08 | HOME | 999 | OFF CAMPUS | : |

*4th and 5th six weeks grades from O.D. Wyatt.*                    :
                                                                   :
ИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИИ *4-18-95*   ИИ<
DDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDDi            DDD
  PROCESS           F3 POPUP              F5 LO

*CC: C. Holtz*
*     D. Price*

*Luann- I know we
have to change these
"0" to "50" but do I
use them as his
5th 6 weeks grades
or what? O.Wyatt
said the 4th-9 week
cycle began 3/20/95.
~~Also do I need to~~
(use as 4th & 5th)*

## POLYTECHNIC HIGH SCHOOL

Date:      8/2/95

To:        Kim Gonzalez
           TDPRS
From:      Wilma Chambers
           Counseling Clerk

Re:        Yokamon Hearn

I have tried several times to FAX Yokamon's
records to you; but, I could never get the
FAX to go through.

If I can be of further service to you, please do
not hesitate to call.

# STATE OF TEXAS ACADEMIC ACHIEVEMENT RECORD

** all Legal Name** HEARN   YOKAMON   B
Last   First   Middle

**Student ID Number** 106   **Ethnicity** B
**Social Security Number** ____   **Sex** MALE
**Date of Birth** ____   **Place of Birth** ____
X **Parents' or** ____ **Guardians' Names** SUSAN HEARN
**Current Address** ____
Street   City / State / Zip Code
**Most Recent Former Address** ____
Street   City / State / Zip Code
**Home Phone** 336-1781   **Business Phone** ____

**Name of High School** POLYTECHNIC HS
**Phone** 817 531-6200 **Proposed Date of Graduation** ____
**High School Address** 1300 CONNER   FORT WOR
Street   Cit
**District Name** FORT WORTH INDEPENDENT SCHOO
**TEA County/District/Campus Number** 220-905-009
**Rank** 257 **No. in Class** 274 **Date of Ranking** ____
**Grade Point Average** .5000 **Date Graduated** ____
**Last District/High School Attended** ____
**Address** ____
Street   Cit

| Generic Course Name | 016 016 Grade 9 19 94-95 Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. |  | Grade 19 - Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. |  | Grade 19 Abbreviated Course Name | 1st Sem Gr. |
|---|---|---|---|---|---|---|---|---|---|---|
| ENGLISH LANGUAGE ARTS | READ IMP1 | 50 | 33 | | | | | | | |
| | ENG 1AB | 21 | 25 | | | | | | | |
| | READ IMP1 | | 50 | | | | | | | |
| MATHEMATICS | ALG 1AB | 19 | 52 | | | | | | | |
| SCIENCE | PHYS SCI 1 | 64 | 70 | .5 | | | | | | |
| SOCIAL STUDIES | W HIST 1AB | | 33 | | | | | | | |
| | W GEO 1AB | 76 | 10 | .5 | | | | | | |
| ECONOMICS FREE ENTERPRISE | | | | | | | | | | |
| HEALTH | HLTH ED 1A | 70 | | .5 | | | | | | |
| PHYSICAL ED./EQUIVALENT | ROTC 1AB | 78 | | .5 | | | | | | |
| OTHER LANGUAGES | | | | | | | | | | |
| FINE ARTS | | | | | | | | | | |
| COMPUTER SCIENCE | | | | | | | | | | |
| VOCATIONAL EDUCATION | CARINVES1A | | 51 | | | | | | | |
| BUSINESS EDUCATION | | | | | | | | | | |
| OTHER ELECTIVES | ROTC 1AB | | 50 | | | | | | | |
| LOCAL CREDIT | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 07/12/95 | **Total Credits for Year** 2.0 | | | | **Total Credits for Year** | | | | **Total Credits for Year** | |

PAGE 1 OF 1

09

| ABSENCES | 1st Sem 2nd Sem Total | ABSENCES | 1st Sem 2nd Sem Total | ABSENCES | 1st Sem 2nd Sem |
|---|---|---|---|---|---|
| Regular School Year | | Regular School Year | | Regular School Year | |
| Entered 041295 Withdrew | | Entered ___ Withdrew | | Entered ___ Withdrew | |
| Reason | | Reason | | Reason | |
| Entered ___ Withdrew | | Entered ___ Withdrew | | Entered ___ Withdrew | |
| Reason | | Reason | | Reason | |

No credit given because of excessive absences.

---

FORT WORTH PUBLIC SCHOOLS
FORT WORTH, TEXAS
DR. THOMAS S. TOCCO, SUPERINTENDENT
PAT DUNGY, PRINCIPAL

**NAME:** HEARN   YOKAMON
**GRADE:** 09 **ADVISOR:** 106 **ID NO.:** 009
**SCHOOL YEAR:** 1994-95
**SCHOOL:** POLYTECHNIC HIGH SCHOOL

TEACHER: LEVIS, DAVIS, WENN, LOWE

E = EXCELLENT
I = INCOMPLETE
91-100=OUTSTANDING PROGRESS

S = SATISFACTORY
81-90=GOOD PROGRESS

N = NEEDS IMPROVEMENT
1A = INSUFFICIENT ATTENDANCE FOR A GRADE
70-80=SATISFACTORY PROGRESS

U = UNSATISFACTORY
69-BELOW=FAILING

* CAN NOT RECEIVE CREDIT DUE TO EXCESSIVE UNEXCUSED ABSENCES

# EXHIBIT 20

# DALLAS CAN! ACADEMY

### 325 W. 12th Street, Suite 125
### Dallas, Texas 75208
### (214) 943 –2244 – PHONE
### (214) 943 –8899 - FAX

ADMISSION COORDINATOR
Martha Ortiz Ext. 323

REGISTRAR (STUDENT RECORDS)
Olivia White Ext. 303

ADMISSION/TESTING COORDINATOR
Lisa Norris Ext. 337

To: _O. Wilkowski_

Date: _2·17·04_

Fax: _713 222·0260_

From: _O. White_

NUMBER OF PAGES (INCLUDING COVER SHEET) _____

Mr. Hearn's did not receive any
grades from Dallas Can because
of his attendance. He enrolled
7·30·97 and withdrew 10·22·97

# Dallas Can! Charter School
## Exit Form

**Name:** Hearn _____ L, _____ Yokamon ____
　　　　　　　Last　　　　　　　　　　M.I.　　　　　　　First

**Birthdate:** ████████████

**\*Exiting Student eligible for re-entry?\***　yes **/** no　　**ASAP or date** _____

**Exit Date** 10/22/97 _____

**Reason for Exiting** Numerous tardies, absences, and rule violations.

**Counselor's Signature** Bradford Stephens　　**Date** 10/22/97

X Yokamon L. Hearn

A.M. / P.M.

# Dallas Can! Academy
## STUDENT INFORMATION SHEET

Date 7-30-97

Last Name HEARN                First Name YoKAnon                M.I. L

How did you hear about Dallas Can! Academy? My mother

Social Security # ▓▓▓▓▓▓        Nickname or Preferred Name: (Yoci.)

Street Address ▓▓▓▓▓▓ Apt.____ City ▓▓▓ State ▓▓▓
Home Phone:( 214 ) 371-6615        Message Phone: ( 214 ) 371-6615

Date of Birth ▓▓▓▓▓▓        Age 18    Race B    Sex M

Marital Status (please check one)   Married (  )  Single ( ✓ )  Divorced (  )
Number of Children ____0____        Ages of Children ____0____
Will you need Childcare? __0__        Are you Currently Pregnant? __0__  (If yes, Due Date?)____

Last School you attended? A. Maceo Smith    Last grade you completed? 10
Last Date you Attended? March
Have you attended any other High Schools? ____N/A____
If yes, put the school name(s)____

Living with (Name) Jessie and Paul Shaw    Relationship Friends

Currently on Probation or Parole? No    Reason ____

Probation Officer/Parole Officer (Name)____    Phone # (  )____

Ever been arrested? Yes    Reason Traffic Ticket    Ever been in a gang? No

Do you currently have a job? Yes    Where? Secure America Phone # (972) 522-3869

Backup Contact: Two people who do not live with you, but would know how to reach you. (relative or close friend)
Name: Susan or Mike Johnson    Relationship Mother and Father
Home Phone ( 214 ) 527-0127    Work Phone (  )____

Name Woods or Zamin Bell    Relationship Aunt and Cousin
Home Phone ( 214 ) 374-1501    Work Phone (  )____

Which would you like to complete? (Please check one) ____ GED or ___✓___ H.S. Diploma
(If your answer is H.S. Diploma) How many credits do you have? Don't Know

Please circle the parts of the TAAS you have passed?    (Reading)    (Writing)    Math

Have you ever qualified for Special Ed services? No

☒004/007

TEL:                                    Oct 02.97    9:33 No.006 P.03

DATE 10/02/97                    DALLAS INDEPENDENT SCHOOL DISTRICT                    PAGE  1
                                      STUDENT TRANSCRIPT SYSTEM

ID:773749 LOC:003 BIRTHDATE:▓▓▓▓▓                         SSN▓▓▓▓▓▓▓ STATE ID:      ID:773749

STUDENT: HEARN        YOKAMON    L            WORKING DOCUMENT

SEX:M RACE:B GRADE:10 ADVISOR:                    TRANSCRIPT LOC:003 A. MACEO SMITH HIGH SCHOOL
GRAD PLAN: (10) - HIGH SCHOOL PROGRAM             STUDENT-STATUS : WITHDRAWN (11) 04/03/97
PARENT/GUARD: WANDA HEARN                         GPA: 64.83 GPA EQV: 1.170  STUDENT DIR:
ADDRESS   :                                       CLASS-RANK: 174 IN CLASS OF  200 AS OF SEMESTER END FALL 96/97
                                                     (LAST LOADED 03/08/97 BY LOC 003)

| ####REQUIRED KEY#### | | | CRS | ######GRADES###### | | | | | ##COURSE INFO## | | | | #&EPA## | RANK | PE | UPDATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YF | SEM LOC CRS/SEC | CRS TITLE DEPT | SOURC | 1 | 2 | 3 | EX | SEM PE AP | TYPE | GPA RNK PE | CRED | GP | UNT PNTS | UNTS | ACTION |

92/93 1 072 1000/12 LANG ARTS 7       01       71 56 70 59 65                        .0
        072 1015/35 READING IMPRV 7 01       73 77 76 67 75                        .0
        072 2000/14 TEX HST-GEO7       02       80 83 89 65 82                        .0
        072 2505/13 MATH 7 PH           03       74 79 76 52 71                        .0
        072 2530/17 COMP LITERACY       03          50 79 58 60                        .0
        072 7594/41 MATH 7/MASTERY      03       70 72 80 70 74                        .0
        072 3008/16 LIFE SCI 7          04       60 50 78 50 61                        .0

92/93 2 072 1000/12 LANG ARTS 7       01       70 70 50 UE 50                        .0
        072 1015/35 READING IMPRV 7 01       76 70 73 I 55                        .0
        072 2000/14 TEX HST-GEO7       02       70 75 65 UE 53                        .0
        072 2505/13 MATH 7 PH           03       70 80 72 I 56                        .0
        072 7594/41 MATH 7/MASTERY      03       81 50 74 I 51                        .0
        072 3008/16 LIFE SCI 7          04       80 50 70 I 50                        .0
        072 4577/27 PE-AEROBICS 7       71       70 90 90 60 78                        .0

4/95 1 003 1200/99 ENGLISH I          01 4-EQV               50       Y Y       .0   50 1          ADD (11/14/95)
        003 2120/99 WLD GEO STU         02 4-EQV               76       Y Y       .5   76 1   532   ADD (11/14/95)
        003 2600/99 ALGEBRA I I          03 4-EQV               50       Y Y       .0   50 1          ADD (11/14/95)
        003 3110/99 PHYSICL SCIENCE 04 4-EQV               64       Y Y       .0   64 1          ADD (11/14/95)
        003 3437/99 HEALTH ED           12 4-EQV               70       Y Y       .5   70 1   496   ADD (11/14/95)
        003 4740/99 NJROTC I             15 4-EQV               78       Y Y 2   .5   78 1   546   ADD (11/14/95)
        003 1226/99 READING IMPRV I 19 4-EQV               50  OTHR Y Y       .0   50 1          ADD (11/14/95)

4/95 2 003 1200/99 ENGLISH I          01 4-EQV               50       Y Y       .0   50 1          ADD (11/14/95)
        003 2108/99 WLD HIST STU         02 4-EQV               50       Y Y       .9   50 1          ADD (11/14/95)
        003 2600/99 ALGEBRA I           03 4-EQV               52       Y Y       .0   52 1          ADD (11/14/95)
        003 3110/99 PHYSICL SCIENCE 04 4-EQV               70       Y Y       .5   70 1   490   ADD (11/14/95)
        003 1226/99 READING IMPRV I 19 4-EQV               50  OTHR Y Y       .0   50 1          ADD (11/14/95)

4/96 1 003 1201/61 ENGLISH I I        01       78 55 79 70 71       Y Y       .5   71 1   497
        003 2321/71 U.S. HISTORY I 02       70 60 86 65 70       Y Y       .5   70 1   490
        003 2601/51 ALGEBRA I I         03       80 68 84 81 78       Y Y       .5   78 1   546
        003 3151/11 BIOLOGY I I         04       70 70 74 68 71       Y Y       .5   71 1   497
        003 4740/41 NJROTC I             15       89 87 70 79 81 Y    Y Y 2   .5   81 1   567   1
        003 1226/31 READING IMPRV I 19       70 78 80 82 78  OTHR Y Y       .5   78 1   468
        003 7075/02 TAAS TUTORING 19       79 76 75 59 70  OTHR Y Y       LC   70 1   420
        003 5431/81 IT TECH SYSTEMS 33       74 70 70 66 70       Y Y       .5   70 1   490

TEL:                                    Oct 02.97    9:33 No.006 P.02

@005/007

: 10/02/97                          DALLAS INDEPENDENT SCHOOL DISTRICT                      PAGE   2
                                       STUDENT TRANSCRIPT SYSTEM
73749  LOC:003                                              SSN          STATE ID:        ID:773749
                                          WORKING DOCUMENT
ENT: HEARN       YOKAMON    L

CONTINUED

| SEM | LOC | CRS/SEC | CRS TITLE | DEPT | CRS SOURC | 1 | 2 | 3 | EX | SEM | PE | AP | TYPE | GPA | PNK | PE | CRED | GP | UNT | PNTS | UNTS | ACTION |
|-----|-----|---------|-----------|------|-----------|---|---|---|----|----|----|----|------|-----|-----|----|------|----|-----|------|------|--------|
| 96 2 | 003 | 1202/61 | ENGLISH I 2 | 01 | | 90 | 79 | 78 | 59 | 77 | | | | Y | Y | | .5 | 77 | 1 | 539 | | |
| | 003 | 2322/71 | U.S. HISTORY 2 | 02 | | 73 | 70 | 78 | 59 | 70 | | | | Y | Y | | .5 | 70 | 1 | 490 | | |
| | 003 | 2602/51 | ALGEBRA I 2 | 03 | | 73 | 70 | 80 | 73 | 74 | | | | Y | Y | | .5 | 74 | 1 | 518 | | |
| | 003 | 3152/11 | BIOLOGY I 2 | 04 | | 89 | 83 | 60 | 75 | 76 | | | | Y | Y | | .5 | 76 | 1 | 532 | | |
| | 003 | 4740/41 | NJROTC I | 15 | | 75 | 80 | 89 | 61 | 76 | Y | | | Y | Y | 2 | .5 | 76 | 1 | 572 | 1 | |
| | 003 | 1226/31 | READING IMPRV I | 19 | | 77 | 83 | 81 | 74 | 79 | | | | OTHR | Y | Y | | .5 | 79 | 1 | 474 | | |
| | 003 | 7075/02 | TAAS TUTORING | 19 | | 70 | 72 | 75 | 50 | 67 | | | | OTHR | Y | Y | | .0 | 67 | 1 | | | |
| | 003 | 5431/81 | IT TECH SYSTEMS | 33 | | 72 | 74 | 78 | 64 | 72 | | | | Y | Y | | .5 | 72 | 1 | 504 | | |
| 7 1 | 003 | 1300/51 | ENGLISH II | 01 | | 70 | 70 | 50 | I | 50 | | | | Y | Y | | .0 | 50 | 1 | | | |
| | 003 | 2630/61 | GEOMETRY | 03 | | 60 | 50 | N6 | UE | 49 | | | | Y | Y | | .0 | 49 | 1 | | | |
| | 003 | 3160/71 | SCIENCE III | 04 | | 79 | 50 | 50 | UE | 50 | | | | Y | Y | | .0 | 50 | 1 | | | |
| | 003 | 4168/41 | BAND BEGINNING | 09 | | 80 | 80 | 80 | 80 | 80 | | | | Y | Y | | .5 | 80 | 1 | 560 | | |
| | 003 | 4741/11 | NJROTC II | 15 | | 90 | 92 | 66 | UE | 62 | Y | | | Y | Y | 2 | .0 | 62 | 1 | | | |
| | 003 | 7075/11 | TAAS TUTORING | 19 | | 70 | 70 | 70 | UE | 33 | | | | OTHR | Y | Y | | .0 | 53 | 1 | | | |
| | 003 | 5082/31 | FOOD SCI & NUTR | 25 | | 70 | 75 | 50 | UE | 50 | | | | Y | Y | | .0 | 50 | 1 | | | |
| | 003 | 5439/81 | IT CONSTR GRPHC | 33 | | 65 | 60 | 70 | UE | 50 | | | | Y | Y | | .0 | 50 | 1 | | | |
| 7 2 | 003 | 1300/51 | ENGLISH II | 01 | | 50 | | | | | | | | Y | Y | | .0 | | | | | |
| | 003 | 2307/32 | U.S. GOVT | 02 | | 50 | | | | | | | | Y | Y | | .0 | | | | | |
| | 003 | 2630/61 | GEOMETRY | 03 | | 50 | 50 | | | | | | | Y | Y | | .0 | | | | | |
| | 003 | 3160/71 | SCIENCE III | 04 | | 50 | | | | | | | | Y | Y | | .0 | | | | | |
| | 003 | 4168/41 | BAND BEGINNING | 09 | | 60 | 75 | | | | | | | Y | Y | | .0 | | | | | |
| | 003 | 4741/11 | NJROTC II | 15 | | 50 | 50 | | | | | | | Y | Y | 2 | .0 | | | | | |
| | 003 | 7075/19 | TAAS TUTORING | 19 | | 50 | 50 | | | | | | | OTHR | Y | Y | | .0 | | | | | |
| | 003 | 5439/81 | IT CONSTR GRPHC | 33 | | 50 | | | | | | | | | Y | Y | | .0 | | | | | |

URSES MARKED '*' MUST BE UPDATED VIA)          HIGH SCHOOL TRANSCRIPT SYSTEM:   9.5 2334  36 10182   2 SEM  5 UNDET  0
CARD AND 6-CARD. ALL OTHERS MUST BE )          HIGH SCHOOL CURRENT CRS RECS :    .0    0   0    0     0      0     0
DATED VIA THE TRANSCRIPT SYSTEM.    )          HIGH SCHOOL TOTAL:              9.5 2334  36 10182   2      5     0
URSES MARKED '@' INDICATES CREDIT   )    LC = LOCAL CREDIT    LC CREDIT TOTAL:   .5
S BEEN FORCED.                      )                          MC CREDIT TOTAL:   .0

| RENT TOTALS | COMP | ENRL | | COMP | ENRL | | COMP | ENRL |
|-------------|------|------|---|------|------|---|------|------|
| G/LANG ARTS/JOURNAL/SPCH | 1.0 | .0 | 02 SOCIAL STUDIES | 1.5 | .0 | 03 MATHEMATICS | 1.0 | .0 |
| :ENCE | 1.5 | .0 | 09 MUSIC-INSTRUMENTAL | .5 | .0 | 12 HEALTH | .5 | .0 |
| OTC/NDCC MILITARY | 1.5 | .0 | 19 MISCELLANEOUS | 1.0 | .0 | 33 INDUSTRIAL ARTS TECHNOLOGY | 1.0 | .0 |

9 BEGUN 95/96 SEM 1   HONORS:                          COMMENTS:
10 BEGUN 96/97 SEM 1
11 BEGUN 00/01 SEM 0
12 BEGUN 00/01 SEM 0

☑006/007

DALLAS INDEPENDENT SCHOOL DISTRICT
STUDENT TRANSCRIPT SYSTEM
WORKING DOCUMENT

PAGE   3

C:003

SSN:▓▓▓▓▓ STATE ID:          ID:773749

N      YOKAMON     L

:0

```
******* SAT **************     *********** SAT ACH **********     ***************************** ACT *****************************
VERB  MATH  TSWE  READ  VOC    DATE  ACH1  ACH2  ACH3     DATE  GRD  ENGLISH  MATH  READING  SC REAS  COMP
```

```
TAAS **********   *********** PSAT *************   ********************************** TAP ********************************
LE SUBJ  DATE        DATE  GRD VERB MATH SEL     GRADE 09   FORM K    LEVEL 15    DATE 04/96
RE NSTRY  SCORE                                            RD-ADV  RD-TOTAL    WR-EXPR MTH-ADV MTH-TOT      SURVEY-TOT
79 B-FAIL 09/92  %ILE                            SCORE  5.1   5.7        6.5   8.5   5.7          5.8
00 B-FAIL 09/92                                  NAT %   13    12         22    38    11           12
60 B-FAIL 09/92
```

ACADEMIC ACHIEVEMENT ********    MIDDLE SCHOOL                    OTHER DISD LOC
REQUESTING AGENCY  DATE SENT      072 SARAH ZUMWALT MIDDLE SCHOOL

```
* MISCELLANEOUS INFO **********
    CATE:  0 - NO PARTICIPATION

VALENT
 = 4.0
 = 3.0
 = 2.0
j = 0.0

NTS WEIGHTING INFO:

SEMESTER 1    SEMESTER 2
LOC PERIODS   LOC PERIODS
EQV   7       EQV   5
003   8       003   8
```

TEL:

TEL:

Oct 02,97    9:34 No.006 P.04

DATE 09/30/97

DALLAS INDEPENDENT SCHOOL DISTRICT
STUDENT TRANSCRIPT SYSTEM

WORKING DOCUMENT

PAGE    1

ID:466531 LOC:003 BIRTHDATE

SEX:▓              STATE ID:          ID:466531

STUDENT: MORGAN        FERNANDO     0
SEX:M  RACE:3  GRADE:12  ADVISOR:027
GRAD PLAN: (40) -
PARENT/GUARD: ALVIN DANIELS
ADDRESS    :

TRANSCRIPT LOC:003 A. MACEO SMITH HIGH SCHOOL
STUDENT-STATUS : ACTIVE   08/27/97
GPA: 79.00  GPA EQV: 2.50%  STUDENT DIR: Y
CLASS-RANK:   0 IN CLASS OF   0 AS OF SEMESTER END      00/01
(LAST LOADED 00/00/00 BY LOC 000)

| ****REQUIRED KEY**** | | | CRS | ******GRADES***** | | | | | | | | | **COURSE INFO** | | | **PASS | RANK | PE | UPDATE |
| YR | SEM LOC CRS/SEC | CRS TITLE | DEPT | SOURC | 1 | 2 | 3 | EX | SEM | PE | AP | TYPE | GPA | RNK | PE | CRED | GF | UNT | PNTS | UNTS | ACTION |
| 1997/98 | 1  027 1501/30 | ENGLISH IV | 1 | 01 | 81 | 80 | 80 | 84 | 81 | | | Y | Y | | .5 | 81 | 1 | 567 | | |
| | 027 2722/11 | ALGEBRA II | 2 | 03 | 79 | 81 | 75 | 80 | 77 | | | Y | Y | | .5 | 77 | 1 | 535 | | |
| | 027 7816/11 | STUDY HALL | | 84 | | | | | | | | OTHR | | | .0 | | | | | |

(COURSES MARKED '*' MUST BE UPDATED VIA)
(1-CARD AND 6-CARD. ALL OTHERS MUST BE )
(UPDATED VIA THE TRANSCRIPT SYSTEM.    )
(COURSES MARKED '*' INDICATES CREDIT   )
(HAS BEEN FORCED.                       )

| | COMP | 0 | 0 | 0 | 0 SEM | 0 UNDET | 0 |
| HIGH SCHOOL TRANSCRIPT SYSTEM: | .0 | | | | | | |
| HIGH SCHOOL CURRENT CRS RECS : | 1.0 | 158 | 2 | 1106 | 0 | 1 | 0 |
| HIGH SCHOOL TOTAL: | 1.0 | 158 | 2 | 1106 | 0 | 1 | 0 |
| LC = LOCAL CREDIT    LC CREDIT TOTAL: | .0 | | | | | | |
| HC CREDIT TOTAL: | .0 | | | | | | |

DEPARTMENT TOTALS
| 01 ENG/LANG ARTS/JOURNAL/SPCH | COMP .5 | ENRL .0 | 03 MATHEMATICS | COMP .5 | ENRL .0 | | COMP | ENRL |

GRADE  9 BEGUN 00/01 SEM 0  HONORS:          COMMENTS:
      10 BEGUN 00/01 SEM 0
      11 BEGUN 00/01 SEM 0
      12 BEGUN 97/98 SEM 1

| ********** SAT ********** | | | | | | ******** SAT ACH ******** | | | | ************ ACT ************ | | | | | |
| DATE | GRD | VERB | MATH | TSWE | READ | VOC | DATE | ACH1 | ACH2 | ACH3 | DATE | GRD | ENGLISH | MATH | READING | SC REAS | COMP |

| ******** TAAS ******** | | | ******** PSAT ******** | | | | | ************ GABE ************ | | | | | | |
| SCALE | SUBJ | DATE | DATE | GRD | VERB | MATH | SEL | GRADE | FORM | LEVEL | DATE | | | | | |
| | SCORE | HSTRY | SCORE | | | | | | SPELLING | WRD-ATTK | VOCAB | READING | LANG-TOT | MTH-TOT | COMPOSITE |
| READING | 1-PASS 07/95 | | %ILE | | | | | SCORE | | | | | | |
| MATH | 1-PASS 10/96 | | | | | | | NAT % | | | | | | |
| WRITING | 1-PASS 03/95 | | | | | | | | | | | | | |

| ******** ACADEMIC ACHIEVEMENT ******** | | MIDDLE SCHOOL | OTHER DISD LOC |
| DATE | REQUESTING AGENCY | DATE SENT | | 027 METROPOLITAN ED. CENTER |

TEL:                          Oct 02,97    9:34 No.006 P.04

DATE 09/30/97                    DALLAS INDEPENDENT SCHOOL DISTRICT                              PAGE   1
                                   STUDENT TRANSCRIPT SYSTEM
ID:466531 LOC:003  BIRTHDATE:▓▓▓▓▓                                    SSN▓▓▓▓▓  STATE ID:      ID:466531
                                      WORKING DOCUMENT
STUDENT: MORGAN       FERNANDO    O
SEX:M  RACE:3  GRADE:12  ADVISOR:027                    TRANSCRIPT LOC:003 A. MACEO SMITH HIGH SCHOOL
GRAD PLAN: (40) -                                       STUDENT-STATUS : ACTIVE  08/27/97
PARENT/GUARD: ALVIN DANIELS                             GPA: 79.00  GPA EQV: 2.50%   STUDENT DIR: Y
ADDRESS    :▓▓▓▓▓▓▓▓▓                                    CLASS-RANK:   0 IN CLASS OF   0 AS OF SEMESTER END    00/01
                                                          (LAST LOADED 00/00/00 BY LOC 000)
------------------------------------------------------------------------------------------------------------------
######REQUIRED KEY####           CRS   ######GRADES######     ##COURSE INFO##      ##GPA## RANK  PE   UPDATE
 YR   SEM LOC CRS/SEC   CRS TITLE DEPT SOURC  1  2  3  EI SEM PE AP  TYPE GPA RNK PE CRED   GF UNT PNTS UNTS  ACTION

#97/98 1  027 1501/30 ENGLISH IV 1   01     81 80 80 84 81        Y  Y    .5  81  1  567
#         027 2722/11 ALGEBRA II 2   03     70 81 75 80 77        Y  Y    .5  77  1  539
#         027 7816/11 STUDY HALL     84                      OTHR          .0

    (COURSES MARKED '#' MUST BE UPDATED VIA)           HIGH SCHOOL TRANSCRIPT SYSTEM:   .0    0   0    0   0 SEM  0 UNDET 0
    (1-CARD AND 6-CARD. ALL OTHERS MUST BE )           HIGH SCHOOL CURRENT CRS RECS :  1.0  158   2 1106   0      1       0
    (UPDATED VIA THE TRANSCRIPT SYSTEM.    )              HIGH SCHOOL TOTAL:  1.0  158   2 1106   0      1       0
    (COURSES MARKED '#' INDICATES CREDIT   )   LC = LOCAL CREDIT     LC CREDIT TOTAL:   .0
    (HAS BEEN FORCED.                      )                         MC CREDIT TOTAL:   .0
------------------------------------------------------------------------------------------------------------------
DEPARTMENT TOTALS               COMP  ENRL                        COMP  ENRL                        COMP  ENRL
 01 ENG/LANG ARTS/JOURNAL/SPCH   .5    .0    03 MATHEMATICS        .5    .0

 GRADE  9 BEGUN 00/01 SEM 0   HONORS:                           COMMENTS:
       10 BEGUN 00/01 SEM 0
       11 BEGUN 00/01 SEM 0
       12 BEGUN 97/98 SEM 1
------------------------------------------------------------------------------------------------------------------
############### SAT ###############   ######## SAT ACH ########   ################### ACT ####################
 DATE  BRD  VERB MATH TSWE READ VOC    DATE  ACH1  ACH2  ACH3    DATE  GRD  ENGLISH MATH  READING SC REAS  COMP


------------------------------------------------------------------------------------------------------------------
######### TAAS ##########   ######### PSAT ##########   ##################################### GABE #####################
     SCALE SUBJ  DATE        DATE  GRD VERB MATH SEL    GRADE    FORM      LEVEL      DATE
     SCORE MSTRY             SCORE                      SPELLING WRD-ATTK VOCAB READING LANG-TOT    MTH-TOT COMPOSITE
READING   1-PASS 07/95       %ILE                       SCORE
MATH      1-PASS 10/96                                  NAT %
WRITING   1-PASS 03/95
------------------------------------------------------------------------------------------------------------------
######### ACADEMIC ACHIEVEMENT #########       MIDDLE SCHOOL              OTHER DISD LOC
 DATE    REQUESTING AGENCY  DATE SENT                                     027 METROPOLITAN ED. CENTER

# EXHIBIT 21

## Social Security Administration
## Retirement, Survivors and Disability Insurance
### Earnings Record Information

From:  Office of Central Operations
       300 North Greene Street, Baltimore, Maryland 21201

NAOMI E TERR                              Date: JANUARY 20 2005
P O BOX 421398
HOUSTON TX  77042                         Refer to:  S2RB1H/47220

                                          Your Reference:

We are sending you the statement of earnings you requested for the number holder shown below.

| Number Holder's Name: | Social Security Number: |
|---|---|
| YOKAMON L HEARN |  |

If we recently received earnings information, it may not yet be shown on this statement.

Please read the back of this letter for more information about Social Security records.

If you have any questions, you should call, write or visit any Social Security office.  If you visit, please bring this letter.  It will help us answer questions.

Enclosures:
Original Letter
Earnings Statement

Control Number:
Remittance CTL Number:

Department of Health and Human Services
Social Security Administration

Form SSA-L460 (4-91) Destroy Prior Editions

# INFORMATION ABOUT SOCIAL SECURITY RECORDS

- Our records show the amount of earnings reported, not the amount of Social Security taxes which were paid.
- Wages were first covered under Social Security in 1937. Therefore, 1937 is the first year for which earnings may be shown on our records. Employers were required to report earnings semi-annually in 1937, and on a quarterly basis for the years from 1938 through 1977. Beginning with 1978, employers are required to report earnings annually.
- Our records do not show the exact dates of employment (month and day) because we don't need this information to figure Social Security benefits. Employers do not give us this information.
- Our records may not show earnings from last year because it takes some time to process earnings reports from employers.
- Each year, there is a maximum amount of earnings that are subject to Social Security taxes and are used to compute benefits. If a person earns more than this maximum amount, the earnings statement will usually show the maximum rather than the total earnings.

| Years | Maximum Yearly Earnings Taxed for Social Security | Years | Maximum Yearly Earnings Taxed for Social Security |
|---|---|---|---|
| 1937-50 | $ 3,000 | 1985 | $39,600 |
| 1951-54 | $ 3,600 | 1986 | $42,000 |
| 1955-58 | $ 4,200 | 1987 | $43,800 |
| 1959-65 | $ 4,800 | 1988 | $45,000 |
| 1966-67 | $ 6,600 | 1989 | $48,000 |
| 1968-71 | $ 7,800 | 1990 | $51,300 |
| 1972 | $ 9,000 | 1991 | $53,400* |
| 1973 | $10,800 | 1992 | $55,500* |
| 1974 | $13,200 | 1993 | $57,600* |
| 1975 | $14,100 | 1994 | $60,600* |
| 1976 | $15,300 | 1995 | $61,200* |
| 1977 | $16,500 | 1996 | $62,700* |
| 1978 | $17,700 | 1997 | $65,400* |
| 1979 | $22,900 | 1998 | $68,400* |
| 1980 | $25,900 | 1999 | $72,600* |
| 1981 | $29,700 | 2000 | $76,200* |
| 1982 | $32,400 | 2001 | $80,400* |
| 1983 | $35,700 | 2002 | $84,900* |
| 1984 | $37,800 | 2003 | $87,000* |

- Beginning in 1951, self-employed persons could also receive Social Security credit for their work. The maximum amounts of self-employment earnings that are subject to Social Security taxes and are used to compute benefits are the same as those shown above.

☐  Please read the enclosed pamphlet(s) for more information.

*  The maximum yearly earnings taxed for Hospital Insurance for 1991 is $125,000, 1992 - $130.000, 1993 – 135,000 and from 1994 to date there is no limit.

Form SSA-L460 (4-91)

SSA-1826                    ITEMIZED STATEMENT OF EARNINGS          JOB:
VERSION 1984.002 * * *      FOR SSN ██████████      * * *


FROM:   SOCIAL SECURITY ADMINISTRATION
        OFFICE OF CENTRAL OPERATIONS
        300 N. GREENE STREET
        BALTIMORE, MARYLAND  21290-0300

NAOMI E TERR                              NUMBER HOLDER NAME:
                                          YOKAMON L HEARN
P O BOX 421398


HOUSTON                    TX  77042

PERIOD REQUESTED    JANUARY 1992  THRU  DECEMBER 1999

| YEAR | JAN – MARCH | APRIL –JUNE | JULY – SEPT | OCT – DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

EMPLOYER NUMBER:  74-2606390
SOUTHWEST TICKETING INC
4849 GREENVILLE STE 500
DALLAS  TX 75206-4187

| 1996 | – | – | – | – | $ | 945.74 |
|------|---|---|---|---|---|--------|

EMPLOYER NUMBER:  75-2267306
AUTO MARKETING INC
111 SHANGRI LA DR
AZLE  TX 76020-1207

| 1997 | – | – | – | – | $ | 371.32 |
|------|---|---|---|---|---|--------|

EMPLOYER NUMBER:  75-2673025
SAMARITAN SERVICES INC
1617 PEAR ST
DALLAS  TX 75215-4146

| 1997 | – | – | – | – | $ | 1,361.89 |
|------|---|---|---|---|---|----------|
| 1998 | – | – | – | – | $ | 227.06 |

THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS SOCIAL SECURITY
NUMBER FOR THE PERIOD(S) REQUESTED.

EARNINGS FOR THE YEARS AFTER   2003 MAY NOT BE SHOWN, OR ONLY
PARTIALLY SHOWN, BECAUSE THEY MAY NOT YET BE ON OUR RECORDS.

                          PAGE 001 END

# EXHIBIT 22



## TEXAS HEALTH AND HUMAN SERVICES COMMISSION

**ALBERT HAWKINS**
**EXECUTIVE COMMISSIONER**

February 16, 2005

Naomi E. Terr, LMSW
Attorney at Law
P.O. Box 421398
Houston, Texas 77242

Re: Yokamon Hearn

Dear Ms. Terr:

This is in response to your open records request of January 12, 2005 to the Texas Health and Human Services Commission regarding state benefits received by Yokamon Hearn.

I have enclosed the only documents held by the Commission that are responsive to your request. According to our records, Mr. Hearn was active in our TANF database from September 1, 1996 until April 30, 1997. Mr. Hearn's resident address was ███████████████ ███████ Our records do not reflect that Mr. Hearn received any Medicaid benefits.

I regret it taking so long to get this information for you. Because of their age, most of the records you sought had been purged from our system, and only a limited amount of responsive information was retrievable.

If you have any questions regarding this correspondence, you may contact me at (512)/424-6910.

Sincerely,

Robert W. Patterson
Open Records Coordinator

Enclosures

P. O. Box 13247  •  Austin, Texas 78711  •  4900 North Lamar, Austin, Texas  78751

CLIENT NO. 516031303, HEARN, YOKAMON        BD███████SM R2 CNTY
057
CASES    TC S S-I-G  W CLI CERT   SSN████████ SSCN
                     SSMS   ALIAS    SMIB-ACTION
                     RFUG  00 ALIEN-DT   SMIB
                     INS-SUB-DT   COV TP OPEN     CLOSE S    *T H NF*
                     04/04/97    02R 01 09/01/96 04/30/97
                     LAST-MED TYPE 02R 01 07/01/95 08/31/96
                     04/03/97 1
                     SSMS-DT ED
FTL DISQ                        B  HI
A1               INCOME
    PA     IAS MPS      FS        SSI       BENDEX
 RSDI      RSDI      RSDI       RSDI      RSDI
 IT44      IT44      IT44      VA
 EARND      EARND      EARND      EARND
              SSI       SSI
PT B             MED C
B1        HISTORY          THSteps INFORMATION     PILOT
   CASE HIST TC S S-I-G  ADD-DATE DROP-DT  |DECISIONDEFLT-NO CLT
ANS | Pil Ind
    _020094570 1 2 5   09/30/96 04/03/97  |DATE      11/29/96 |IDA Ind
    _020094570 1 2 5   08/04/95 08/07/96  |MEDICAL SCRN        |
                        |DENTAL TRTMNT         |
                        |OVERDUE MED DT 03/1998 |

```
HISR401A                National Heritage Insurance Company    .   Page:     1
Clerk ID CKUCZEO1       English Language History Type 21          Run Date: 01/25/2005
                        Rpt Period 01/01/2000 - 01/25/2005        Run Time: 19:05:35

Limitations-    Claim Type 999       Destination NHIC      PCN 516031303
---------------------------------------------------------------------------------
```

No claims match the selection criteria.

```
HISR401A               National Heritage Insurance Company        Page:    2
Clerk ID CKUCZEO1      English Language History Type 21       Run Date: 01/25/2005
                       Rpt Period 01/01/2000 - 01/25/2005      Run Time: 19:05:35
```

```
Limitations-  | Claim Type 999      Destination NHIC        PCN 516031303
--------------|--------------------------------------------------------------------
Purged History
```

No purged claims

```
----------------------------------------------------------------------------
                          ***Control Totals***

                    Num Services                  Amounts
        Claim Type  Billed    Paid        Billed       Paid      Denied


                         *** END OF REPORT ***
```

# EXHIBIT 23

State of Texas          )
                        )              In Re Yokamon Laneal Hearn
County of Bowie         )

### DECLARATION OF DELVIN J. DILES

I, Delvin J. Diles, state that the following is true and correct to the best of my knowledge:

1.  My name is Delvin J. Diles. I am serving a life sentence at the Telford Unit of TDCJ. I was convicted of capital murder for the death of Joseph Franklin Meziere. I give this affidavit freely and voluntarily to counsel for Yokamon L. Hearn. I have not received anything, nor have I been offered anything in exchange for this affidavit.

2.  I met Yokamon Hearn in 1996 through a friend by the name of Paul Shaw. Back then, we knew Yokamon as "Yogi." Yogi didn't have many friends. He used to hang out with me, Dwight Burley, Paul Shaw, and a guy named Aaron Runnels.

3.  I was big into rap when I met Yogi. Dwight, Paul, and I would get together all the time to rap. Yogi was there too, but he didn't have any input. He stayed in the background and never tried to rap. He never had anything to say when we asked him to rap.

4.  Paul Shaw had an uncle who owned a golf course. Sometimes we would also go to the golf course to hit balls. Even though Yogi came along with us, he didn't hit the balls. He just hung out with us.

5.  When we hung out together, we played a lot of video games. Yogi didn't join in. He didn't play videogames with us.

6.  The night Mr. Meziere died, it was Dwight's idea to go jacking. Jacking meant to take someone's car. Before we got to the 7-Eleven, there was no plan to kill Mr. Meziere or anyone else. Once we were at the 7-Eleven, the fact that we didn't have masks to cover our faces came up. I said that we should kill Mr. Meziere and Yogi said he was cool with it. It was never Yogi's idea to kill the man.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _6th_ day of July, 2006

By: _Delvin Diles_
Delvin J. Diles

| | | |
|---|---|---|
| State of Texas | ) | |
| | ) | In Re Yokamon Laneal Hearn |
| County of Grimes | ) | |

## DECLARATION OF DWIGHT PAUL BURLEY

I, Dwight Paul Burley, state that the following is true and correct to the best of my knowledge:

1.  My name is Dwight Paul Burley. I am incarcerated at the Luther Unit of the Texas Department of Criminal Justice in Navasota, Texas. I am serving a ten-year sentence for aggravated robbery of Joseph Meziere. I give this affidavit freely and voluntarily to counsel for Yokamon L. Hearn. I have not received anything, nor have I been offered anything in exchange for this affidavit.

2.  When I met Yokamon in 1997, everyone called him "Yogi." I met Yogi through Delvin Diles. There was a group of us that hung out together. Delvin Diles, Paul Shaw, and Aaron Runnels, and me hung out together. At first, no one liked Yogi. He was like glue. Everyone gave him the cold shoulder, but he kept coming around. Yogi rolled with the flow. Yogi followed along with what the group decided.

3.  Delvin, Paul, and I were into rapping. Yogi hung with us, but he couldn't rap. Yogi would sit there when he came to the studio with us. Even though Yogi couldn't rap, he would come to the studio because he wanted to be with us.

4.  Yogi was kind of crazy. For example, when we went places with Yogi and there was a large group of people like at a football game, Yogi would stare down people. It didn't matter whether there were only five of us and twenty of them. We often had to tell Yogi to calm down because we all knew a fight could start and that we were outnumbered. Sometimes, we even had to take off running because we knew there were too many of them. The fact that we were outnumbered didn't seem to phase Yogi.

5.  When Yogi hung out with us, he never had a job and he never had money. He said he went out to look for a job, but we didn't believe he was looking for a job. If we went to the movies or something like that, everyone had to pitch in because he had no money.

6.  Yogi was a follower. He didn't have the skills to be a leader.

7.  When we went to North Dallas the day Mr. Meziere got killed, the plan was not to kill anyone. We only planned to get money. The whole thing wasn't supposed to

1

be like it happened. ~~I thought Yogi agreed with the plan.~~ He never said he was going to shoot the guy. There was no plan, it just happened. DPB

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of July, 2006

By: _Dwight Paul Burley_
Dwight Paul Burley

2

State of Texas        )
                      )          In Re Yokamon Laneal Hearn
County of Coryell     )

## DECLARATION OF TERESA SHAVONN SHIRLEY

I, Teresa Shavonn Shirley, state that the following is true and correct to the best of my knowledge:

1. My name is Teresa Shavonn Shirley. I received a ten-year sentence for the armed robbery of Joseph Meziere. I am serving my time at the Gatesville Unit of TDCJ. I give this affidavit freely and voluntarily to counsel for Yokamon L. Hearn. I have not received anything, nor have I been offered anything in exchange for this affidavit.

2. I met Yokamon through my friend Dwight Burley. Dwight and Yogi were part of a group of guys that used to hang out together. Yokamon went by "Yogi" when I met him.

3. Yogi's actions were kind of wild when I met him. Yogi was an "impressionist." When I say that Yogi was an "impressionist," I mean that he did things to impress the guys in the group.

4. Yogi had poor hygiene. It looked like he did not bathe or groom himself regularly.

5. Dwight and the other guys he and Yogi used to hang out with were part of a rap group. Yogi, however, did not rap with them.

6. The night Mr. Meziere got shot, the plan was to go to North Dallas and "hit a lick." To "hit a lick" means to rob someone. I know that the plan was not to kill anyone because when we returned to Dwight's house after Mr. Meziere got shot, Dwight and Yogi got into a fight. Dwight was yelling at Yogi asking him why he shot the guy, why he did that.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _5_ day of July, 2006

By: _____
Teresa Shavonn Shirley

# EXHIBIT 24

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

No. 11-70031

---

RAMIRO RUBI IBARRA,

Petitioner-Appellant

v.

RICK THALER, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:02-cv-52

---

O R D E R:

Before JONES, Chief Judge, and HAYNES and GRAVES, Circuit Judges.

EDITH H. JONES, Chief Judge:

The Court has considered Ramiro Rubi Ibarra's motion to vacate the district court's judgment denying his petition for habeas corpus relief in light of the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). We DENY his motion.

Ibarra petitioned the district court for postconviction relief on 11 issues, which the district court denied, several of which as defaulted. Currently pending in this court is his application for a COA on three issues. Ibarra's current motion argues that *Martinez* invalidates the district court's conclusion that

No. 11-70031

Ibarra procedurally defaulted these COA issues: (1) an ineffective-assistance-of-trial-counsel claim; (2) a claim of mental retardation under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002); and (3) a claim that the prosecution violated his rights under the Vienna Convention on Consular Relations ("VCCR"). We may readily dismiss these latter two claims, as *Martinez*, by its terms, applies only to ineffective-assistance-of-trial-counsel claims. *Martinez*, 132 S. Ct. at 1311-12. *Martinez* is also limited, again by its own express terms, to "initial-review collateral proceedings," which it defines as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 1315. Other courts have rejected entreaties to expand *Martinez*, and we do the same. *See, e.g., Arnold v. Dormire*, 675 F.3d 1082 (8th Cir. Apr. 3, 2012) (declining to extend *Martinez* to claims of ineffective assistance in appeals from initial-review collateral proceedings); *Hunton v. Sinclair*, 2012 WL 1409608, at *1 (E.D. Wash. Apr. 23, 2012) (declining to extend *Martinez* to *Brady* claims); *Sherman v. Baker*, 2012 WL 993419, at *18 (D. Nev. Mar. 23, 2012) (declining to extend *Martinez* beyond ineffectiveness claims).

The district court concluded that Ibarra defaulted his ineffective-assistance-of-trial-counsel claim by first presenting it in his fourth state petition for habeas relief. Ibarra now argues that his initial habeas counsel was also ineffective, thereby excusing his procedural default in presenting his underlying ineffective assistance claim. A short summary of the facts underpinning Ibarra's allegedly deficient representation suffices. Ibarra claims his trial counsel "virtually abandoned their duty to prepare for sentencing," focusing instead on an innocence defense. Ibarra argues that trial counsel's failure to present more than two social history witnesses — Ibarra's wife and one of his siblings — rendered his sentencing-phase assistance constitutionally deficient. Following conviction, Ibarra was then appointed new counsel for his first state habeas

2

No. 11-70031

petition, who raised only a purported *Lackey* claim[1] predicated on pre-indictment delays. The state trial court denied relief, and the Texas Court of Criminal Appeals ("TCCA") affirmed. *Ex parte Ibarra*, No. 48,832-01 (Tex. Crim. App. Apr. 4, 2001) (unpublished).

Until recently, this court's precedent foreclosed Ibarra's argument. *See, e.g., Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001). A habeas petitioner must demonstrate cause — objectively external to his defense — and prejudice to overcome a regularly applied state procedural default, which ordinarily bars federal habeas review of a defaulted issue. *Coleman v. Thompson*, 501 U.S. 722, 746-47, 111 S. Ct. 2546, 2562-63 (1991).

But, as Ibarra notes, the Supreme Court recently recognized a "limited qualification to *Coleman*" in *Martinez*. *Martinez*, 132 S. Ct. at 1319. In *Martinez*, a defendant, represented by counsel, was convicted of sexual conduct with a minor based in part on expert testimony regarding child-abuse accusations and recantations. *Id.* at 1313. The state of Arizona appointed new counsel for the defendant's direct appeal. Appellate counsel pursued myriad claims unsuccessfully, but Arizona law required defendants to bring ineffectiveness of counsel claims only in post-conviction proceedings rather than on direct appeal. *Id.* at 1314. Appellate counsel initiated such a proceeding under Arizona procedures, but elected not to pursue an ineffectiveness claim against trial counsel; she ultimately filed a statement with the court that she found no colorable issue appropriate for post-conviction relief. *Id.* Martinez attempted to petition for post-conviction relief a year and a half later in state court, claiming trial counsel ineffectiveness. *Id.* The state habeas court

---

[1] A *Lackey* claim asserts violation of the Eighth Amendment if a prisoner remains on death row too long. *Lackey v. Texas*, 514 U.S. 1045, 115 S. Ct. 1421 (1995) (mem.) (Stevens, J., respecting denial of cert.).

## No. 11-70031

dismissed Martinez's petition under its rule refusing to consider claims in subsequent petitions that could have been raised in earlier ones. *Id.*

Martinez began anew in federal court, again raising his IAC claims. *Id.* Martinez acknowledged his procedural default, but sought to avoid the familiar bar to federal review by alleging his habeas counsel's ineffectiveness as cause for his default. *Id.* at 1314-15. While leaving open the constitutional question "whether a prisoner has a right to effective counsel in collateral proceedings" that provide "the first occasion" to raise a trial-counsel-ineffectiveness claim, the Supreme Court established a "narrow exception" to the *Coleman* rule that "an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as a cause to excuse a procedural default." *Id.* at 1315. The Court distinguished Arizona's procedures for ineffectiveness claims from other post-conviction proceedings by noting that Arizona ineffectiveness claims roughly equate to direct review of ineffectiveness claims. *Id.* at 1311-12. The Court specifically noted that Arizona habeas courts "look[] to the merits of" the ineffectiveness claim, that no other court prior to the collateral proceeding has addressed the claim, and that prisoners pursuing initial review pro se are especially disadvantaged due to the lack of counsel's briefs or a court's opinion addressing their claims. *Id.* at 1312. The Court justified this ineffectiveness-specific exception based on the importance of counsel to the adversarial criminal process. *Id.* (citing the right to effective counsel as "bedrock").

*Martinez*, by its own terms, therefore establishes a specific and narrow exception to the *Coleman* doctrine; it reiterates this not merely once, but again and again, as the Court repeatedly (and exclusively) refers to the scenario of a state in which collateral review is the first time a defendant may raise a claim of ineffective assistance of counsel. Thus, the phrase "initial-review collateral proceeding" is a specifically defined term referring to states like Arizona in which a defendant is prevented from raising counsel's ineffectiveness until he

4

No. 11-70031

pursues collateral relief (normally bereft of a right to counsel). *Martinez* defines the legal issue that it addresses as follows: "[*Coleman*] left open, and the Court of Appeals in this case addressed, a question of constitutional law: whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial.  *These proceedings can be called, for purposes of this opinion, 'initial-review collateral proceedings.'" Martinez*, 132 S. Ct. at 1315 (emphasis added). Reinforcing this definition, the Court states: "The State of Arizona does not permit a convicted person alleging ineffective assistance of trial counsel to raise that claim on direct review. Instead, the prisoner must bring the claim in state collateral proceedings." *Martinez*, 132 S. Ct. 1309, 1313 (2012). "Where, as here, the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim." *Id.* at 1317. "From this it follows that, *when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding*, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*." *Id.* at 1318 (emphasis added) (citation omitted). Finally, "The rule of *Coleman* governs in *all but the limited circumstances recognized here* . . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a

5

## No. 11-70031

prisoner to raise a claim of ineffective assistance at trial . . . ." *Id.* at 1320 (emphasis added).[2]

When a state diverts ineffectiveness claims to collateral proceedings that function as the prisoner's first opportunity to assert those claims, a prisoner who can demonstrate that he was either unrepresented in that collateral proceeding or that his initial habeas counsel performed ineffectively thereby establishes "cause" for purposes of *Coleman's* cause-and-prejudice framework to forgive a state procedural default. *Martinez* goes on to describe the parameters of a "prejudice" showing. The result of *Martinez* is to allow petitioners in these narrowly described cases to urge their claims of ineffective trial (and habeas) counsel in federal court.

No published opinion from this court has yet considered *Martinez's* applicability to Texas cases. To ascertain *Martinez's* applicability to Texas procedures, it is useful to describe Arizona's habeas procedures more carefully. Arizona bars initial review of ineffectiveness claims outside of collateral proceedings. Arizona's collateral-review proceedings — "Rule 32 proceedings" — have predominated Arizona ineffectiveness adjudication since at least 1989, when the Arizona Supreme Court recommended ineffectiveness claims be raised under Rule 32. *State v. Valdez*, 770 P.2d 313, 319 (Ariz. 1989). Yet Arizona practitioners continued to raise ineffectiveness claims on direct appeal. As Rule 32 motions could either follow direct appeals or proceed contemporaneously with direct appeals, these ineffectiveness proceedings were sometimes consolidated on direct appeal, only to be remanded to the trial court. *State v. Spreitz*, 39 P.3d 525, 526-27 (Ariz. 2002). In 2002, the Arizona Supreme

---

[2] Had the Court sought to craft a general exception to *Coleman* for claims of ineffective trial counsel, it would have said: "inadequate assistance of counsel at initial-review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Instead, the court said: "inadequate assistance of counsel at initial-review *collateral* proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315.

No. 11-70031

Court "clarif[ied]" this "murky" procedure by instructing appellate courts to disregard ineffectiveness claims on direct appeal, regardless of merit. *Id.* at 527. Arizona's Rule 32 proceedings remained the exclusive venue for developing an ineffectiveness record; at least one Arizona appellate court has expressly disapproved using motions for a new trial to develop ineffectiveness claims in favor of the Rule 32 procedure. *See State v. Williams*, 819 P.2d 962, 964 (Ariz. Ct. App. 1991).

Contrast these procedures with Texas's rules governing ineffectiveness claims. The TCCA made clear that a state habeas petition is the preferred vehicle for developing ineffectiveness claims. *Robinson v. State*, 16 S.W.3d 808, 809-10 (Tex. Crim. App. 2000). Yet Texas defendants may first raise ineffectiveness claims before the trial court following conviction via a motion for new trial, when practicable, and the trial court abuses its discretion by failing to hold a hearing on an ineffectiveness claim predicated on matters not determinable from the record. *Holden v. State*, 201 S.W.3d 761, 762-63 (Tex. Crim. App. 2003). A prisoner who develops such a record through a new trial motion can of course pursue the denial of an ineffectiveness claim through direct appeal, but the TCCA has indicated that a new trial motion is neither a sufficient nor necessary condition to secure review of an ineffectiveness claim on direct appeal. Indeed, an ineffectiveness claim may simply be raised on direct appeal without the benefit of a motion for new trial. *Robinson*, 16 S.W.3d at 813. As a result, both Texas intermediate courts and the TCCA sometimes reach the merits of ineffectiveness claims on direct appeal. *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999). Where they do not, Texas habeas procedures remain open to convicted defendants. *Ex parte Nailor*, 149 S.W.3d 125, 129, 131 (Tex. Crim. App. 2004). In short, Texas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings,

7

No. 11-70031

and they do not by law deprive Texas defendants of counsel-and court-driven guidance in pursuing ineffectiveness claims.

    Accordingly, Ibarra is not entitled to the benefit of *Martinez* for his ineffectiveness claims, as Texas procedures entitled him to review through counselled motions for new trial and direct appeal. We therefore DENY Ibarra's motion to vacate the district court's judgment. This disposition does not affect our consideration of the pending COA application.

**MOTION DENIED.**

8

GRAVES, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Ramiro Rubi Ibarra's motion to vacate should be denied, as he presently has an application for a certificate of appealability (COA) pending before this Court. Further, as the Government asserts, the motion is an "improper procedural vehicle" for obtaining the relief he seeks because this relief is not available until a decision is made on the COA. However, the majority denies the motion to vacate based on its interpretation and application of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and its finding that *Martinez* does not apply to Texas. Therefore, I respectfully concur in part and dissent in part.

As the majority states, *Martinez* recognizes a limited exception to *Coleman v. Thompson*, 501 U.S. 722, 746-47, 111 S. Ct. 2546, 2562-63 (1991). Specifically, in *Martinez*, the Court said:

> To protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default. *This opinion qualifies Coleman by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.*

*Id.* at 1315. (Emphasis added).

To find that Ibarra could not be one of those prisoners with a potentially legitimate claim of ineffective assistance of trial counsel that *Martinez* proposes to protect, one must read the above use of "initial-review collateral proceedings" to mean state-mandated initial-review collateral proceedings rather than rely on the literal definition of an "initial-review collateral proceeding."[1] Yet the

---

[1] The majority quotes language from *Martinez's* discussion of *Coleman* regarding a definition of "initial-review collateral proceedings" included in the Supreme Court's statement of the constitutional issue that the majority concedes the Supreme Court left open: "whether

Court did not include "state-mandated" or any such phrase in pronouncing this exception. The Court also did not exclude the application of this equitable exception to prisoners like Ibarra, who raised IAC claims in a collateral proceeding as strongly suggested by the state. Yet the Court specifically excluded "attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 132 S.Ct. at 1320. While *Martinez* does repeatedly refer to the applicable Arizona requirement, it is an Arizona case, and, of course, the narrow exception set out above would apply to a state such as Arizona which requires that IAC claims are raised collaterally.

Moreover, as stated by the majority, the Supreme Court specifically noted that Arizona habeas courts look to the merits of the ineffectiveness claim, that no other court prior to the collateral proceeding has addressed the claim, and "defendants pursuing first-tier review . . . are generally ill equipped to represent themselves because they do not have a brief from counsel or an opinion of the court addressing their claim of error." *Id*. at 1317.[2] (Internal marks omitted). That is exactly the situation with Ibarra. The Texas habeas court would have been the first court to look to the merits of his ineffective assistance of trial counsel claim. As to the third factor above, Ibarra and Martinez were both

---

a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez*, 132 S.Ct. at 1315. That "definition" does not include any language such as state-mandated. Further, that "definition" supports the proposition that *Martinez* applies to Ibarra as, based on the preference of the State of Texas, his first habeas proceeding would be one of the "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial."

[2] The majority's citation is to the syllabus rather than the actual opinion.

2

represented by counsel, but the Supreme Court extended the exception both to unrepresented and represented defendants. *Martinez*, 132 S.Ct. at 1318.

The Supreme Court unequivocally made an "equitable ruling" creating an exception to a default in instances with and without counsel. In an "equitable ruling," there is no practical or legal way to distinguish between a prisoner asserting that his initial-review collateral proceeding counsel was ineffective for failing to assert an ineffective-assistance-of-trial-counsel claim in a state that requires the claim to be raised collaterally and a state that strongly suggests that the claim should be raised collaterally. In both instances the claim would properly be raised collaterally. The only reasonable distinction between the two would be in the context of a constitutional ruling, which is not what the Supreme Court made. And, as the Supreme Court says, the purpose of the exception is to "protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel."

Texas, like Louisiana, Mississippi, Alabama, and others, is not a state where you must raise IAC claims in collateral proceedings, although it is the preferred and encouraged method of raising IAC claims. Notwithstanding that Texas does not require IAC claims to be raised in a motion for new trial or on direct appeal but does require that they must be raised no later than the initial collateral proceeding, there clearly are instances where a collateral proceeding will be the "first occasion" to legitimately raise a claim of ineffective assistance of trial counsel in Texas. That "first occasion" would necessarily be an "initial review." Ibarra's case appears to be one of those occasions.

Based on the interpretation of the application of *Martinez*, the majority is finding that Ibarra is not entitled to the benefit of *Martinez* because "Texas procedures entitled him to review through counselled motions for new trial and direct appeal." The majority also states, "[f]ollowing conviction, Ibarra was then

3

appointed new counsel for his state habeas petition, who raised only a purported *Lackey* claim. . . ." Based on the interpretation of the application of *Martinez*, the majority is finding that Ibarra has defaulted on any claim of ineffective assistance of trial counsel that state habeas counsel failed to raise in his initial state habeas petition because Texas allowed said claimed ineffective trial counsel to raise his own ineffectiveness in a motion for new trial or on direct appeal. Overlooking the fact that failing to raise his own ineffectiveness could possibly be a basis for an IAC claim, it is not equitable to find that Ibarra has defaulted on a claim of ineffective assistance of counsel because his claimed ineffective counsel did not prematurely raise said claim when clearly not practicable.

With regard to cited cases, the majority cites *Arnold v. Dormire*, 675 F.3d 1082 (8th Cir. Apr. 3, 2012), as a basis for not "expanding" *Martinez*. *Arnold* was an appeal from an initial-review collateral proceeding. This is not an appeal from an initial-review collateral proceeding. *Hunton v. Sinclair*, 2012 WL 1409608, at *1 (E.D. Wash. Apr. 23, 2012), was a *Brady* claim. This is an IAC claim. Also, *Sherman v. Baker*, 2012 WL 993419, at *18 (D. Nev. Mar. 23, 2012), actually said that to the "extent that Sherman claims ineffective assistance of post-conviction counsel prevented him from presenting any of his claims in compliance with Nevada's procedural rules, the Court in *Martinez* made clear that post-conviction counsel's ineffectiveness can serve as cause only with respect to claims of ineffective assistance of counsel at trial." *Id.* That is exactly the situation here - Ibarra's underlying claim is ineffective assistance of trial counsel, the merits of which would be decided pursuant to his application for a COA. Also, notably, it appears that Nevada, like Texas, allows ineffective

4

assistance of counsel to be raised on direct appeal. *McConnell v. State*, 212 P.3d 307, 314 (Nev. 2009). *See also* Nev. Rev. Stat. 34.810.

Additionally, the Ninth Circuit in *Leavitt v. Arave*, 2012 WL 1995091 (9th Cir. June 1, 2012), found that Idaho's unique post-conviction procedure for capital defendants requiring that any claim of ineffective assistance of trial counsel must be raised in a post-conviction action that is then litigated *before* the direct appeal was the "'initial-review collateral proceeding' as to those claims about which *Martinez* speaks." *Id.* at *8. The Ninth Circuit left open the question of whether *Martinez* would apply to non-capital matters.

Even more relevant is this Court's handling of *Martinez* in the unpublished opinion of *Lindsey v. Cain*, 2012 WL 1366040 (5th Cir. Apr. 19, 2012).[3] In *Lindsey*, this Court granted a COA and remanded for further proceedings in light of *Martinez*, saying:

> When a state, like Louisiana, requires that a prisoner raise an ineffective assistance of counsel claim on collateral review, a prisoner can demonstrate cause for the default in two circumstances: (1) "where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial" and (2) "where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland [v. Washington*, 466 U.S. 668 (1984)]." *Id.* at *8 (citation omitted). Further, the prisoner must also show that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

*Id.* at *1.

---

[3] This unpublished case and others are mentioned to demonstrate how this Court and others have applied *Martinez*.

5

Louisiana, like Texas, allows a prisoner to raise ineffective assistance of counsel on direct appeal "when the record contains sufficient evidence to decide the issue and the issue is properly raised by assignment of error on appeal." *State v. Brashears*, 811 So.2d 985 (La. App. 5 Cir. 2002). *See also State v. Williams*, 738 So.2d 640, 651-652 (La. App. 5 Cir. 1999) ("Ineffective assistance of counsel claims are most appropriately addressed on application for post conviction relief, rather than on direct appeal, so as to afford the parties adequate opportunity to make a record for review. However, when an ineffective assistance claim is properly raised by assignment of error on direct appeal and the appellate record contains sufficient evidence to evaluate the claim, the reviewing court may address the ineffective assistance claim in the interest of judicial economy.").

In *Adams v. Thaler*, --- F.3d ----, 2012 WL 1415094 (5th Cir. April 25, 2012), a case where the prisoner reasserted ineffective assistance of counsel in a successive habeas petition after the district court found that he had procedurally defaulted under *Coleman*, this Court said:

> Although we need not, and do not, address the impact of *Martinez* on the Texas habeas landscape, we note that Texas does not require a defendant to raise an ineffective assistance of trial counsel claim only in state habeas proceedings, *see Lopez v. Texas*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011), and that ineffective assistance claims (particularly those, like Adams's claim, involving trial counsel's failure to object to jury instructions) are often brought on direct appeal, with mixed success.

*Id.* at *3, n.4.

In *Cantu v. Thaler*, --- F.3d. ----, 2012 WL 1970364 (5th Cir. June 1, 2012), on remand from the Supreme Court, this Court remanded to the district court

6

"so that the district court may decide in the first instance the impact of *Martinez v. Ryan* on Cantu's contention that he had cause for his procedural default." *Id.*[4]

In analyzing the application of *Martinez* in *Brown v. Thaler*, --- F.3d ----, 2012 WL 2107238 (5th Cir. 2012), this Court said:

> The Supreme Court's recent decision in *Martinez v. Ryan*, does not assist Brown's argument. In *Martinez*, the Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." The Texas Court of Criminal Appeals did not find Brown's ineffective assistance claim to be procedurally defaulted, but instead considered the claim on the merits.

*Id.* at *15, n. 4.

In *Williams v. Alabama*, 2012 WL 1339905 (N.D.Ala. April 12, 2012), the district court found that Williams demonstrated cause under *Martinez* to overcome procedural default of his ineffective assistance of counsel claim. The court ultimately denied the claim for ineffective assistance of counsel because Williams failed to demonstrate prejudice or that his claim had merit. The fact that the Alabama district court found *Martinez* applicable is significant because Alabama, like Texas, Louisiana, and Mississippi, does not require a claim for ineffective assistance of counsel to be raised collaterally. Specifically, the Alabama rule says:

> Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable. In no event can relief be granted on a claim of ineffective assistance of trial or appellate counsel raised in a successive petition.

---

[4] The Supreme Court also remanded *Newbury v. Thaler*, 132 S.Ct. 1793 (March 26, 2012), for consideration of *Martinez*. Further, this is not an exhaustive list of cases analyzing the application of *Martinez*.

7

Ala. R. Cr. P. 32.2(d).

Thus, various courts, including a panel of this Court, have decided the application of *Martinez* differently than the majority. To be clear, this has no bearing on whether Ibarra has a substantial claim of ineffective assistance of trial counsel, as any review of the merits of his claims would be conducted pursuant to his application for a COA. I am not convinced that it is correct to foreclose the possible application of an "equitable ruling" to Texas prisoners with potentially legitimate claims of ineffective assistance of trial counsel. Therefore, I respectfully concur in part and dissent in part.

# EXHIBIT 25

FORM NO. 333/REV. 8/87

## DEFENSE CLAIM FOR SERVICES OR EXPENSES

THE STATE OF TEXAS          IN THE 282d DISTRICT COURT
VS. Yokamon Hearn          OF DALLAS COUNTY, TEXAS

| | | CHECK BOX IF REVOCATION | CHECK BOX IF PARTIAL PAYMENT REQUEST ☐ |
|---|---|---|---|
| OFFENSE Cap Mur | CAUSE NO. W98-46232-5 (A) | ☐ | |
| | | ☐ | |
| | | ☐ | DATE OF APPT. 10-5-99 |
| | | ☐ | DATE OF DISPO. 12-14-00 |

w/ typos pending

| | NUMBER OF DAYS | HOURS PER DAY | JUDICIAL AUTHORIZATION | |
|---|---|---|---|---|
| **NON CAPITAL OFFENSES:** | | | | |
| NON-JURY DISPOSITION | | | | D/H |
| JURY TRIAL | | | | D/H |
| EVIDENTIARY HEARING | | | | D/H |
| COURT APPEARANCE | | | | D/H |
| EXAMINING TRIAL | | | | $75 |
| OUT OF COURT TIME (attach list of specific activities) | | | | H |
| INVESTIGATION (Bill attached $_____ prior Court approval) | | | | |
| EXPERT WITNESS (Bill attached $_____ prior Court approval) | | | | |
| **CAPITAL OFFENSES:** | | | | |
| Court Appearance | | | | D/H |
| Motion Hearing | | | | D/H |
| Voir Dire | | | | D/H |
| Trial | | | | D/H |
| Investigation (Bill attached) | | | | |
| Expert Witness (Bill attached) | | | | |
| Capital Appeal | | | | D/H |
| **APPEALS:** | | | | |
| C.A. | | | | D/H |
| C.C.A. | | | | D/H |
| HABEAS CORPUS: Hemphill, | 32.8 hrs | | 100 | D/H |
| OTHER (capital) Thorn, | 2.5 hrs | | | |
| (Judge to specify) | 61.2 hrs | | | |
| Time + if assets attached | Swanda Expenses | $401.92 | | |

**TOTAL:** $ 112.89
9,901.92

**AFFIRMATION**

I, the undersigned attorney, am appointed to represent the above named defendant and am requesting payment in accordance with the laws of the State of Texas. I further affirm to the truth and correctness to the above listed services performed, and I have not received nor will I receive any other monies or anything else of value for said services.

Gary S. Hemphill _____ Attorney at Law

**ATTORNEY INFORMATION (Print):**          (For Auditor Use Vendor I.D. _____)

Name In E Hemphill          Bar Card No. 9412000

Mailing Address 4519 W Lovers Ln   Dallas Tx 75209
                Number   Street   Suite   City   Zip

Telephone Number 214-353-6466   Soc. Sec. No. 467 66 5 59

**TO THE COMMISSIONERS COURT OF DALLAS COUNTY, TEXAS:**

I, the undersigned Judge of Dallas County, Texas, do hereby certify that the defendant in the above cause(s) has / have on file with this court an affidavit reflecting indigency and an inability to afford counsel, that the attorney shown above has been appointed to represent the defendant, and that said attorney is entitled under Article 26.05, Texas Code of Criminal Procedure, to be paid from the General Fund of Dallas County, Texas, for services performed in an amount shown above.

3.13.01 _____          _____
Date                              Judge

JUDICIAL NOTES (Only for Judicial File)

**JAN E. HEMPHILL**
ATTORNEY AT LAW
4519 WEST LOVERS LANE
DALLAS, TEXAS 75209-3161
TELEPHONE 214/358-6466
FAX 214/358-1404

Date: February 19, 2001

Hon. Karen Greene, Judge
282nd Judicial District Court
Crowley Courts Building
133 N. Industrial Blvd.
Dallas, TX 75207

RE: EX PARTE YOKAMON HEARN, NO. W98-46232-S(A)

Dear Judge Greene:

I was appointed by you to represent Yokamon Hearn on a capital habeas application. The application was filed December 14, 2000. I recruited attorney Dean M. Swanda to act as co-counsel in this matter. The following services were rendered and expenses were incurred as of this date:

Services rendered by Jan E. Hemphill:

| | |
|---|---|
| 10/5/99 Apptmt to file habeas appl. | .1 |
| 10/26/99 Tel TDCJ, Ellis I | .1 |
| 11/15/99 Ltr to client | .2 |
| 11/26/99 Ltr from client | .1 |
| Various dates: FromCCA: copies of correspondence re direct appeal | .5 |
| 5/4/00 Ltr from client | .1 |
| 5/30/00 Tel relatives of client | .4 |
| 6/4/00 Review documents; prepare for client conference | 1.5 |
| 6/5/00 Conf/client @Terrell Unit, Livingston | 1.5 |
| 8/16/00 Tel/DA re extension; prep motion for ext. | .5 |
| 9/6/00 Prep Order, file motion, fax to D.A., present to court, order signed | 1.0 |
| 9/10/00 Review records | 1.7 |
| 9/15/00 Send copy of order to D.A.(first copy not delivered by dom.viol.recep.) | .1 |
| 9/23/00 et seq. Review trial records | 8.0 |
| 9/26 & 27/00 Tel client's relative | .2 |
| 10/20/00 Tel Robt. P. Abbott, appeal atty, re a witness | .2 |
| 11/18/00 Tel Dean Swanda | .6 |
| 11/21/00 Conf Dean Swanda | 1.0 |
| 11/21/00 Locate & order cert.copies of docs re co-defts; mail to Dean Swanda | .4 |
| 12/1/00 Tel Dean Swanda | .3 |
| 12/5/00 Tel Swanda; tel Doug Parks, atty for D. Burley, co-deft. | .6 |

| | |
|---|---:|
| Oct., 2000 et seq DMNews articles re jury pools | 1.0 |
| 12/7/00 Tel calls re use of DMNews jury pool info | 1.0 |
| 12/7/00 Tel Richard Franklin, atty for co-deft Teresa Shirley | .2 |
| 12/11/00 Review D.Clk. Records re Nicky Washington & F98-68352-S | .2 |
| 12/11/00 Review juror questionaires @ D.Clk's; prep'd stats re race & age, totals, %s; tel D.Swanda; tel/CCA & D.Clk re # of copies needed of app. | 4.0 |
| 12/11/00 faxes to D.Swanda | .2 |
| 12/11 & 12/00 Tel D. Swanda | .6 |
| 12/13/00 Meet D.Swanda, review petition, swear to it; take to Kinko's and to Notary, return to Kinko's to correct the copies | 4.0 |
| 12/14/00 File writ appl; deliver copy to D.A. | .5 |
| 12/14/00 Cover ltr to CCA with O + 11 copies of writ app; take to Mail Boxes, Etc.; to Kinko's to correct one copy | .6 |
| 12/19/00 Cover ltr with writ app to client | .4 |
| ? Date Review State's Answer | 1.0 |
| Services rendered by Jan E. Hemphill, Total to date: | 32.8 Hrs. |
| | |
| Services rendered by Dean M. Swanda: See attached | 61.2 Hrs. |
| | |
| Travel Time: to & from Livingston, 8 hours x 1/4(4 client visits)= | 2.0 Hrs. |

Expenses:
6/4-6/00 Trip to Livingston(Terrell Unit)& return: one-fourth of expenses due to seeing four inmates at the same unit on 6/6 & 7/00; drove to Livingston 6/4 and drove home 6/6/00, 2 nights at Holiday Inn=$158.24, 1/4=$39.56; Mileage=440mi x $0.32=$140.80, 1/4=$35.20

| | |
|---|---:|
| Hotel (AmEx) | 39.56 |
| Mileage | 35.20 |
| 10/30/00 Kinko's, copy & bind partial SF(Paid ck #2778) | 81.18 |
| 11/21/00 Dist.Clk. Cert.copies on co-defts(Paid Cash) | 19.00 |
| 12/13/00 Notary fee(Paid Cash) | 7.00 |
| 12/1300 Kinko's, copy & bind O & 16 copies of application(Paid ck #2807) | 196.64 |
| 12/14/00 Mail Boxes, Etc., mail application & copies to CCA (Paid ck #2808) | 20.14 |
| 12/19/00 Postmaster, mail copy of app. to client(Paid ck#2823) | 3.20 |
| Total Expenses | $401.92 |

*Jan E. Hemphill* (signature)

Jan E. Hemphill



**Holiday Inn**
**EXPRESS**

| Name & Address | |
|---|---|
| JAN | HEMPHILL |
| 4519 W LOVERS LANE | |
| DALLAS | TX  75209 |

| | |
|---|---|
| Room | 124-11 |
| Arrival Date | 06/04/00 |
| Dept. Date | 06/06/00 |
| Folio # | 4015 |
| Room Rate | 69.00 |
| Account | 2-CAMEX |
| Mkt/Seg | 0-TRAN |
| Page # | 1 |

HI- 4996-1
CHECKED IN BY:  ARS AT:   16:37
CHECKED OUT BY: WRH AT:   08:09
AX 373415619283004 05/02

I authorize you to bill the full balance of my account to my credit card which was presented upon registration

SIGNATURE

The management is not responsible for any valuables not secured in safety deposit boxes provided at the front office. I agree that my liability for the charges is not waived and will be to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of such charges

X
SIGNATURE

| DATE | CODE | REFERENCE | ID. | DESCRIPTION | CHARGE | PAYMENT | BALANCE |
|---|---|---|---|---|---|---|---|
| 0604 | 111 | 0604000 | BMW | GUEST ROOM | 69.00 | .00 | 69.00 |
| 0604 | 812 | 0604001 | BMW | OCCUPANCY TAX | 4.83 | .00 | 73.83 |
| 0604 | 813 | 0604002 | BMW | STATE TAX | 4.14 | .00 | 77.97 |
| 0605 | 412 | 6 | XXX | 214-358-6466 | 2.30 | .00 | 80.27 |
| 0605 | 412 | 10 | XXX | 972-387-3336 | 2.12 | .00 | 82.39 |
| 0605 | 111 | 0605000 | RBE | GUEST ROOM | 69.00 | .00 | 151.39 |
| 0605 | 812 | 0605001 | RBE | OCCUPANCY TAX | 4.83 | .00 | 156.22 |
| 0605 | 813 | 0605002 | RBE | STATE TAX | 4.14 | .00 | 160.36 |
| 0606 | 913 | 0606000 | WRH | AMERICAN EXPRES | .00 | -160.36 | .00 |

***TOTAL***

.00
160.36
- 2.12

$2^{12}$ per call

158.24

Trip to see Nealy,
Jones. Johnson, Hearn
@ Terrell unit
6/5+6/00

DEPOSIT RECORD

ck

10.30-00

Hearn

Kinko's                    (214) 361-2121
8411 Preston Road   Suite 138
Dallas,            TX 75225

QTY/LIST      DISC      PRICE     AMOUNT
817     FS B&W S/S WHITE STD
    0.07      0.00      0.07      57.19
4      BIND COIL CLEAR STANDARD
    4.45      0.00      4.45      17.80

SUB   74.99  TX   6.19   TOT    81.18
                         CHECK  81.18
                         CHG     0.00

CW2047 TR    564810 RG 2   10/30/00 20:02
      Visit us @ http://www.kinkos.com



Y. Hearn - de on
Z-co-Da

CAT. 105

COUNTY OF DALLAS
OFFICIAL CASH RECEIPT
JIM HAMLIN - DISTRICT CLERK

DATE 11-21-00        BOND NO K500000000 PZ   RECEIPT NO  02882
TIME 16:15:05
         STATE OF TEXAS   VS.

PAID BY HEMPHILL               PAYMENT BY CASH
RECEIVED BY SUTHERLAND         WORK ORDER NO 224824

              COST      FINES    TRANS FEE.    TOTAL.
AMOUNT PAID   19.00      .00        .00        19.00
BALANCE DUE    .00       .00        .00          .00

RPT 0-0 CERTIFIED COPIES

---

```
*************** SALE ****************
           Mail Boxes Etc.
   Making Business Easier.  Worldwide.
********************************************
Shift:0272 Drw:01 ID:1211 Clerk:JIM
12/14/2000                    16:27:43
          Center #2004
       5600 West Lovers Lane
           Suite 116
         Dallas, TX 75209
         Phone 2143563800

Qty Description     Unit     Ext
-------------------------------------
 1 Packaging Service  1.90    1.90
 1 Metered Mail      18.24   18.24

          Sub Total:        20.14
               Tax:          0.00
        Total Sale:         20.14

              Cash:          0.00
            Change.          0.00

Visit our Web Site at: WWW.MBE.COM
```

Y. Hearn -
O+11 of writ app.
to CC# - 1st class

Y Hearn
Notary Fee
Writ App.

A B C
CUSTOM SHIPPING
(214)
522-2333

12-13-00 13:3
CLK1    0001    20

NOTARY      $7.00
CASH    $7.00

1 R my clerk

Y. Hearn
copy 11.071 app
+ 16; bind
Orig + 16 copies

Kinko's                          (214) 522-7434
3905 Oak Lawn Avenue Suite 110
Dallas,         TX 75219

QTY/LIST      DISC   PRICE   AMOUNT
2000    FE B&W S/S WHITE STD
    0.07    0.00    0.07      140.00
17      BIND COMP CARDSTOCK STANDARD
    2.45    0.00    2.45       41.65

SUB    191.65   TX   14.99   TOT   196.64
ck #2807                     CHECK   196.64
                             CHG    0.00

CN 115 TR   721491 RG 2  12/13/00 15:10
    Visit us @ http://www.kinkos.com

INVOICE



**UNITED STATES POSTAL SERVICE**

***** WELCOME TO *****
OAKLAWN STA.
DALLAS, TX 75219-9998
12/19/00 03:40PM

Store USPS        Trans      120
Wkstn sys5006     Cashier    KTSC81
Cashier's Name    YVONNE
Stock Unit Id     WINDOW17
PO Phone Number   800-275-8777

1. First Class
   Destination:   77343          0.55
   Weight:        1.80oz
   Postage Type:  PVI
   Total Cost:    0.55
   Base Rate:     0.55
2. First Class
   Destination:   75861          0.77
   Weight:        2(2)oz
   Postage Type:  PVI
   Total Cost:    0.77
   Base Rate:     0.77
3. Priority Mail                 3.20
   Destination:   77351
   Weight:        1lb 7.900z
   Postage Type:  PVI
   Total Cost:    3.20
   Base Rate:     3.20
4. Priority Mail                 5.40
   Destination:   75270
   Weight:        3lb 1.90oz
   Postage Type:  PVI
   Total Cost:    5.40
   Base Rate:     5.40
5. Priority Mail                 3.20
   Destination:   76096-3474
   Weight:        1lb 9.60oz
   Postage Type:  PVI
   Total Cost:    3.20
   Base Rate:     3.20

Subtotal                        13.12
Total                           13.12

Personal/ Business Check        13.12

Number of Items Sold: 5

        RATE
        WILL WAIT IN LINE?
   GET YOUR 1c STAMPS TODAY !
           THANK YOU
        PLEASE COME AGAIN

# EXHIBIT 26

### DEAN M. SWANDA
**Attorney At Law**
**P.O. Box 183474**
**Arlington, Texas 76096-3474**

**Metro (817) 467- 4668**                              **Fax (817) 465-3779**

December 15, 2000

Jan E. Hemphill
Attorney at Law
4519 West Lovers Lane
Dallas, TX 75209-3161

Re:    *Ex parte Yokamon Hearn*
       Trial court cause no. F98-46232-QS

Dear Jan:

    Thank you for selecting me to help you with Yokamon Hearn's habeas.  I enjoyed
working with you on it.

    Enclosed is an invoice reflecting services rendered through December 14, 2000.  If
you have any questions concerning this invoice, please feel free to contact me.

                      Very truly yours,

                      Dean M. Swanda

:dms

**DEAN M. SWANDA**
Attorney At Law
P.O. Box 183474
Arlington, Texas 76096-3474

Metro (817) 467- 4668                                      Fax (817) 465-3779

December 15, 2000

Re:   *Ex parte Yokamon Hearn*
       Trial court cause no. F98-46232-QS

**INVOICE**

**DATE**        **HOURS**        **CUMULATIVE HOURS**

11-18-00     0.6         (0.6)

Telephone conference with Jan Hemphill regarding the Hearn habeas and what issues to raise and how to raise them.  Coordinate when I can pick up the record.

11-21-00     1.4         (2.0)

Go to Jan Hemphill's office in Dallas to pick up the record.   Conference with Jan Hemphill regarding the Hearn habeas and what issues to raise.

11-27-00     0.1         (2.1)

Receive a package of documents from Jan Hemphill.

11-29-00     2.2         (4.3)

Begin review of the reporter's record.

12-1-00      0.3    ·    (4.6)

Telephone conference with Jan Hemphill regarding the habeas.

2

<u>12-2-00</u>      7.0          (11.6)

Continue review of the reporter's record.

<u>12-3-00</u>      7.7          (19.3)

Continue review of the reporter's record.

<u>12-4-00</u>      6.1          (25.4)

Finish review of the reporter's record.  Review the brief on direct appeal.  Work on petition.

<u>12-5-00</u>      6.8          (32.2)

Work on the petition.  Telephone conference with Jan Hemphill regarding possible issues.

<u>12-6-00</u>      0.7          (32.9)

Work on the petition.

<u>12-7-00</u>      0.6          (33.5)

Work on the petition.  Telephone conference with Jan Hemphill regarding the juror questionnaires and regarding what happened to Nick Washington.

<u>12-8-00</u>      5.5          (39.0)

Work on the petition.

<u>12-9-00</u>      5.5          (44.5)

Work on the petition.

<u>12-11-00</u>     4.5          (49.0)

Work on the petition.  Telephone conference with Jan Hemphill regarding what happened to Nick Washington and regarding the composition of the venire.

<u>12-12-00</u>     4.0          (53.0)

3

Work on the petition. Telephone conference with Jan Hemphill regarding: (1) the status of the application, (2) photocopying, and (3) the ice storm.

<u>12-13-00</u>      8.2            (61.2)

Work on the petition. Telephone conference with Jan Hemphill regarding the status of the application and how to handle the ice storm. Go to juvenile court to pick up Jan Hemphill. Drop the application off at Kinko's. Go to Jan Hemphill's office to prepare cover letters. Pick the application up at Kinko's and discover there were serious photocopying errors. Before the corrections are completed, it is too late in the day to file the application. Take Jan Hemphill and the copies to Jan Hemphill's.

**TOTAL HOURS:**          **61.2**

*Federal Tax Identification Number 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*

4

# EXHIBIT 27







TEXAS STATE
LAW LIBRARY

SEP 1 2 1997

# TEXAS CRIMINAL APPELLATE MANUAL 1996

## VOLUME I

### CRIMINAL JUSTICE SECTION

KFT
9050
T5
1996
v.1

# INTRODUCTION

## to the

## 1996 TEXAS CRIMINAL APPELLATE MANUAL

The first edition of this manual was published by the Criminal Justice Section in 1986, shortly before the Rules of Appellate Procedure went into effect, and the second edition was published in 1989, after many of the questions left open in the rules had been answered by the courts. Now, in 1996, this third edition is published in response to the many changes in appellate practice that have occurred over the past seven years.

One subject area in particular has changed a lot. In 1989, it was only necessary to include one section on post-conviction writs of habeas corpus under Art. 11.07 of the Texas Code of Criminal Procedure. Since then, that statute has been amended and a wholly new statute governing post-conviction writs in capital murder cases, art. 11.071, has been enacted. As a result, this edition contains five articles on writs, including capital writs, competency, and federal writs.

Some things have not changed, however. Most of the articles are co-authored by a prosecutor and a defense attorney, and most include forms or sample documents. As before, there is no article on certiorari practice in the United States Supreme Court and no copies of the various local rules enacted by some of the courts of appeals. Practitioners should contact those courts to see if any local rules might alter the information in this manual.

We hope this manual will be a helpful guide to the lawyers and judges practicing appellate law in the State of Texas, although it should always be used in conjunction with the applicable statutes and rules and most recent case law. We solicit your comments and suggestions.

### Co-Editors

Betty Marshall
Assistant Criminal District Attorney
401 W. Belknap
Fort Worth, Texas 76106-0201
(817) 884-1687
FAX (817) 884-1672

Brian Wice
Attorney at Law
440 Louisiana, Suite 1400
Houston, Texas 77002-1635
(713) 524-9922
FAX (713) 222-8810

# TABLE OF CONTENTS

A.        Preliminary Steps of the Appeal

B.        Bail Pending Appeal

C.        Preservation of Error

D.        Preparation of the Brief

E.        Oral Argument

F.        Motions for Rehearing and Petitions for Discretionary Review

G.        State's Appeals

H.        Capital Murder Direct Appeals

I.        Article 11.07 Post-Conviction Writs of Habeas Corpus

J.        Capital Murder State Writs of Habeas Corpus (State's Perspective)

K.        Capital Murder State Writs of Habeas Corpus (Defense Perspective)

L.        Competency Issues in Capital Murder State Writs of Habeas Corpus

M.        Capital Murder Federal Writs of Habeas Corpus

N.        Extraordinary Remedies

O.        Client Considerations and Correspondence

# STATE CAPITAL WRITS:
# A VIEW FROM THE APPLICANT'S PERSPECTIVE

Lynn B. Lamberty

412 Main Street
Suite 700
Houston, Texas 77002
(713) 222-7788

TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     NATURE AND SCOPE OF THE WRIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    Nature of the Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    Constitutional and Statutory Bases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.    Issues that can be Raised in State Writs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    THE NEW STATE HABEAS PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    Overview of Differences Between Old
              and New State Habeas Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.    Appointment of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
              1.     Creation of a right to counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
              2.     Waiver of the right to counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              3.     How counsel is appointed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
              4.     Who can be appointed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
              5.     Compensation and reimbursement of counsel . . . . . . . . . . . . . . . . 13

        C.    The New State Habeas Time Line . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
              1.     Filing the initial application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
              2.     Amending the application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
              3.     Untimely applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
              4.     Issuance of the writ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
              5.     The state's answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
              6.     Reply to the state's answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              7.     Determination of the need for factfinding proceedings . . . . . . . . . . . 19
              8.     Burden and standard of proof in state habeas proceedings . . . . . . . . . 19
              9.     If there is no need for further factfinding procedures . . . . . . . . . . . . 19
              10.    If further factfinding procedures are needed . . . . . . . . . . . . . . . . . . 20
              11.    Review in the Court of Criminal Appeals . . . . . . . . . . . . . . . . . . . . 22
              12.    Counsel's duties after relief denied . . . . . . . . . . . . . . . . . . . . . . . . 23

        D.    Subsequent or Successive Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        E.    Execution Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
              1.     Date settings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
              2.     Modification or withdrawal of execution dates . . . . . . . . . . . . . . . . 25

1

|  |  | 3. | Timing of executions ........................................ | 26 |

| | F. | Applicability of New Statute to Existing Writ Applications ............... | 26 |

| | G. | Constitutionality of the New Statute ................................ | 27 |

| IV. | WHAT ISSUES ARE YOU LOOKING FOR? ........................... | 28 |

| V. | INVESTIGATION ................................................. | 31 |

| | A. | The Need for Investigation ...................................... | 31 |

| | B. | Starting Points. ............................................... | 31 |
| | | 1. | Read the record ......................................... | 31 |
| | | 2. | Talk to your client ....................................... | 32 |
| | | 3. | Interview your client's family members .................... | 33 |
| | | 4. | Interview the trial lawyers ................................ | 34 |

| | C. | Expanding the Investigation ..................................... | 34 |
| | | 1. | Obtaining records ....................................... | 35 |
| | | 2. | Information in the files of the prosecution, law enforcement agencies and other governmental agencies ............ | 36 |
| | | | a. | The Open Records Act ............................. | 36 |
| | | | b. | Motions for discovery ............................. | 37 |
| | | 3. | Talk with witnesses ..................................... | 37 |
| | | 4. | Seek expert assistance ................................... | 38 |
| | | 5. | Investigation is never done .............................. | 39 |

| VI. | WRITING THE APPLICATION AND ASSOCIATED DOCUMENTS .......... | 40 |

| | A. | The Application ............................................... | 40 |
| | | 1. | Heading ............................................... | 40 |
| | | 2. | Style of the case ........................................ | 41 |
| | | 3. | Page limits ............................................ | 41 |
| | | 4. | Paragraph numbering .................................... | 41 |
| | | 5. | Attachments ........................................... | 41 |
| | | 6. | Printing, binding, cover color, font styles and margins .............. | 41 |
| | | 7. | Contents .............................................. | 41 |
| | | 8. | Objections to procedural unfairness ......................... | 43 |

| | B. | Other Documents .............................................. | 43 |
| | | 1. | In forma pauperis motion ................................. | 43 |
| | | 2. | Motion for stay of execution .............................. | 43 |

       3.      Motion for evidentiary hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       4.      Motion for discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       5.      Motion to require court to engage in independent factfinding . . . . . . . . 43
       6.      Proposed findings of fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

VII.    CLIENT RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

VIII.   YOUR MENTAL HEALTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

IX.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

X.      APPENDICES

      A.     James Harrington  & Anne Burnham, *Texas' New Habeas Corpus Procedure for Death Row Inmates: Kafkaesque -- and Probably Unconstitutional.* 27 ST. MARY'S L. J. 69-102 (1995).

      B.     New Habeas Corpus Procedure Timeline.

      C.     *Ex parte Briseno*, Writ No. 29,819-01 (Tex. Crim. App. Oct. 30, 1995).

      D.     *Ex parte Duhamel*, Writ No. 17,001-05 (Tex. Crim. App. Nov. 6, 1995)(unpublished).

      E.     Texas Court of Criminal Appeals Application for Appointment of Counsel Form.

      F.     Texas Court of Criminal Appeals Guidelines and Rules for Attorneys' Fees and/or Expenses Pursuant to Art. 11.071 V.A.C.C.P., Appointment.

      G.     Revised Cost Projection for Appointed Lawyers in State Habeas Corpus Death Penalty Cases, appearing in Appendix to October 28, 1994 Minutes of Legal Representation for those on Death Row Committee of State Bar of Texas.

      H.     Sample Request for Prepayment of Expenses by Texas Court of Criminal Appeals.

      I.      Investigative Source List

      J.      Suggestions for Reading a Texas Capital Trial Record and Identifying Potential Issues to be Raised in State Capital Writ Proceedings

      K.     Sample Release Forms

      L.     Materials Concerning Open Records Act

      M.    Sample Writ Application

      N.     Sample *in forma pauperis* Motion

      O.     Sample Motion for Evidentiary Hearing.

## I. INTRODUCTION.

Representing a death row inmate in state capital writ litigation is some of the most difficult legal work there is. The stakes are literally life or death. Many procedural pitfalls can derail a promising writ application. The hours are often long, the pay will often be disappointing, and attorneys representing people on death row will never win popularity contests. Writ practice is not for the faint of heart.

Nonetheless, there is no more important criminal defense work. The Great Writ of habeas corpus has long served as a bulwark of personal liberty in the United States and the State of Texas. The writ is constantly under attack by those who view it as an example of the rights of criminals being more important than the rights of victims. In fact, by energizing the writ to protect those persons now most in need of its help on death row, we maintain its vitality for all of us, should we ever need to rely on it. If you believe the writ to be worth the price it will exact to defend it and the people who need it, you should read on. If not, I suggest that you turn your attention to some other legal practice area.

There are some essential ideas to bear in mind as you consider the writ process from the applicant's perspective. They will be discussed again below, but I touch on them now for emphasis.

*1. State habeas litigation is not the same as a direct appeal.* Habeas litigation concentrates on developing and presenting facts outside the appellate record which, in conjunction with facts in the record, raise important constitutional claims. Habeas counsel must know the appellate record, but

cannot be bound to it, or they will offer their clients nothing more than another attempt at a direct appeal.

*2. Writ practice requires investigation.* You can't learn about, develop, and present facts outside the record if you don't investigate the case. Investigation for a writ can be as intensive as investigation in preparation for trial. This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel. It is impossible to accurately evaluate the effectiveness of counsel without knowing what the counsel in question knew or could have known.

*3. You have to talk with your client.* Your client is an indispensable source of information for your investigation. Visiting your client can also provide valuable insight into mental conditions or limitations that may have played an important role in the offense or the trial, but received little notice.

*4. The applicant has the burden of proof.* The State does not have to prove anything initially in writ litigation. This is the inmate's lawsuit and the inmate has the burden of going forward with evidence of significant constitutional violations that affected the trial or sentence.

*5. Know the state habeas procedural rules cold.* New legislation was passed last year which substantially changed capital writ procedure. Many of these changes were to the detriment of applicants, placing more obstacles that must be negotiated in the path to habeas relief. Lawyers can't avoid what they don't know about and there is a lot that is new to know about writ procedure now.

4

*6. Understand the relationship between the state and federal habeas processes.* What happens in state habeas can dramatically affect the ability of federal courts to apply the federal habeas corpus remedy to your client's case should the state writ application be unsuccessful. State capital writs must be litigated with an eye toward federal litigation that may become necessary later.

*7. Be imaginative.* Many of the important United States Supreme Court decisions upholding habeas corpus writ protection resulted from imaginative approaches by writ counsel. There is a new statute in Texas that offers much room for challenge and imagination. The law relevant to habeas litigation continues to develop in state and federal court; try to stay near the cutting edge.

*8. Do not underestimate the opposition.* Opposing counsel will almost always be a district attorney with significant experience with state habeas practice or with access to someone who has that experience. There is almost never any incentive to "deal" these cases. The fight will be very hard and you can expect the opposition to use every advantage state habeas procedure gives them.

*9. Don't try to do this alone.* You will likely be the only person appointed to represent your client in state capital writ proceedings, but it is impossible to know enough on your own to provide the most effective litigation strategy for your client. Many experienced criminal defense and habeas lawyers can offer invaluable advice on various issues of procedural and substantive law you will face. Seek them out and ask questions. Trying to be the Lone Ranger endangers your mental health and your client's life.

*10. Your client will probably be executed.* There is no nice way to put it. You can work hard and have good issues, but the system is not friendly to death row inmates. They know that and most are realistic about their chances, though they very much want to live. You have to be realistic too. If you cannot face the possibility of your client being executed, you should not be involved in this litigation. At the same time, remember that your client is a person, not the animal the local media so often like to portray. Deal with a person on death row as a person, with dignity, and many serious client communication problems can be avoided.

*11. You are only human.* You will make mistakes. There will be some things left undone that you regret. You may wonder at times why you ever got into this. All anyone can ask of you is that you engage all your abilities in the fight for your client's life. Active, dedicated advocacy is at the heart of the protection the Great Writ provides.

## II.   NATURE AND SCOPE OF THE WRIT.

### A. Nature of the Remedy

A writ of habeas corpus is a procedural vehicle which can be used by someone whose liberty is restrained, before or after conviction, to challenge the legality of his or her conviction and sentence. The writ is an order "issued by a court or judge of competent jurisdiction, directed to any one having a person in his custody, or under his restraint, commanding him to produce such person, at a time and place named in the writ, and show why he is held in custody or under restraint." TEX. CODE CRIM. PROC. ANN. art. 11.01.

5

Depending upon the type of error alleged, relief that could be granted through a writ could include release, with an order that the prisoner not be retried, retrial of both guilt/innocence and penalty phases of a trial, retrial of only the sentencing phase, or a new direct appeal.

## B.  Constitutional and Statutory Bases

The statutory provisions governing habeas corpus, found in Article 11 of the Code of Criminal Procedure, are based upon TEX. CONST. art. I, § 12, which says: "The writ of habeas corpus is a writ of right, and shall never be suspended.  The Legislature shall enact laws to render the remedy speedy and effectual." (An informative history of the writ in Texas is found in James Harrington & Anne Burnham, *Texas' New Habeas Corpus Procedure for Death Row Inmates: Kafkaesque -- and Probably Unconstitutional*, 27 ST. MARY'S L. J. 69-102 (1995), attached as Appendix A.)

Before September 1, 1995, all state capital and non-capital writs were governed by TEX. CODE CRIM. PROC. ANN. art. 11.07. On that day a new capital writ procedure established in Article 11.071 of the code took effect. Prior to this change, the Court of Criminal Appeals had held that Article 11.07, § 2 was the exclusive vehicle for obtaining relief in a felony situation where the applicant was confined. *Ex parte Alexander*, 861 S.W.2d 921 (Tex. Crim. App. 1993). There is no reason to believe that the Court would rule differently regarding the application of Article 11.071 to capital writs now, unless it finds that the new procedure does not pass constitutional muster. Only the Court of Criminal Appeals has the authority to release persons from confinement as a result of

a final felony conviction. *Ex parte Hoang*, 872 S.W.2d 694 (Tex. Crim. App. 1993).

## C.  Issues that can be Raised in State Writs

The Court of Criminal Appeals has written that state habeas should not be used to litigate matters which should have been raised on appeal. *Ex parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989).  In *Ex parte Bravo*, 702 S.W.2d 189, 193 (Tex. Crim. App. 1982), the Court declared that it was "well established" that the habeas corpus process could be used "to review jurisdictional defects or denials of constitutional rights."  Though the Court indicated in *Ex parte Dutchover*, 779 S.W.2d 76 (Tex. Crim. App. 1989), that claims based on the Texas Constitution are not cognizable on habeas, a later habeas decision concerning a capital case, determined that state constitutional errors so "exceptional or fundamental that they are not susceptible to a harm analysis," or that "so fatally infected" the trial procedure that due process was denied or a resulting sentence was rendered invalid and the judgment void, are cognizable in state post-conviction proceedings.    *Ex parte McKay*, 819, S.W.2d 478, 481 (Tex. Crim. App. 1990).

The Court has also recently held that the state habeas remedy is available to death row inmates who can produce newly discovered evidence to prove innocence, asserting that the execution of an innocent person would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Texas ex rel. Holmes v. Court of Appeals for Third Dist.*, 885 S.W.2d 389 (Tex. Crim. App. 1994).

Though the Court has suggested cognizability

6

limitations in some of its decisions, the conventional wisdom among many writ counsel has been to include all constitutional claims they can identify and believe to be meritorious. This includes all claims that may have been raised on direct appeal, but did not utilize all the available state and federal provisions that they could have been based upon. Habeas counsel should make sure that all federal constitutional claims that are arguably meritorious be included so that they are preserved for federal habeas proceedings.

## III.   THE NEW STATE HABEAS PROCEDURE.

As has been previously noted, a new state habeas procedure for capital writs went into effect on September 1, 1995. Counsel filing capital writs must study and know well TEX. CODE CRIM. PROC. ANN. art. 11.071, which sets out the process. It provides resources which can aid the development and presentation of issues in state habeas applications, but includes significant time limitations and is unforgiving of incomplete initial applications. *The process is much different and more detailed than its predecessor; the previous experience of judges, attorneys, and court personnel with habeas procedure will not be a reliable guide upon which to rely.* For this reason, this chapter will discuss the new statute in detail. The discussion will begin by highlighting some of the most important differences between the new procedure in 11.071 and the old process in the former 11.07. A detailed discussion of the process established by the new provisions will follow.

### A.   Overview of Differences Between Old and New State Habeas Procedures.

The major changes occur in the following areas (page numbers for this article's detailed discussion of the new statute's provisions in each of these areas follow the brief descriptions):

**Timing of State Habeas.** Under the former 11.07, the state post-conviction process started after the direct appeal was concluded. 11.071 requires the state habeas remedy and direct appeal to be pursued simultaneously. See pp 16-17.

**Provision of Counsel.** Counsel was neither required nor routinely provided in many counties under the former 11.07. The new statute provides, through appointment by the Court of Criminal Appeals, counsel for death row inmates for the state habeas process. See pp. 8-15.

**Provision of Investigative and Expert Assistance.** Such assistance was rarely, if ever, provided under the former procedure and the necessity for investigation was often challenged by writ opponents. Article 11.071 recognizes the necessity of reasonable investigation and provides funds for it, upon a sufficient, *ex parte* showing of need to the Court of Criminal Appeals by the applicant. See pp. 14-16.

**Time Limitations.** There were few time limits in the former 11.07. Those that existed did not apply to applicants and were routinely ignored. There were no deadlines for the filing of state habeas applications and no requirement that counsel move a case to federal court at the conclusion of the state post-conviction process, within any specified period of time. The new statute includes time limits for almost every step of the process, including the filing of the writ application, with

A particularly interesting problem may be
presented by the courts which are continuing
to appoint writ counsel, even after the
effective date of 11.071. If the resources, in
terms of compensation or funds for experts,
investigators, etc. vary significantly between
the Court of Criminal Appeals' appointment
system and the systems of appointing
convicting courts, there may be grounds for
Texas equal rights and federal equal protection
constitutional challenges to the statute.

*Practice Note. Habeas counsel may want to
challenge the constitutionality of the process
when coming up against the limitations on
fees and resources that the statute imposes, or
when its time limits are operating to prevent
counsel from developing information vital to
a full and fair presentation of an inmate's
constitutional claims. Remember that it is
critical to make a record for federal court
review if the inmate loses in state habeas, of
all unfair, unconstitutional aspects of the state
habeas system.*

## IV.   WHAT ISSUES ARE YOU LOOKING FOR?

Counsel deciding what issues to raise in a state
writ application must be guided by three
principles:

(1)   Issues must be based upon serious
      state and federal constitutional error.

(2)   The writ process is not direct appeal.
      The trial record is a springboard for,
      not the boundary of, the search for
      issues that can and should be raised.

(3)   Any issue not raised on federal
      constitutional grounds on direct appeal
      or in state habeas proceedings is lost

to the inmate and cannot be raised in
federal court. As long as an issue can
be supported by the record and/or
factual investigation, it should be
raised if it has not been raised on direct
appeal.

Courts have formulated various tests for
serious constitutional error. For purposes of
preparing a writ application, habeas counsel
should assume it to be error that could
reasonably have affected that outcome of
either phase of a capital trial. If you have
doubts about the seriousness of an error,
include it in the writ; later research or factual
development may show it to be more serious
than it initially appeared. If you don't include
it in the initial writ application and it was not
raised on direct appeal, the issue is almost
certainly lost to the inmate forever.

If you identify a constitutional error that direct
appeal counsel should have raised, but did not,
raise it in the writ application. Though habeas
corpus proceedings focus on issues developed
largely through extra-record investigation,
constitutional errors that could have been
raised on direct appeal, but were not should be
raised in the writ application to give state
courts and chance to correct them and to
preserve the errors for later federal review if
necessary.

If direct appeal counsel fails to raise an error
based solely on the violation of a state statute
that would result in automatic reversal of a
conviction or sentence, habeas counsel should
raise that error as in ineffective assistance of
counsel on direct appeal claim.

*Issue-spotting resources.* It is beyond the
scope of this article to identify and discuss all
the possible errors that would be appropriate

in a state habeas application. An extensive listing and brief discussion of possible issues that can be raised is found in a manual published by the American Bar Association for attorneys who are litigating death penalty cases in post-conviction proceedings: MANUAL FOR ATTORNEYS REPRESENTING DEATH SENTENCED PRISONERS IN POSTCONVICTIN PROCEEDINGS. Writ counsel should get this manual immediately after being appointed. It is available free of charge to attorneys representing a person on death row by contacting:

> American Bar Association
> Postconviction Death Penalty Project
> 1800 M. Street N.W.
> Washington, D.C. 20036
>
> Telephone: (202) 331-2273
> Fax:        (202) 331-2220

Other listings of claims are found in 2 JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE 709-36 (1st ed. 1988)(Appendices C and D) and 1 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE 303-26 (2nd ed. 1994). The second edition of this two-volume treatise would can be a valuable resource for state habeas counsel.

Some discussion of the issues the Texas Court of Criminal Appeals has confronted in writ applications is found in [the Teague book - give reference]

**Examples of issues that could be raised.** If counsel reviews the above sources, it will be evident that there is a wide variety of issues that can legitimately be raised in state habeas writs applications. Examples of issues that appear in cases that counsel should watch for

are:

(a)     Issues arising from state misconduct, such as failure to reveal exculpatory information, including information that could have been used to cross-examine vital state's witnesses, or that the state knowingly used perjured testimony or failed to correct perjured testimony by a prosecution witness (most frequently snitch witnesses);

(b)     Claims revolving around the applicant's mental health at the time of the offense and the time of the trial. These may include claims of incompetence to stand trial, lack of specific intent for the capital murder, or claims of ineffective assistance of counsel for failing to develop and present mitigating evidence of mental defects or diseases during the punishment phase of the trial.

(c)     Claims arising from the denial of or failure to use expert assistance that would have provided critical evidence in support of the applicant at trial.

(d)     Claims arising from racial discrimination in the composition and selection of the petit or grand jury, or from discriminatory actions or comments toward the defendant at trial by the court, prosecutors, or court personnel;

(e)     Claims arising out of jury misconduct, such as visiting the scene of the crime against court instructions, conducting experiments with the evidence or at the scene, or using a Bible or other resources not supplied by the court to

29

guide jury deliberations;

(f)     Claims of ineffective assistance of trial or appellate counsel, bases on unreasonable, prejudicial actions or omissions. In cases where important issues have been not been preserved at trial due to failure to object or through other procedural default, this may be the only way to draw the court's attention to them.

**Counsel must know the law.** It is obvious, but bears saying that counsel must know state criminal law and state and federal constitutional law, or know where to readily find it, to identify the existence of claims and what will be required to prove them. Continuing Legal Education seminars and publications concerning criminal law issues are excellent sources of information on the law. As long as it exists, the Texas Resource Center can also be a good source of information on current legal developments and sample issues. That organization can be contacted through Eden Harrington in Austin at (512) 320-8300 or Lynn Lamberty in Houston at (713) 222-7788.

**Don't be afraid to be imaginative.** There is no formula for the statement of a meritorious issue or the law supporting one. Some of the best state writ work done is by lawyers who are willing to put forward issues that have not been previously considered by the courts or in a way that has not been foreclosed by them. This is not to say that lawyers should make up claims; the legal foundation for any issue presented to Texas courts must be sound. It never hurts and may help to catch the courts' attention to be interesting and creative in claim statement and formulation.

**Facts win cases.** In limited instances, straight legal claims in a writ application may be successful. If a good job has been done on direct appeal, however, the errors of law based on the record will have been raised there. Claims in state habeas most often must be based on extensive and careful factual development and presentation to be successful. As is clear from the earlier discussion of the new statute, it is critical that the initial application state facts, as well as law, upon which relief can be granted. There is little opportunity to amend and virtually no meaningful opportunity to raise issues that have been missed, in a later application. The state writ process will likely move relatively quickly once it starts. Habeas counsel needs to find out what facts are necessary early so that efforts can be made to fight for the opportunity to develop and present those facts to the courts.

**A word about innocence....** Experienced criminal and state habeas lawyers know that the majority of capital murder defendants they have represented have said at one time or another that they were innocent. The frequency of that claim, often in the face of what appears to be powerful contradictory evidence, causes many lawyers to become so skeptical about claims of innocence that they are reluctant to pursue them, particularly in the context of state habeas proceedings. Nonetheless, every year stories surface in Texas and across the country of innocent defendants who have been wrongfully convicted and have spent significant time in prison. Innocent people can be convicted of capital murder. Habeas counsel owe it to their clients to hear out their innocence claims and to check them out to the extent necessary to determine whether there is any reasonable chance that they could be true. Proving

30

innocence is a terribly difficult thing, but the new statute allows such a claim to be raised, even in a subsequent application. Doing what you can to ensure that a horrible mistake is not made is worth the effort.

## V.   INVESTIGATION

### A.   The Need for Investigation.

Facts outside the record are critical to a successful writ application. Those facts must be sought out through investigation. The investigation required of habeas counsel is more extensive than that required of trial counsel. Because of the nature of habeas claims, habeas counsel must investigate not only the client's background and the facts that gave rise to the offense, but also the investigation by police and defense counsel and the actions of the jury. There is no quick and easy way to do this and counsel will almost certainly need the help of a trained investigator to do an efficient and complete job, particularly in view of the time limits on filing and amending or supplementing an application in the new statute.

Courts should expect you to energetically investigate habeas claims because habeas counsel has the legal duty to do so after being appointed. Article 11.071 § 3 requires counsel to "investigate expeditiously, before and after the appellate record is filed in the Court of Criminal Appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus." There are many sources of information potentially available to you. A partial listing of those sources appears in Appendix I. Some more specific suggestions about how to approach investigation follow.

### B.   Starting Points

#### 1. Read the Record.

You have to know what happened at trial to have any idea of what habeas issues might be available. Remember that you are looking not only for error on the record, but also indications of things going on outside the record that should be investigated. Two examples will help to make the point.

If you see a letter in the record indicating that your client was examined to determine competency to stand trial, you will want to know why and how that occurred. You will also want to watch the record for any other indications that the client was having difficulty understanding the proceedings or assisting trial counsel with the defense.

If you see testimony from a jailhouse informant, you should immediately determine to investigate that person's background, the charges pending against him or her before, at the time of, and after the trial, and all circumstances leading to the informant testifying at trial. Informants are frequently relied upon at trial to give evidence of damaging admissions allegedly made by defendants and it is not uncommon for juries and defense counsel to be unaware of important information regarding the scope of the deals they received for their testimony.

Capital records are voluminous and habeas counsel must review the entire record, including voir dire. Often suppression hearings are conducted during the weeks that jury selection is progressing, and those hearings are often reported in the voir dire volumes. As mentioned earlier, counsel will also want to be looking for possible

31

constitutional error in jury selection, or hints of things that went unreported in the record, but were affecting the ability of the defendant to receive a fair trial. Some suggestions about record review are included in Appendix J.

## 2. Talk to your client.

There is no one who knows the facts of your client's involvement in the offense or the trial better than your client. Your first meeting with him or her should take place shortly after you are appointed.

**Visiting arrangements.** Male death row inmates are housed at the Ellis Unit near Huntsville, and female inmates at the Mountainview Unit near Gatesville. Both institutions now require you to make arrangements for legal visits by noon of the day before you plan to visit. The Ellis unit will not allow an investigator or paralegal to visit an inmate or accompany an attorney, unless that person has written authorization from the lawyer to visit the client and has been cleared by the prison. The clearance is a one-time process for anyone that the prison is not familiar with, and will take about a week for the prison to process.

You make arrangements for a prison visit by calling the Ellis Unit at (409) 295-5756 or the Mountainview Unit at (817) 865-7226 and telling the person who answers that you want to set up an attorney visit with a death row inmate. That person will forward you to the appropriate department, where someone will take your name, the inmate's name and identification number, and the day you wish to visit.

Contact visits are not allowed except under highly unusual circumstances. You will need

permission from the warden to take a tape recorder in with you. Expect that any briefcases or containers you take with you will be searched. No food or beverages can be taken into the prison, but vending machine fare is available in the visiting room. When you arrive at the prison, you must check in with the guard tower in front of the front gate. At that time you will be asked for photo identification, your Texas or other state bar card, and the names and numbers of the inmates you are there to visit. The guard will call inside to verify your visit. Once inside, you will be asked to sign a special TDC form that requires your name, address, and the client's name.

Don't expect that you will allowed visitation in a separate room; attorneys and all other visitors are together in a large U-shaped visiting room with the inmates seated behind plexiglass and steel mesh walls on the inside of the U. Having private conversations can be difficult, depending on how close the prison places others to you.

While it may be necessary in some emergency situations to try to contact your client by telephone, do not substitute this for personal contact. It can take hours or even days for the prison to arrange for an inmate to return a phone call. You will virtually never be able to wait on the line and have the prison bring the inmate to the phone to speak with you, unless that person's execution is imminent. Phone calls to the Ellis Unit are always monitored by prison personnel. It is not clear whether this happens at Mountainview, but you should assume that it does, for the protection of your client.

**Topics to cover.** (1) Your clients version of the facts of the offense; (2) his or her relationship with the trial and direct appeal

32

lawyers; (3) anything the client found strange, unusual or objectionable about the trial or direct appeal; (4) your client's social history, including his or her background, education, family history, medical history, drug abuse history, etc. You should strive to know more about your client and his or her history than any other lawyer has known, and perhaps more than his own family has known, to ensure that you are aware of and can use all beneficial information that might come from that knowledge.

Why do you want to know anything about your client's social history? Of course, an obvious reason is to identify possible mitigating evidence that could have been, but was not, presented at trial. Knowing your client's history also gives you perspective on mental limitations or disorders that may have contributed to the offense, to a confession, or to the client's inability to understand what was happening at the trial. Just sitting and talking with your client in a general way will allow you to observe how he or she responds to questions and may indicate to you the presence of mental problems that the record might not have suggested.

There has been considerable litigation in recent years in Texas surrounding "double-edged" mitigating evidence, that is, evidence that could paint the defendant in a bad light, making the defendant appear dangerous, while at the same time reducing his or her moral culpability or blameworthiness for the offense. If you are considering raising an issue that deals with such evidence, it is important to remember that courts now seem to require that there be a nexus between such evidence and the commission of the offense. The evidence at issue must have some causal link to the offense. Expert assistance will be

needed to supply this link.

As is the case with a review of the trial record, what your client tells you must serve as the beginning, not the end, of your investigation. Death row inmates are almost always considered incredible by courts unless their accounts are well supported with other evidence. If you can't find other support for what your client says and you have had adequate resources to do so, you should think carefully before including a claim based solely on your client's account in a habeas application.

As you have probably concluded from the comments in this section, the information you need from your client cannot be obtained in just one interview. Obviously there are limits to how many times you can travel to the prison to see the inmate, but the more conversations you have, the more likely it is that you will win the inmate's trust and uncover additional helpful and highly relevant information.

Make sure that your client signs many general releases of information for your use in the investigation. Notary service is often available free of charge at the prisons, but you must make the front desk aware of the need for a notary when you arrive, so that appropriate arrangements can be made.

### 3. Interview your client's family members.

They may shed light on mitigating evidence that was not presented at trial, or guilt/innocence phase evidence that was suggested to trial counsel, but not presented. They will certainly have things to tell you about your client's background that you can get nowhere else that could contribute

33

substantially to the development of claims concerning mental disorders, mental limitations, or drug abuse. You will also want to ask them about their contacts with trial counsel, as part of your investigation into trial counsel's investigation.

## 4. Interview the trial lawyers.

Some experienced habeas litigators might disagree with interviewing trial counsel before one has a clear idea of what the claims will be. I think it can be very beneficial to do so, however, to get their files, their impressions of the trial, of the client, and any extra-record matters that should be investigated, before things may become adversarial.

Trial counsel are keenly aware that ineffective assistance of counsel is almost always considered and is often raised in state habeas proceedings. Many trial lawyers seem to believe that every lawyer preparing a capital writ who approaches them has a hidden agenda and is trying to wring damaging admissions from them. I think is often very wise to approach trial counsel when you have no preconceived notions of the issues and can simply sit and talk about the case in a non-threatening manner. You might find eventually that any ineffective assistance claim you could make would be far less powerful than another claim the trial lawyers will help you on, if you are not attacking them. They are more likely to trust you and your promises of no ineffective assistance claim if they have had a previous, positive meeting with you.

Of course, before you decide not to file an ineffective assistance claim, you must investigate it as fully as possible. If you think that such a claim should be raised, interview the lawyers again, this time with the idea of getting answers to specific questions that are troubling you about the representation. If you are asked whether an ineffective assistance claim will be filed, you should be honest about your thoughts in that regard and assure the lawyers that the filing of such a claim is not a personal vendetta against them, but is a necessary part of your job as habeas counsel. Angry trial lawyers will often submit affidavits to courts opposing ineffective assistance claims. Much of that anger can be subdued or prevented by being up front with them about the likelihood of an ineffectiveness claim.

One final note concerning trial lawyers is that you should always, at the first meeting with them, request their files. The files and all the notes in them belong to the client, not the lawyer, and you should insist on them being turned over to you. It is not unreasonable for a trial lawyer to ask for a copy of the file, or to ask that the original be returned when the client's case is finished, but having access to the file is vital, for it will tell you a lot about what information the lawyers had and what they were doing before, during and after the trial. Be sure that the file you receive includes all notes of the lawyers as well, for those notes are also the property of the client. If you can, it is good idea to have someone sequentially number each page in the lawyer's trial files in the order that they appeared when you received them. This aids in proof later of what documents were in the file and the order they were in.

## C.   Expanding the Investigation.

Your record review, and interviews of your client, his or her family, and trial counsel will give you a pretty good idea of what some of the important issues may be in the case. That will allow you to focus your energy on

34

developing information relevant to those issues. You can develop information through use of the following resources:

## 1. Obtaining records

A wide variety of records can be valuable to you in proving claims. Appendix I contains a partial listing of some of these records. The records you will want to pursue will vary according to the claims you are attempting to develop.

It is vital to start gathering records as early in your writ preparation process as possible. Records collection is time consuming and is sometimes contested by agencies who are the custodians of records. When a dispute develops, expect considerable wrangling before you are successful, and there will be times when you are not successful. It is preferable to deal with these disputes early in the investigation rather than in the last weeks or days before the writ application is due.

Many records can be obtained through use of general release forms signed by your client. Examples appear in Appendix K. Some records custodians, such as the military, require special releases of their own design to be completed. Generally, those custodians can readily supply you with the necessary documentation for your client to complete.

Be sure to request all prison records from every previous incarceration of your client in any institution, as well as his or her time on death row. The general release form in Appendix K should be sufficient to allow you to gain access to those records. Those records may contain very important information concerning your client's mental and medical condition. These should be requested directly

through the prison in which the inmate is housed. Medical records are kept separately from the other institutional records regarding each individual and you will have to write two separate checks, one for the medical records and one for the rest of them. Get as many of the prison records as you can. You can get access to almost everything, if you are reasonable and persistent.

School records are another valuable source of information. Through them you can find out about learning and mental difficulties your client was having throughout school that your client may be too embarrassed to tell you about or does not think are important. The records may include I.Q. tests or other testing that is quite helpful in learning how your client was able to function as he or she developed. When obtaining school records, you will need the names of all schools your client attended. Sometimes records in a school system will be stored in more than one place. Again, be persistent, and keep trying if you are met with an initial statement that no records exist.

Medical and mental health records should be sought from any care provider who treated your client. When getting these records, particularly from mental health professionals, make sure you specifically request all the records the care provider has, including handwritten or dictated notes made at or shortly after interviews or times of testing.

Criminal records of all important witnesses at the trial should be checked in the county of conviction and any counties where they have spent substantial time. You may find that some non-law enforcement witnesses had good reason to cooperate with the state at the trial, due to pending charges against them. You may also find that some witnesses had

35

prior convictions that could have been used to
impeach their testimony at trial.

Criminal and civil records concerning all
members of the jury should be checked, to
identify anything that would disqualify them
from jury service, conflicts for any of the
attorneys who may have previously dealt with
a juror in some capacity, or any dishonest voir
dire answers.

While you are checking criminal records, it is
always a good idea to check on records
concerning your client. Some inmates are
poor historians and you need to know all that
you can about your client's history with law
enforcement before the capital offense.

Generally, when attempting to obtain any
records, it is best to have someone go
personally to the records custodian to make
the request and follow up on it. It is much
easier and quicker to resolve
misunderstandings or to explain the nature of
the need for the records in person rather than
by letter or telephone. Of course, with out of
state records, this may not always be possible,
but the personal touch is often the most
effective.

If some records custodians refuse to provide
copies of records to you without a court order,
seek one. If you have already filed your writ
application, you may be able to subpoena the
documents you need. Another approach is to
file a motion for discovery with the court.
See the discussion of discovery motions *infra*
at p.38.

**2. Information in the files of the
prosecution, law enforcement agencies
and other government agencies.**

Always seek access to the district attorney's
files and law enforcement agency files
regarding the capital offense and any other
offenses that you believe will be relevant to
any of your claims, including offenses
committed by key state's witnesses, such as
jailhouse informants. You should not assume
that prosecutors files contain copies of every
document generated by law enforcement
regarding your client or whoever you are
attempting to investigate. Thus, it important
to energetically seek access the files of every
law enforcement agency that may have
generated information regarding your client.
Sometimes prosecutors and other agencies will
let you see and copy things from them upon
request. If not, there are two ways to try to
get access.

**a. The Open Records Act.**

Though recent legislation has changed the
terminology from "open records" to "public
information," TEX. GOV'T CODE § 552.001
et. seq. continues to provide a valuable tool to
lawyers seeking to investigate state habeas
issues. It is not within the scope of this article
to describe in detail the workings of the act,
but counsel should review Appendix L, which
contains a recent article written about the Act
as it can be applied to habeas proceedings
(minus the attachments that accompanied the
original article, except for a sample Open
Records Act request). Though the article was
keyed to practice in Harris County, most of
the information in it is applicable to the Act as
a whole. (As long as it exists, the Texas
Resource Center can also provide helpful
information concerning the Act and how to
proceed under it. The Resource Center may
contacted through Eden Harrington at (512)
320-8300 or Lynn B. Lamberty at (713) 222-
7788)).

36

Since the time that the article in Appendix L was prepared, the Legislature has amended the statute. The text of those amendments follows the article in the appendix. The most important issue presented by the changes is whether the new 552.027(a), which exempts agencies from responding to ORA requests from people who are incarcerated, effectively ends the usefulness of the ORA to habeas counsel.

It should not do so, given the text of another new provision, 552.023, which gives a person *and a person's authorized representative* "a special right of access, beyond the right of the general public, to information held by a governmental body that relates to the person and that is protected from public disclosure by laws intended to protect that person's privacy interests." More simply put, people should be able to get information concerning them that is held by governmental agencies or subdivisions, themselves, or through their lawyers. The vesting of this right in part in the representatives of individuals may provide the antidote to the poison pill of 522.027(a). No doubt, this will be hotly litigated and habeas counsel should not shrink from the battle to protect this important avenue of investigation.

### b.    Motions for discovery.

Though the new habeas statute does not talk about discovery motions, it imposes a heavy burden on habeas counsel to investigate possible claims in a timely matter and it authorizes the convicting court to use a wide variety of tools to resolve factual disputes. Also, Tex. Gov't Code § 21.001(a) grants a district court "all powers necessary for the exercise of its jurisdiction ... including the authority to issue the writs and orders necessary or in proper aid of its jurisdiction."

From this, it should follow that a habeas applicant is arguably entitled to discovery in state court. Texas courts have not, to this author's knowledge, ever comprehensively addressed the right to, or scope of, discovery for the applicant in the state habeas process. The right to get discovery through the courts is worth litigating if it is the only way you have to get information vital to your case.

Counsel should seek discovery as early as possible in the process, but should not simply make blanket requests for discovery that courts will almost certainly deny. Once counsel has identified the likely claims and has tried to develop information about them, discovery should be used in those situations where nothing short of a court order will cause someone or some agency or institution to provide the information you seek.

### 3. Talk with witnesses.

As you begin to focus on the claims you want to pursue, you will identify people who have important information about those claims. Some may have testified at trial. Others may never have been called or perhaps were even unknown at the time of trial. You or your investigator need to interview these people in person, if at all possible. If someone does have information that is helpful to you in proving a claim in the writ application, get an affidavit from that person immediately, if possible. This preserves the information in case something happens to the witness and helps to tie the witness down to the account they have told you. It is not uncommon to receive information orally from a witness that is helpful, only to find that at a later time when you want to reduce it to writing, the witness has had second thoughts about vital parts of the information or about being helpful at all.

37

Don't be hesitant to talk with witnesses who testified for the state. They may refuse to talk with you, but often they are happy to tell you what they remember, so long as you are cordial to them. It is always best to review a witness' testimony at trial before an interview, so that you can ask about any differences between the trial account and the present one, or can follow up on things that were unclear or not covered in the testimony. Of course, habeas counsel should always be sure that witnesses understand who counsel is working for and why they are being interviewed. It is a good idea to have people you or your investigator interview sign a form in which they say they understand who you are working for and have agreed to talk with you.

After an interview the person who conducted it should write a quick memo about it for the file. This will not only help compensate for memory lapses later, but provides some protection from any claims that may be made later of misconduct by writ counsel.

## 4. Seek expert assistance.

From what has been said thus far about investigation, it should be clear that the services of an experienced criminal or habeas investigator are invaluable in efficiently and comprehensively gathering the information necessary for a writ application. Consult with other experienced writ counsel if you are uncertain about who to hire. Because of the limited period of time in which you have to prepare a writ application, you have to give considerable guidance to an investigator working with you. Habeas investigation cannot be a matter of giving someone a file and telling them to see what they can find and report back. The investigation must be guided by what you identify as the likely issues, and

remain sufficiently flexible to respond to unexpected information that could dramatically change the focus of one or many issues you intend to raise.

Other experts will likely be needed, too. It seems that mental health and medical experts are the focus of many writ counsel, as battles are fought over the mental condition of the applicant at the time of the crime and at trial. You should not lose sight, however, of the benefit that you can gain from other experts. If, for example, issues arise about some physical items of the guilt phase evidence, you may wish to employ experts to evaluate that evidence again, if it is still available. Crime scene reconstruction experts can help determine whether the offense could have occurred in the way the state's witnesses described. Any expert that you might consider using at trial to fight the state's case can be valuable in habeas proceedings to challenge the conviction.

This is not to say that habeas litigation is about sufficiency of the evidence, though it may at times feel like one has to prove a client innocent to attract the attention of some courts. The issues must still center around significant constitutional violations. Expert testimony can be critical in persuading a court that the facts the jury heard were unreliable, which is a substantial contribution to most claims of constitutional violations.

One should take care in choosing experts. Just as there are experts in various fields who predictably testify for the state, there are others who very regularly do so for the defense. Regular defense experts in habeas cases bring the advantage of knowing what burden of proof the lawyers have to meet and structuring their reports and examinations in

ways that are responsive to that. The disadvantage of such experts is that courts probably know them as "defense" experts and accordingly assign them significantly reduced credibility. Finding experts who are sufficiently independent to be credible, and yet understand what is relevant in a habeas context, is difficult, but worth the effort. If you can't find someone who fits the latter description, use one of the more familiar defense faces anyway if expert testimony is critical; developing the facts is what this process must be about. Matters of credibility arising from the frequency with which someone testifies for one side or another can be dealt with later when arguing over the facts.

Experts are expensive. If you use one or more than one, you will likely easily outstrip the limited funding the Court of Criminal Appeals appears to be willing to provide. It is critical, therefore, that you assert your need for expert assistance as soon as you can identify specifically enough to be able to explain in detail why the expert would assist in the development of facts for a claim or particular class of claim for your case. You have to convince the Court that there is some reason to believe such claims may reasonably be made, if the facts can be developed. Your requests therefore, must be detailed and structured to what the actual costs will be as given to you by the expert. Don't underestimate what this assistance will cost for the Court. That is a recipe for disaster when the expert's bill comes due and the Court refuses to pay it, leaving you holding the bag. If expert assistance is denied, make a record of it for federal court review later and present the claim the best way you can with whatever assistance you are allowed, making the point regularly that you are not able to fully present the issue because of a denial of resources.

You can give information to experts to assist them. Their activities and product can be far more relevant to your needs or questions if they understand the context in which their findings may be used. They may require certain preliminary information to meaningfully conduct their examinations or arrive at their opinions. Just remember that anything you give to an expert may well be discoverable at a hearing if it serves as the basis for his or her opinion.

Finally, there is a difference of opinion among some habeas counsel about the desirability of having experts write reports about their activities and findings. The worry is that unhelpful or harmful reports could become the target of discovery efforts on behalf of the state. You have to evaluate the dangers of that in each case, but it is important to factor in the possibility that you may not be representing your client to the end of his or her legal challenges to the capital conviction and sentence. It is not unusual for counsel to change in habeas cases for various reasons. If that happens in your case, your successor will have no way of knowing what the expert did if some written record is not kept of it. There is no right answer that applies to every case; just be sure to weigh the relevant factors.

If you do have an expert write a report, there is nothing wrong with asking for a draft of the report and suggesting changes that make it more responsive to the relevant issues in your case. This doesn't mean you are telling the expert what to say; you are simply focusing the report on the important issues the findings were intended to address.

## 5. Investigation is never done.

Though you will reach a point where you have

to take the information you have gathered and mold it into a writ application, you should not assume that all investigation is done then. There will likely be some things you could not finish before writing the application. Some matters may surface in the state's answer that require exploration. Some information just may not surface until you are beyond the filing of the initial application. In such situations, you have a responsibility to try to find ways of bringing the additional information to the courts' attention. If you run afoul of the deadlines in the new statute governing amendments or supplements, so be it. You must try to include the additional relevant facts you have found in the state litigation before the case goes to federal court, because if you don't try, those facts are lost to your client during the rest of the client's legal struggles. Make a record of how the facts came to your attention, why they could not be included earlier and how they are relevant to the issues in the case. If state courts are unsympathetic, you might find a more attentive audience in federal court when you argue about the unfairness and unreliability of the state post-conviction process.

## VI.   WRITING THE APPLICATION A N D     A S S O C I A T E D DOCUMENTS.

When you file a writ application, you may file other pleadings, such as motions for evidentiary hearing, for discovery, and for stay of execution, if an execution date has been scheduled. The formal requirements for these documents are discussed below.

### A.    The Application.

There are not many formal requisites that govern the appearance of an application for a

writ of habeas corpus.    Though 11.071 purports to describe the procedure in a death penalty case, it says nothing about the physical appearance of an application. The only formal procedural matters it mentions are that habeas applications are to be filed with the convicting court, and they must be returnable to the Court of Criminal Appeals. 11.071 § 4(a). To be safe, lawyers should assume that TEX. CODE CRIM. PROC. art. 11.14, which applied to writ applications under the former procedure, still applies.    It provides the following relevant requirements:

(1)     The petition must "state substantially" that the applicant is illegally restrained in his liberty, and by whom, naming both parties;

(2)     A copy of the order by virtue of which the applicant is restrained is to be attached to the application;

(3)     There must be a prayer in the application for a writ of habeas corpus; and

(4)     The applicant must verify the allegations of the application under an oath saying they are true, according to his belief.

From this one can see that the form of capital writ applications is not tightly governed. It may be helpful, however, to  review basic elements of form that a number of applications have followed in the past or  that applications should now follow in light of the few statutory requirements that exist.  A copy of a writ application including a couple of sample claims is found at Appendix M.

### 1. Heading.

40

# EXHIBIT 28

Hearn

001033

9-26-00  Tel from LaDonna Ross,
         D's cousin. He asked her
         about status.
              I told her nothing's new,
         I'm trying to find const'l
         issues.
              I did get ext granted
         for filing the writ — till
         sometime in Dec.

9-27   V-mail from LaDonna Ross
       cousin of Hearn 214/@767-44?5
       Ret'd call + L.W.

Hearn, Yokamon L 999293

6/5/00   Conf/client @ Terrell Unit

11:30 am   Intro; explained my job.

11:50am
Wait for
Inmate to
come to
booth

001064

11:50am
- 1:00pm

(1.5)

D 1st wanted to talk about
Nick Washington. D says
his atty didn't know
about Nick's priors.
D says Nick was arrested
for carrying concealed,
loaded gun in car
- 1998. First case was
pending @ time of D's trial.
Asslt chgs early 1997 -
OW - Kimberly Jackson -
D talked to her - mo after
the asslt.) Doesn't know if pending
when D was tried.       Inca Dr
Paul Shaw, friend 2/3-4/99

may help find some of these
people. He was @ Ct
+DA wanted to call him
to testify but he didn't.

Wanda Bell - D's aunt -
   214-374-1301 not working
   5166 Burnside
   D/s

001065

Aaron Runnels - slow, abt 24,
   Chandra testified she hadn't seen
   D for a week-before the items
   were found in aaron's room.
   D thinks D says he was
never chg'd w/ offense on this.

Diles, - didn't testify -
   D thinks he got 72 or 75 yrs -
on plea.

Teresa Shavonn Shirley -
   testified. the state's star star
   witness. Bloo

Blood all over but none
on D or his clothes or shoes.
Diles had blood on shoes r.

001066

She waffled on id
of D - 1st said shooter
was D, then she didn't
know due to night
blindness.

Prob. shd have inv see her.
She got 10 yrs - plea.

Dwight Burley - didn't testify,
got 10 yrs - plea.

Selena Wilson ,
+ Lemonica Austin ) Nick
made them look like liars,
They had said D was
bragging saying he was the
Devil. Nick said he was in
LR all the time D was
there + didn't hear this.

D was at Delux Inn to work
on Runnels' car.

D says his ID card wasn't
in Runnels' car.

001067

D claim someone else
shot deceased.
~~D believes~~
D wasn't present when ca
got killed. D was @
Dwight's house when
this happened, w/ Dwight.
Interview Dwight Burley.

Dwight's mom (or
stepmom?) was there but asleep.

D believes Washington
+ Delvin killed the guy.
Washington - sold the guns
Delvin - blood on shoes.

001068

Asked what happ'd @ trial
that wasn't fair.
① Wit to ___ off – fire
setting – said he was 10-15'
from D @ fire @ night –
BM – said he hadn't
been shown any photos
of D. Said D shot at him 3/98.
② Female – robbed – same
week – that D held pistol
grip gun ~~in this case~~
on her – dimly lit –
wasn't shown photos.
She id'd Diles' photo @ D's trial as
being 1 of robbers.
These 4 cases were ~~not~~
filed on D.
③ BM Dejuvar Jones claimed
D pulled pistol on him +
made him return a jkt
④ Burg – A. Canfield
⑤ Julie Myers claimed D
raped her – Aaron's girlfriend
She's also slow

001069

① wearing gold chain.

① gave st - explained a guy that
played basketball had a Mustang
+ he'd driven it + ~~~~~~~ left it
@ Kmart SC. said his friend JW asked
him to drive it -

① says he had no priors.

Parents -

① Susan Diane Johnson Mom
1617 N. Peak   (H.I.P.)
D/s

② Tony Massengale -
deceased - when ?

③ GM + GF  Willie Mae Ross
deceased  + Timothy Milton Ross

Ed - 10th grade

No drug history

001070

send him release forms
+ Q'oire re backgrounds

Hearn

001071

baby faced
very dark complexion
not very intelligent - maybe
below normal
many stunts about what
could have happened,



Hearn

5/30/00
(.2)

**PHONE CALL**

For: Jan
M. LaDonna Ross
Of: LaDonna Ross
Phone: 214-762-4435
area code   number   extension
Fax #:
Message: RE: Y. Hearn
Hearns cousin
H 972/557-5276
Signed:

☑ Telephoned
☑ Returned Your Call
☑ Please Call
☑ Will Call Again
☐ Came To See You
☐ Wants To See You

SC1145

001076

5/30    Wanda Ross   214/374-1301
(.2)    aunt of Hearn   5166 Burnside Ave.
        Dls 41.
    Knows little of co Ds.
    Nick got nothing - was
    caught w/cr cards, got guns
    later from trunk later +
    sold to 3M who was present at trial. But
    no guns were produced in court.
    Thinks theres strange things in
    case - the female adult told
    lying when asked if she
    told cross if she had lied.

Case 3:12-cv-02140-D   Document 1-3   Filed 07/05/12   Page 105 of 107   PageID 459

**JAN E. HEMPHILL**
ATTORNEY AT LAW
4519 WEST LOVERS LANE
DALLAS, TEXAS 75209-3161
TELEPHONE 214/358-6466
FAX 214/358-1404

*COPY*

001090

November 15, 1999

Yokamon Laneal Hearn, #999292
Ellis I
Huntsville, TX 75743

RE: COURT OF CRIMINAL APPEALS #73,371, YOKAMON LANEAL HEARN; TRIAL
COURT #F98-46232-US, 282ND DISTRICT COURT, DALLAS COUNTY, TEXAS

Dear Mr. Hearn:

I have been appointed by Judge Karen Greene to represent you under Art. 11.071, Code of
Criminal Procedure in the above case. As you may know, this is a separate proceeding from
the direct appeal, which is being handled by Attorney Robert P. Abbott. I understand his brief
on appeal is due February 11, 2000.

The 11.071 writ of habeas corpus proceeding concerns constitutional issues in the way your
case was handled.

I will try to visit you during December. Hopefully I will be able to review part of your trial
records before coming to see you. Please let me know how to contact your family. I do not
want to make the trip to Ellis I to visit you at a time you may be having visits from family.

Yours truly,

Jan E. Hemphill

# EXHIBIT 29

A summary of Jan Hemphill's file notes indicating the time she and her investigator spent on Mr. Hearn's case between her appointment as his federal habeas counsel and the filing of Mr. Hearn's habeas petition is as follows:

| Date (H) | Stamp | Hours | Description |
|---|---|---|---|
| *From appointment (12/03/01) to filing in fed district court (03/04/02)* | | | |
| 10/08/01 | 882 | 0.20 | H read CCA opinion on direct appeal [also 1217] |
| 11/29 -11/30/01 | 594 | 1.30 | H's handwritten time (re federal habeas appointment) |
| 01/02/02 | 916 | 0.80 | H notes from Tel w/Abbott on how to do fed writs |
| 01/23/02 | 1434 | 1.00 | H mtg with Moses and Moses re jury venire issue |
| 02/12-02/13/02 | 1435 | 0.50 | H Tel with Moses & Moses re juror q'aires |
| 02/14/02 | 503 | 0.10 | H's notes from Tel with LaDonna Ross (contact with YH and case status) |
| 02/14/02 | 1436 | 0.10 | H read fax from Moses & Moses  re jury |
| 02/15/02 | 1438 | 0.20 | H read fax from Moses & Moses (memo plus race demographics) |
| 02/18-02/19/02 | 1458 | 2.00 | H  jury research on-line, census data |
| 02/20/02 | 1460 | 1.50 | H notes and tel notes re jury issue |
| 02/21/02 | 1445 | 0.50 | H mtg  with Catherine Bernhard, Public Def re juror issue/race |
| 02/21/02 | 1446 | 1.50 | H handwritten time(read emails re juror issue and SMU journal request) |
| 02/24-02/25/02 | 798 | 5.00 | H handwritten time (edit brief) |
| 02/25/02 | 752 | 1.50 | H notes on habeas rules |
| 02/26 - 03/01/02 | 756 | 8.60 | H handwritten time (notes on habeas rules and time editing fed pet) |
| 02/28/02 | 759 | 0.50 | H handwritten time (jury issue to do list) |
| 03/01/02 | 486 | 7.00 | H's handwrritten time (review jury pool research and notes and finish pet) |
| 03/02/02 | 760 | 8.40 | H handwritten time (edit brief) |
| 03/03/02 | 761 | 5.00 | H handwritten time (edit brief) |
| 03/04/02 | 762-63 | 1.55 | H handwritten time (edit brief and Tel with AG) |
| JH pre-filing Sub-total | | 47.25 | Hours |
| | | | |
| *Investigator/Expert* | | | |
| 01/23 - 04/05/02 | 739-44 | 6.50 | Moses and Moses Investigation, Invoice dated 01/06/03 ($325, 6.5 hours) |
| Investigator pre-filing Sub-total | | 6.50 | Hours |
| Expert pre-filing Sub-total | | 0.00 | Hours |